## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COGNIPOWER LLC,

      Plaintiff,

      v.

FANTASIA TRADING LLC D/B/A
ANKERDIRECT and
ANKER INNOVATIONS LIMITED,

      Defendants.

Case No.:  19-cv-02293-CFC

## JOINT CLAIM CONSTRUCTION BRIEF

Pursuant to Paragraph 16 of the Court's Scheduling Order  (D.I. 23) entered on July 30, 2020, plaintiff CogniPower LLC ("CogniPower" or "Plaintiff") and defendants Fantasia Trading LLC d/b/a AnkerDirect and Anker Innovations Limited (collectively "Fantasia" or "Defendant") hereby provide the following Joint Claim Construction Brief.

1

I.      Agreed-upon Constructions

- "selectively gate the oscillator pulses" / "selectively gates the oscillator pulses" (`031 Patent, Claims 5, 19, 23, 35, 48, 50, and 63) means "preventing or allowing one or more supplied oscillator pulses to pass a node in the circuit."

- "selectively blocks certain oscillator pulses" (`713 Patent, claims 26, 28, and 53) means "preventing or allowing one or more supplied oscillator pulses to pass a node in the circuit."

- "gating the stream of output-side pulses"  and "gating the stream of input-side pulses" (`031 Patent, claim 19) require no construction.

II.     Disputed Constructions

A.      "demand pulse" (`031 Patent, claims 1, 10, 18, and 64; `713 Patent, claims 18 and 48)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** A pulse signal that determines only when to turn on a primary switch and plays no role in determining when to turn off the switch.

1.      CogniPower's Opening Position

The claim language itself best describes how demand pulses are generated and what they are used for. No additional construction of this term is necessary. Further, because Fantasia's proposal improperly excludes preferred embodiments and unduly limits the scope of the claims it, must be rejected.

2

`031 Patent, independent claim 1 explains that demand pulses originate on the secondary-side and are "applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load." `031 Patent, independent claims 10 and 64 explain that demand pulses originate on the secondary-side and "control the switch to continue power conversion after being started by the first pulse source circuitry." `031 Patent, independent claim 18 explains the criteria for generating demand pulses on the secondary-side, that the demand pulses are applied "to an output-port side of galvanic isolation circuitry," that the demand pulses are received "at an input-port side of the galvanic isolation circuitry," and that the converter's control is "responsive to the demand pulses." `713 Patent, independent claims 18 and 48 explain that "the primary-side switch is turned on in response to the demand pulses conveyed from the secondary side."

The dependent claims go on to further detail and claim the demand pulses. For example, `031 Patent, dependent claim 2 explains that "frequency of the demand pulses is responsive to the comparison between the output port voltage or current and the reference signal." `713 Patent, dependent claim 22 explains that a demand pulse is generated "when a feedback signal based on the output port voltage or the output current is lower in magnitude than a magnitude of a reference signal such that the demand pulses regulate the output port voltage by driving the

3

feedback signal to match the reference signal." `713 Patent, dependent claim 24 explains and claims an apparatus where "the feedback from the secondary side to the primary side for regulating the output voltage or current is provided solely by the demand pulses."

In all cases, the claims themselves detail the meaning of "demand pulse." One need not look beyond the claims to understand what a demand pulse is and how it is used. Because the claims themselves offer the best explanation of the meaning of "demand pulse," no further construction is necessary. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention").

Fantasia's proposed construction introduces additional limitations that unduly narrow the scope of the claims and exclude preferred embodiments. First, the proposal's inclusion of the phrase "plays no role in determining when to turn off the switch" contradicts certain claims and embodiments described in the specification. While a demand pulse does not *determine* when to turn off the switch, it may nevertheless *play a role* in that determination.

For example, `031 Patent, claims 29, 35, 42, 48, 57, and 63 and `713 Patent, claims 45, 49, 58, and 61 all claim a controller on the primary/input side that establishes a maximum duration for the switch to stay on. The specification also

describes exemplar circuitry on the primary side that sets this maximum ON time for the primary-side switch. *See, e.g.*, `031 Patent, 7:23-37. Because the primary-side controller may implement such a maximum ON time, the primary-side controller's receipt of a demand pulse from the secondary side may *play a role* in determining when to turn off the primary-side switch. Indeed, in an embodiment with a maximum ON time, the primary-side controller will turn off the switch within at most a time period triggered by the arrival of a demand pulse, although it may turn off the switch sooner. Thus, while the primary-side controller makes the *determination* of when to turn off the primary-side switch, that determination may still be based on the time the preceding demand pulse arrived. Therefore, a demand pulse may *play a role* in the primary-side controller's determination of when to turn off the primary-side switch. Adopting Fantasia's proposed construction would read-out claims and exclude embodiments shown in the specification and must be rejected. *Vitronics*, 90 F.3d at 1583 (a claim construction that excludes a preferred embodiment "is rarely, if ever, correct").

Further, Fantasia's inclusion of the word "only" in its proposal ("determines *only* when to turn on a primary switch") is unduly limiting. There is nothing in the independent claim language that prevents a power converter from using demand pulses to perform other functions in addition to turning on the power switch. Unless explicitly stated, the claims do not exclude from their scope a power

converter that uses pulses from the secondary side to implement other functionality in addition to turning on the primary switch.

Fantasia's inclusion of the term "signal" only adds confusion to a term whose meaning is already apparent from the claims. It is unclear what difference in meaning, if any, Fantasia intends between the word "pulse" and the phrase "pulse signal." In any event, the claims use the word "pulse," not the phrase "pulse signal," and there is no benefit or justification for injecting this additional language into the claims.

In this case, the claims themselves explain what a demand pulse is and how it is used. No further construction of the term is required. *See Vitronics*, 90 F.3d at 1582. Further, because Fantasia's proposal improperly excludes preferred embodiments and limits the scope of the claims it, must be rejected.

### 2.      Defendants' Answering Position

CogniPower's argument directly contradicts what it told the Patent Office in order to secure allowance of the claims.  CogniPower forgets that a patent involves a bargain between the applicant and the government—representing the public—in order to secure a limited monopoly, and that patentees are bound by what they tell the Patent Examiner.  In addition, CogniPower is wrong that the meaning of "demand pulse" is apparent from the rest of the claims (such that the phrase "demand pulse" is mere surplusage), and also wrong that Defendants' construction

6

is inconsistent with the patent specification.  Finally, CogniPower invites legal error by suggesting that no construction is necessary when the Federal Circuit requires the Court to resolve claim construction disputes.

Beginning with the prosecution history, the Examiner rejected CogniPower's proposed claims in April 2018, finding them invalid over prior art by Szepesi.  *See* Ex. L ('713 Prosecution History) 4/10/18 Rejection at 7-8 (finding Szepesi "comprises a secondary-side inductor (at TR2) configured to be magnetically coupled to the primary-side inductor to convey the demand pulses from the secondary side to the primary side").[1]  In response, CogniPower argued that Szepesi "does not teach or even suggest the secondary-side generation of demand pulses as that term is used in the '152 patent" because the pulses identified by the Examiner "determine[] both when to turn on and when to turn off the primary-side switch," rather than determining only when to turn on the primary switch and playing no role in determining when to turn it off.  *See* Ex. L ('713 Prosecution History) 4/24/18 Amendment at 11 (emphasis in original).  This understanding of, and limitation on, "demand pulse" is at the heart of Defendants' construction.

---

[1] The '713 Patent is a continuation of the '031 Patent, which means they share the same specification.  Statements made during the prosecution of a continuation application are also relevant to construction of the parent patent.  *E.g.*, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).

59788/0001-40134382v1

A few months later, CogniPower was even clearer during an Examiner interview.  There, CogniPower said "Szepesi's PWM pulses are <u>not</u> demand pulses—demand pulses only turn ON a primary-side switch."  *See* Ex. L ('713 Prosecution History) 11/6/18 Interview Summary Agenda at 3 (emphasis in original); *see also id.* at 4 ("• Feedback (i.e., demand pulses) do <u>not</u> control ON/OFF time of switch 200a • Demand pulses control <u>only</u> ON time of switch 200a • OFF time of switch 200a is controlled solely by primary side") (emphasis in original).

As prosecution continued, CogniPower continued to emphasize this point.  It later told the Examiner that "the feedback in Fig. 1 [of CogniPower's patent] consists of demand pulses that are generated on the secondary side of the power converter and conveyed to the primary side.  Furthermore, those demand pulses do <u>not</u> control both the ON and OFF times of switch 200a.  Rather, the demand pulses control <u>only</u> the ON times of switch 200a, <u>not</u> the OFF times. The OFF times of switch 200a are controlled by circuitry on the primary side of the power converter of Fig. 1."  *See* Ex. L ('713 Prosecution History) 1/2/19 Amendment at 15 (emphasis in original); *see also id.* at 16, 31.  Co-inventor Thomas Lawson even submitted a declaration saying the same thing:

> Referring to the power converter of Fig. 1 of the '152 patent, the
> feedback signal conveyed to transformer winding (102a) is <u>not</u> a
> generic voltage.  Rather, the feedback in Fig. 1 consists of demand
> pulses that are generated on the secondary side of the power converter

and conveyed to the primary side.  Furthermore, those demand pulses do <u>not</u> control both the ON and OFF times of switch 200a.  Rather, the demand pulses control <u>only</u> the ON times of switch 200a, <u>not</u> the OFF times.  The OFF times of switch 200a are controlled by circuitry on the primary side of the power converter of Fig. 1.

Ex. L ('713 Prosecution History) 1/2/19 Lawson Dec. at ¶ 4 (underlining in original); *see also id.* at ¶¶ 6, 55.

Finally, in August 2019, CogniPower drove home the point one last time and convinced the Examiner to allow the claims by saying the following in response to the Examiner's high-level description of CogniPower's invention in his penultimate Office Action:

> **The Applicant submits that these are <u>not</u> accurate characterizations of the power converter of Fig. 1.**  First of all, the feedback signal conveyed to transformer winding (102a) is <u>not</u> a generic voltage.  Rather, the feedback in FIG 1 consists of demand pulses that are generated on the secondary side of the power converter and conveyed to the primary side.  Furthermore, **those demand pulses do <u>not</u> control both the ON and OFF times of switch 200a. Rather, the demand pulses control <u>only</u> the ON times of switch 200a, <u>not</u> the OFF times.**  The OFF times of switch 200a are controlled by circuitry on the primary side of the power converter of FIG 1.
>
> . . .
>
> Applicant submits that stating that secondary-side circuitry controls "the ON/OFF time" of a primary-side switch, when, in fact, that secondary-side circuitry controls <u>only</u> the ON time of that primary-side switch and <u>not</u> the OFF time is clearly <u>not</u> "a broad overview of the claimed invention," but is rather an <u>inaccurate</u> description of "the specific details of the converter."

*See* Ex. L ('713 Prosecution History) 8/2/19 Amendment at 11-12 (underlining in

original, bold added).  The co-inventor, Mr. Lawson, submitted another declaration

emphasizing this point:

> These are <u>not</u> accurate characterizations of the power converter of Fig. 1.  First of all, the feedback signal conveyed to transformer winding (102a) is <u>not</u> a generic voltage.  Rather, the feedback in FIG. 1 consists of demand pulses that are generated on the secondary side of the power converter and conveyed to the primary side.  Furthermore, those demand pulses do <u>not</u> control both the ON and OFF times of switch 200a.  Rather, the demand pulses control <u>only</u> the ON times of switch 200a, <u>not</u> the OFF times.  The OFF times of switch 200a are controlled by circuitry on the primary side of the power converter of FIG. 1.
>
> . . .
>
> On page 6, the Examiner stated that the Examiner's previous summary of the invention (in the office action dated 10/03/18) "provides a broad overview of the claimed invention rather than describing <u>the</u> specific details of the converter argued above."  Stating that secondary-side circuitry controls "the ON/OFF time" of a primary-side switch, when, in fact, that secondary-side circuitry controls <u>only</u> the ON time of that primary-side switch and <u>not</u> the OFF time is clearly <u>not</u> "a broad overview of the claimed invention," but is rather an <u>inaccurate</u> description of "the specific details of the converter."

Ex. L ('713 Prosecution History) 8/2/19 Second Lawson Dec. at ¶¶6, 8

(underlining in original).

Two weeks later, the Examiner allowed the claims.  *See* Ex. L ('713

Prosecution History) 8/16/19 Notice of Allowance.

CogniPower mentions none of this prosecution history in its argument.  Yet

it is black letter law that patentees are bound by representations they make to the

10

Patent Office in order to secure allowance.  For example, the Federal Circuit

explained this rule in the case of *Krippelz v. Ford Motor Co.*:

> Mr. Krippelz's statements are of course now part of the intrinsic record.  Taking them into account, we agree with the district court that the term "conical beam of light," as used in the '903 patent and in light of Mr. Krippelz's arguments during reexamination, incorporates limitations as to the shape of the reflector and the positioning of the light source relative to it.  **As a result of these statements, Mr. Krippelz disclaimed lamps lacking these limitations, and the limitations therefore became part of the properly construed claims.**  As the district court properly concluded, Mr. Krippelz's claimed invention thus requires (1) a reflector having a focal point, such as a parabolic or elliptical reflector, and (2) positioning of the light source at or near the reflector's focal point.  We therefore affirm the district court's construction of "conical beam of light."

667 F.3d 1261, 1267 (Fed. Cir. 2012) (emphasis added).  Put another way, "[a]

patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and

another to find infringement."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239

F.3d 1343, 1351 (Fed. Cir. 2001).  Yet that is exactly what CogniPower is

attempting to do: tell the Patent Office one thing to obtain the claims, and then tell

the Court the opposite in an attempt to prove infringement.[2]

CogniPower's argument that Defendants' proposed construction—which

was CogniPower's construction during prosecution—is somehow inconsistent with

---

[2] Infringement is not yet before the Court, but the Court should be aware that CogniPower's position during prosecution should establish non-infringement. CogniPower has reversed course after securing allowance of its claims in order to urge infringement.

59788/0001-40134382v1

the patent specification is also belied by what CogniPower told the Examiner.

CogniPower specifically told the Examiner that its interpretation of demand pulses

was supported by "Fig. 1" of its patent. *See* Ex. L ('713 Prosecution History)

1/2/19 Amendment at 15. CogniPower also told the Examiner that it would be an

"inaccurate description of 'the specific details of the converter'" to say that

demand pulses control ON/OFF rather than just ON. *See* Ex. L ('713 Prosecution

History) 8/2/19 Amendment at 11-12 (citing Fig. 1 and switch 200a in its patent

specification).

     In other words, even if there is a maximum ON time in the embodiment of

Figure 1, as CogniPower now argues, CogniPower's statements to the Examiner

confirm that OFF time is still "controlled solely" by the primary side. *See* Ex. L

('713 Prosecution History) 11/6/18 Interview Summary Agenda at 4. The Court

should recognize CogniPower's about-face for what it is. In addition,

CogniPower's current position is pure attorney argument, whereas its position

during prosecution was supported by the sworn testimony of inventor Lawson in

two separate declarations. *See* Ex. L ('713 Prosecution History) 1/2/19 Lawson

Dec. at ¶¶ 4, 6, 55; Ex. L ('713 Prosecution History) 8/2/19 Second Lawson Dec.

at ¶¶ 6, 8.

     CogniPower's further argument that "the claims themselves detail the

meaning of 'demand pulse'" is not only an attempt to ignore the prosecution

history, but also makes the phrase "demand pulse" meaningless. If the rest of the claim sufficiently defines "demand pulse," then "demand pulse" could be replaced with "thing" without changing the meaning of the claim. Yet this argument is contrary to the presumption that all claim terms must have meaning. *E.g.*, *Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc.,* 381 F.3d 1111, 1119 (Fed. Cir. 2004) (rejecting construction that "reads the term 'operatively' out of the phrase 'operatively connected'" because "all claim terms are presumed to have meaning in a claim"). And CogniPower's litigation argument is again at odds with what CogniPower said during prosecution, where it never once directed the Examiner to the balance of the claim language to define the meaning of demand pulse.

Finally, CogniPower's position that "demand pulse" requires no construction invites legal error. The Federal Circuit has been clear that "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (vacating jury verdict where jury was left to decide disputed claim meaning). In this case, CogniPower does not cite any evidence that "demand pulse" *has* an ordinary meaning to one of skill in the art, and it never suggested to the Examiner that the term had such an ordinary meaning. Instead, it is a term created by the patentee. It thus requires construction. *See O2*

13

*Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); *see also Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1346-48 (Fed. Cir. 2019) (ordering new trial where disputed claim construction left to jury); *In re Mobile Telecomms. Techs., LLC*, 265 F. Supp. 3d 454, 467 (D. Del. 2017) ("Because the Court finds that the term has more than one ordinary meaning, and the parties present a genuine dispute, a construction other than an unspecified plain and ordinary meaning is required.").

If CogniPower's plan is to reveal its real claim construction in its reply—when Defendants have only a few words to respond—that is improper sandbagging.  And if CogniPower intends to reveal its real position later in the case (*e.g.*, in its expert report or at trial), that is even worse.  It will waste the Court's time and be fundamentally prejudicial to Defendants.

The Court should therefore adopt Defendants' proposed construction, both because it is firmly rooted in the intrinsic record and because CogniPower has failed to offer a timely alternative.

14

3.      Plaintiff's Reply Position

*O2 Micro* does not require a court to construe every term a defendant wishes

to rephrase, but rather requires a court to construe terms where there is a genuine

dispute regarding the scope of the term at issues:

> It is clear from *O2 Micro* that district courts have a duty to resolve
> disputes between the parties regarding the scope of claims. However,
> nothing in *O2 Micro* requires district courts to serve as all-purpose
> dictionaries. Any word or phrase in a claim can be rephrased in terms
> of other words. But, absent a true dispute regarding the *scope* of the
> word or phrase, district courts are not required to step in and paraphrase
> each claim term. The Federal Circuit recognized as much in *O2 Micro*,
> noting that "the district court failed to resolve the parties' dispute
> because the parties disputed not the *meaning* of the words themselves,
> but the *scope* that should be encompassed by [the] claim language."

*Star Envirotech, Inc. v. Redline Detection, LLC, No.*, 2015 WL 12743875, at *3

(C.D. Cal. Apr. 30, 2015) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

*Co.*, 521 F.3d at 1361). Further, "[i]n some instances, *disputes as to the scope of*

*claim terms can best be resolved simply by rejecting a proposed alternative*

*definition in favor of the claim language itself.*" *Id.* (emphasis added).

Here, it appears the parties only truly dispute whether a demand pulse can

"play a role" in determining when to turn off the switch. Fantasia's entire argument

is a prosecution history estoppel argument based on statements that do not say

what Fantasia claims. Because there is no basis for prosecution history estoppel,

this Court should simply reject Fantasia's proposal in favor of the original claim

language. *See id.*

15

Fantasia's argument is premised on the false equivalence it draws between the phrases "*plays no role in determining* when to turn off the switch"—used in its proposed construction—and the phrase "*does not determine/control* when to turn off the switch." Indeed, CogniPower did explain to the PTO that Szepesi "does <u>not</u> teach or even suggest the secondary-side generation of demand pulses as that term is used in the `152 patent" because the pulses identified by the Examiner "determine[] <u>both</u> when to turn on <u>and</u> when to turn off the primary-side switch." Ex. L, `713 Prosecution History, 4/24/2018, Amendment, p. 11 (emphasis in original). But CogniPower has never taken the position before the PTO that a demand pulse "plays no role in determining when to turn off the switch" as suggested by Fantasia. Indeed, Fantasia has not cited a single passage of the prosecution history where CogniPower has taken that position because it can't.

Any argument that these two phrases are equivalent is disingenuous. In Section H of its Response, Fantasia argues:

> Turning on the switch ***depends upon*** "other demand pulses" because the generation of demand pulses is a continuous process performed in response to a closed feedback loop. In other words, because the output is regulated in a closed loop, and the demand pulses are the feedback, the turn on timing in any given cycle will be dependent on the prior stream of previous feedback demand pulses.

Fantasia Response, Section H (emphasis in original). Further, in Section I of its Response, Fantasia asserts that "'[p]lays no role' and 'is dependent solely on' refer to the same concept." In other words, under Fantasia's view of cause and effect,

16

prior actions that do not directly determine an outcome may nevertheless "depend upon" or "play a role" in that outcome.

Under that view, and as previously explained by CogniPower, while a demand pulse does not *determine* when to turn off the switch, it may nevertheless *play a role* in that determination as illustrated by certain claims and the specification's exemplar primary-side circuitry that sets a maximum ON time for the primary-side switch. *See* CogniPower's Opening, Section A. In an embodiment with a maximum ON time, the primary-side controller will turn off the switch within at most a time period triggered by the arrival of a demand pulse, although the primary-side controller may turn off the switch sooner. Thus, while the primary-side controller makes the *determination* of when to turn off the primary-side switch, that determination may still be based on the time the preceding demand pulse arrived. Therefore, a demand pulse may *play a role* in the primary-side controller's determination of when to turn off the primary-side switch. Because Fantasia's proposed construction would read-out claims and exclude embodiments shown in the specification, its construction must be rejected. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a claim construction that excludes a preferred embodiment "is rarely, if ever, correct").

Fantasia' argument in favor of its proposed claim construction is in essence a prosecution history estoppel argument premised on statements that do not appear

in the prosecution history. Fantasia's claim that its proposed construction "was CogniPower's construction during prosecution" is verifiably false. Fantasia's proposed construction appears nowhere in the prosecution history. In an effort to support its claim, Fantasia simply quotes things and then asserts that they mean something different. For example, Fantasia relies on the following quote from the prosecution history in an effort to argue that its claim construction "was CogniPower's construction during prosecution":

> In response, the Applicant submits that stating that secondary-side circuitry **controls** "the ON/OFF time" of a primary-side switch, when, in fact, that secondary-side circuitry **controls** only the ON time of that primary-side switch and not the OFF time is clearly not "a broad overview of the claimed invention," but is rather an inaccurate description of "the specific details of the converter."

Ex. L, `713 Prosecution History, 8/2/19 Amendment at 11-12 (emphasis added). This passage does not say that the secondary-side circuitry "*plays no role* in determining when to turn off the switch"; it says that the secondary-side circuitry does not **control** when to turn off the switch.

Had Fantasia proposed a construction that read "[a] pulse that determines only when to turn on a primary switch and not when to turn off the switch," CogniPower would find such a proposal unnecessary but reasonably accurate. Instead, Fantasia chose to make a prosecution history estoppel argument that is without foundation in a transparent attempt to avoid infringement. *See* Fantasia's Response, Section A, n.2.

18

Because Fantasia has not shown any valid basis for limiting the scope of the claims, this Court should simply reject Fantasia's proposal in favor of the original claim language.

### 4.     Defendants' Sur-reply Position

By continuing to advocate for "no construction," CogniPower would have the Court hold that CogniPower's many clear disclaimers have *no effect whatsoever* on the meaning of the claims.  This cannot be correct.  Moreover, CogniPower's remarkable assertion in its reply (Section I) that "it has never taken the position that 'when the primary switch turns off in any given cycle is dependent solely on inputs generated on the primary side'" *directly contradicts* the intrinsic record.  In fact, CogniPower told the Examiner "OFF time of switch 200a is controlled **solely** by primary side."  Ex. L ('713 Prosecution History) 11/6/18 Interview Summary Agenda at 4 (emphasis added).

If the OFF time is controlled *solely* by the primary side, as CogniPower represented, that means the secondary side can *play no role*.  That is what "solely" means.  Given there is no dispute that "demand pulses" are generated on the secondary side, that means demand pulses can play no role in turning off the switch.  *See* Ex. L ('713 Prosecution History) 1/2/19 Amendment at 15 ("the feedback in Fig. 1 [of CogniPower's patent] consists of demand pulses that are generated on the secondary side").

19

CogniPower attempts to sidestep its clear and repeated disclaimers by citing the specification's discussion of maximum ON time.  However, there is no contradiction.  If there is a maximum ON time, that sets a limit on when the primary side must turn off the switch based on the *fact* that the switch turned on, *not* based any secondary-side signal, including demand pulses.  This is why CogniPower told the Examiner it would be "inaccurate" to characterize the *patent specification* as featuring secondary-side demand pulses that control OFF time, rather than just ON time.  *See* Ex. L ('713 Prosecution History) 8/2/19 Amendment at 11-12.  Thus, CogniPower is wrong that Defendants' construction would "exclude embodiments" or "read-out [unidentified] claims."

CogniPower is also wrong that Defendants' argument is "premised on statements that do not appear in the prosecution history."  Defendants rely on quotes from the prosecution history, accurately reproduced in their brief and also in the cited record.  Furthermore, CogniPower ignores that its current position is pure attorney argument, whereas its prosecution position was supported by the sworn testimony of inventor Lawson.  *See* Ex. L ('713 Prosecution History) 1/2/19 Lawson Dec. at ¶¶ 4, 6, 55; Ex. L ('713 Prosecution History) 8/2/19 Second Lawson Dec. at ¶¶ 6, 8.

The prosecution history also confirms that having a maximum ON time is irrelevant to defining "demand pulse."  This is because the prior art CogniPower

20

was distinguishing, Szepesi, *also* discloses maximum ON time (or "duty cycle limit"). *See* Ex. R (U.S. patent 5,498,995 to Szepesi) at 6:59-67. Yet what CogniPower told the Examiner is that Szepesi "does not teach or even suggest the secondary-side generation of demand pulses as that term is used in the '152 patent" because the pulses in Szepesi identified by the Examiner "determine[] <u>both</u> when to turn on <u>and</u> when to turn off the primary-side switch," rather than determining only when to turn on the primary switch and playing no role in determining when to turn it off. *See* Ex. L ('713 Prosecution History) 4/24/18 Amendment at 11 (emphasis in original). In other words, Defendants' proposed construction is very much driven by the concessions that CogniPower made during prosecution to secure allowance.

Finally, as Defendants' feared, CogniPower waited until its reply to propose a construction other than "no construction necessary." It now suggests construing "demand pulse" as "[a] pulse that determines only when to turn on a primary switch and not when to turn off the switch." This proposal not only violates this Court's disclosure requirements, but also fails to capture the full import of CogniPower's disclaimers. That is because CogniPower's construction would permit a demand pulse to play a role in turning off the switch so long as it does not "determine" when to turn off the switch. Such a construction does not fully capture the meaning of CogniPower's clear disclaimer that "OFF time" is

controlled "solely" by the primary side.  Ex. L ('713 Prosecution History) 11/6/18

Interview Summary Agenda at 4.  The primary side cannot "solely" determine OFF

time if a secondary-side demand pulse is allowed to play any role.  Thus, only

Defendants' proposed construction captures the true meaning of "demand pulse"

that CogniPower articulated during prosecution.

     B.     "rectifier [] poled to charge [a] capacitor during forward pulses"
               ('031 Patent, claims 1 and 10; '713 Patent, claims 18 and 48)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** A diode that converts alternating current
to direct current and which is oriented to allow current to flow through
it to the capacitor whenever the primary power switch is on during a
switching cycle.

     1.     CogniPower's Opening Position

The phrase "rectifier poled to charge a capacitor during forward pulses" is

well understood by those skilled in the art and requires no further construction. In

contrast, Fantasia's proposal is inaccurate and narrower than the term's plain and

ordinary meaning. As discussed below, Fantasia's proposed construction

improperly limits the claimed rectifier to a diode and incorrectly ties the operation

of the claimed rectifier to other elements and operations of the recited power

converter.

First, as explained by a number of patents that appear on the face of the '031

and '713 Patents, a rectifier can be built with electronic components other than a

diode. *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence"). While a rectifier *can* be built using a diode, a rectifier *can also* be built using other components like a transistor. One of ordinary skill in the art knows this. For example, U.S. Patent No. 9,246,392, cited on the face of the Patents-in-Suit, explains that a rectifier can be built from a diode or a transistor used as a synchronous rectifier:

> In the example illustrated in FIG. 1, the rectifier D1 114 is exemplified as a diode . . . . In some examples, the rectifier D1 114 may be a transistor used as a synchronous rectifier.

Ex. A, U.S. Patent No. 9,246,392, 4:35-45. U.S. Patent Application No. 2005/0254266A1, also cited on the face of the Patents-in-Suit, further explains the well-known technique of synchronous rectification:

> A synchronous rectifier is a type of switch that is significantly more efficient than a diode. . . . A synchronous rectifier is typically a MOSFET (metal-oxide-semiconductor field-effect transistor) and bypass diode embedded within the same silicon structure. In comparison to the 0.15 to 0.45 voltage drop of a Schottky diode, the voltage drop across a MOSFET during conduction is typically less than 0.1 volt. A MOSFET is a three terminal device in which a current will flow between a source terminal and a drain terminal if a control signal is applied to a gate terminal . . . The MOSFET stops conducting and acts like an open circuit when the control signal is removed from the gate.

Ex. B, U.S. Patent Application No. 2005/0254266A1, [0012].

As shown below, numerous patents cited during the prosecution of or on the face of the Patents-in-Suit illustrate that one of ordinary skill in the art understands that the term "rectifier" encompasses a class of circuit topologies beyond simply "a diode":

> The, rectifier may be a diode or another sort of rectifier, such as an active rectifier/synchronous rectifier.

Ex. C, EP 2717449 at [0007].

> A synchronous rectifier is sometimes used instead of a diode in the output winding of a switching power supply because the voltage across a MOSFET can be significantly less than the voltage across a diode when conducting current.

Ex. D, U.S. Patent Application No. 2010/0157630A1, [0062].

> Although power converter 100 includes synchronous rectification circuit 132, in some examples, power converter 100 may include a passive rectification component, such as a diode, instead of synchronous rectification circuit 132.

Ex. E, U.S. Patent No. 9,178,411, 8:40-59.

> In one example, the first rectifier D1 126 is a diode. However, in some examples, the first rectifier D1 126 may be a transistor used as a synchronous rectifier.

Ex. F, U.S. Patent No. 10,008,942, 3:66-4:11.

> Synchronous rectification utilizes a MOSFET (metal oxide semiconductor field effect transistor) that is switched to behave like a rectifier, in place of an output rectifier diode, to reduce voltage drop and power loss.

Ex. G, U.S. Patent No. 9,035,435, 10:16-34.

Further, Fantasia's proposal ignores the fact that certain claims were broadened during prosecution. Claims that initially included a "diode" and a "rectifier" were broadened to clarify that the rectifier was a "first rectifier" and replace the "diode" with a "second rectifier . . . different form the first rectifier." *See* Ex. H, `031 Prosecution History, April 5, 2016, Preliminary Amendment for Broadening Reissue Application, pp. 7, 14 (submitting a new claim 28 that broadened from the `152 Patent's original claim 9 as described above); Ex. I, `031 Patent, March 23, 2018 Amendment, pp. 2-4, 13 (merging the limitations of new claim 28 into independent claims 1 and 10 of the `031 Patent and explaining that "diode" was changed to "second rectifier," and "first" was added to the original rectifier).

Significantly, the patentees made explicitly clear that a rectifier was *not* merely a synonym for diode in responding to the Examiner's Statement of Reasons for Allowance (the "Statement"). *See* Ex. J, `031 Prosecution History, April 20, 2018 Comments on Statement of Reasons for Allowance. In the Statement, the examiner stated that "[t]he prior art of record fails to teach or reasonably suggest the claimed switched-mode power conversion apparatus including in particular a second rectifier (diode and capacitor) galvanically connected to the secondary winding." *Id.* Because it was unclear whether the examiner viewed the terms "diode" and "rectifier" to be synonymous, the patentees explained to the examiner

that "neither independent claim 1 nor independent claim 10 recites that the second rectifier is a diode and a capacitor." *Id.* Patentees also explained that "to the extent that the Statement differs from the language of any of the independent claims, the Applicant rejects any narrowing or limitations that might possibly result from such differences." *Id.* Patentees received their Issue Notification on August 21, 2018 without any objection from the Examiner. Ex. K, `031 Prosecution History, August 21, 2018 Issue Notification.

The remainder of Fantasia's proposed construction is not accurate and does not capture the meaning of the disputed phrase. Specifically, Fantasia's inclusion of the word "whenever" deviates from the scope claim language and is technically inaccurate. The claimed rectifier (be it one built with a diode or a synchronous rectifier) would not "allow current to flow through it . . . *whenever* the primary power switch is on during a switching cycle," nor do the claims require this. As explained in the specification, "[p]ower for pulse generation circuitry may be rectified from either forward pulses, from flyback pulses, or both, appearing across one or more power transformer windings." `031 Patent, 10:1-4. "Forward pulses, of opposite polarity to the flyback pulses, occur while MOSFET 200a is ON." `031 Patent, 2:63-65. "MOSFET 200a" is an example of the "the primary power switch" in Fantasia's proposal. The instant the "primary power switch" is turned on the voltage across the transformer's secondary winding does not appear

26

instantaneously but rather will rise over some period of time. *See, e.g.*, Ex. B, U.S. Patent Application No. 2005/0254266A1, [0051] (generally explaining that the voltage across the secondary winding "does not rise instantly; instead, it rises with a delay that defines an upward sloping line"). But a diode, for example, will only begin to conduct current after the voltage drop across it meets a certain threshold. *See generally* Ex. B, U.S. Patent Application No. 2005/0254266A1, [0010], [0012]-[0014] (explaining the forward voltage drop of diode). Thus, there could be some period of time when the "primary power switch" is on but the rectifier is not conducting. Similarly, in the case of synchronous rectification, the control signal can be asserted and de-asserted such that there is not perfect synchronization between the "primary power switch" and the synchronous rectifier. *See generally id.* at [0051] (explaining that "[t]he control signal Vs for the synchronous rectifier SR is enabled if the voltage V becomes greater than the threshold Voltage V"). Further, if the capacitor is already fully charged, then current will not flow through the rectifier to the capacitor.

Fantasia's use of the word "whenever" appears to require complete simultaneity between conduction in the rectifier and switching of the "primary power switch," but this requirement would narrow the claim scope and is not how the claimed rectifier works. Instead, the actual phrase at issue states that the "rectifier [] is poled to charge the capacitor *during* forward pulses." The use of the

27

word "during" simply requires that the rectifier charge the capacitor at some point between the time the forward pulse beings and ends.

There is simply no need to replace a short phrase that has a well-understood meaning to one of ordinary skill in the art with a lengthy and inaccurate sentence that wholly fails to adequately capture that meaning. *See Star Envirotech, Inc. v. Redline Detection, LLC*, No. SACV1201861JGBDFMX, 2015 WL 12743875, at *3 (C.D. Cal. Apr. 30, 2015) (noting that "[w]hen claim language does not depart from the ordinary meaning of its terms, no paraphrase—however artful—will capture the meaning of those terms as precisely as the terms themselves").

Because Fantasia's proposed construction improperly limits the plain and ordinary meaning of the term "rectifier," deviates from the scope of the claims, and is otherwise inaccurate and unhelpful, the Court should reject Fantasia's proposal.

### 2.   Defendants' Answering Position

CogniPower again invites error by advocating "no construction," and again refuses to reveal its own proposed construction.

CogniPower's criticism of Defendants' construction also neglects the intrinsic evidence, starting with the claim language itself.  In arguing that a "rectifier" can include a transistor acting as a "synchronous rectifier," CogniPower ignores the rest of the claim phrase at issue:  "poled to charge [a] capacitor during forward pulses."  CogniPower does not discuss the meaning of "poled" at all, or

28

explain how it could possibly apply to a transistor—it cannot—yet the term is critically important in revealing why CogniPower's position is wrong.

CogniPower argues that "[w]hile a rectifier can be built using a diode, a rectifier can also be built using other components like a transistor." As support, it cites prior art—*not* its own patent—saying things like "rectifier D1 114 may be a transistor used as a synchronous rectifier." Yet none of CogniPower's cited prior art discusses "poled" rectifiers, as claimed, and none suggests that a transistor can be poled.

How the claimed rectifier is poled was also a key point during prosecution. For example, CogniPower told the Examiner that prior art "Zhu's rectifier 313[3] is **poled** to charge Zhu's capacitor 314 during <u>flyback</u> pulses, <u>not</u> during <u>forward</u> pulses, of Zhu's power converter 300, as those terms would be understood by those skilled in the art and as those terms are explicitly defined in the '152 patent." Ex. L ('713 Prosecution History) 8/2/19 Amendment at 17 (underlining in original, bold added); *see also id.* at 17 (similar description of Szepesi prior art), 23 (further discussing the importance of poles); Ex. L ('713 Prosecution History) 8/2/19 Second Lawson Dec. at ¶ 28 (re Zhu), ¶¶ 31-33 (re Szepesi); Ex. L ('713

---

[3] It is worth noting that during prosecution, every reference to "rectifier"—both by the examiner and the patentee—corresponded to a "diode", in discussing both the patent specification and the prior art references. There was never a suggestion that "rectifier poled to charge" had a broader meaning. *See generally* '031 and '713 prosecution histories.

Prosecution History) 7/16/19 Interview Summary at 2 ("Specifically, Applicant argued that Zhu and Zsepesi fails to teach a first rectifier (500a) **poled** to charge a first rectifier [sic capacitor] (501a) during forward power converter pulses of the flyback converter as shown in Fig. 3 of the invention (US 9,071,152 B2).") (emphasis added).

The prosecution history also makes clear that both CogniPower and the Examiner understood that the poled rectifier in the claims is a diode.  Indeed, in the Reasons for Allowability of the '031 patent, the Examiner expressly equated the claimed second rectifier with a "diode and capacitor."  Ex. M ('031 Prosecution History) 4/11/18 Notice of Allowability at 3.  CogniPower responded by noting only that the capacitor was an ***additional*** component added to the rectifier, but it did not deny the rectifier was a diode:  "Independent claims 1 and 10 both recite 'a capacitor and a second rectifier ***both*** galvanically connected to the secondary winding.'  The Applicant notes that neither independent claim 1 nor independent claim 10 recites that the second rectifier ***is*** a diode ***and*** a capacitor."  Ex. M ('031 Prosecution History) 4/20/18 Comments on Statement of Reasons for Allowance at 1 (emphasis added).

Thus, the intrinsic evidence confirms that a poled diode is required.  The issue is not whether the word "rectifier" can be used in some contexts to describe both a diode and a transistor used as synchronous rectifier.  The word "poled,"

which CogniPower ignores, can apply only to rectifiers that are diodes and is thus dispositive.[4]

Finally, with one exception, CogniPower does not take issue with the rest of Defendants' proposed construction, which explains what "poled to charge [a] capacitor during forward pulses" means: the claimed rectifier converts alternating current to direct current and is oriented to allow current to flow through it to the capacitor whenever the primary power switch is on during a switching cycle. *See*, *e.g.*, Ex. N ('031 Patent) at 6:7-9 ("As in FIG. 1, forward pulses on the secondary winding of transformer 100c charge a capacitor 501c through a diode 500c."); *id.* 9:28-31 ("The converter may comprise one or more auxiliary rectifier circuits which may be poled as forward converters.  The converter may be powered by a rectifier circuit to provide an AC/DC converter."); Ex. L ('713 Prosecution History) 1/2/19 Amendment at 29 ("An isolated flyback power converter has a primary side and a secondary side separated by a power transformer.  A primary-side switch is turned on and off to selectively allow DC input power to be applied

---

[4] In the related *Power Integrations* case (Case No.: 20-cv-00015-CFC)*,* CogniPower has taken the opposite position that "rectifier" by itself *does not encompass a* "synchronous rectifier."  In that case, CogniPower cited the Morong patent as prior art.  The Morong patent discloses "[a] diode 300a and a capacitor 301a form a rectifier circuit."  *See* Ex. O (U.S. Patent No. 9,071,152) at 2:40.  Even so, CogniPower does not assert that Morong's "rectifier" discloses a "synchronous rectifier."  Instead, CogniPower relies upon an additional reference, *combined* with Morong, to argue only that a synchronous rectifier would be *obvious*.  *See* Ex. P (20-cv-00015 CogniPower Invalidity Contentions Ex. A) at 1.

to the primary-side winding of the power transformer in order to regulate the power converter's output.  In an isolated flyback power converter, ***a forward power pulse occurs when the primary-side switch is closed***, which allows energy to be stored in the power transformer.  A flyback power pulse occurs when the primary-side switch is opened, which causes energy stored in the power transformer to appear at the power transformer's secondary-side winding and be rectified by a secondary-side rectifier for presentation at the power converter's output port as a regulated voltage or current, where the secondary-side rectifier is connected in series with the output port and where regulation implies the maintenance of a desired voltage or current level at the output port.  In an isolated flyback power converter, ***current flows through the power transformer's secondary-side winding only in one direction during a forward power pulse and only in the other direction during a flyback power pulse***.");  *see also* Ex. L ('713 Prosecution History) 1/2/19 Lawson Dec. at ¶ 42.[5]

CogniPower's one complaint is that "during" should not be construed as "whenever" but instead as "at some point between the time the forward pulse

---

[5] As explained in the intrinsic record, ***opening*** the primary-side switch means turning it ***off***.  ***Closing*** the primary-side switch means turning it ***on***.  *E.g.*, Ex. L ('713 Prosecution History) 7/18/19 Applicant Interview Summary at 1.  In other words, "closing the switch" means making an electrical connection that allows current to flow, like a light switch, whereas "opening the switch" means making a gap that prevents current flow (and turns the light off).

begins and ends."  However, "during" connotes a length of time rather than a single "point" in time.  To the extent this is ambiguous, it should be resolved by reference to the intrinsic record, which supports Defendants' position, as detailed above and again below.

The issue is the *direction* of current flow "during" forward pulses; is it always toward the capacitor during forward pulses, or just sometimes?  The answer is found in the intrinsic record.  CogniPower's present argument directly contradicts what it told the Patent Office.  What CogniPower told the Examiner was far more exacting than its litigation argument allows, and CogniPower fails to account for the position it took in order to secure allowance.  CogniPower also relies almost exclusively on attorney argument about technology, without citation to evidence.

For example, CogniPower told the Examiner that current flows "only in one direction" during a forward pulse, and "only in the other direction" during a flyback pulse.   Ex. L ('713 Prosecution History) 1/2/19 Amendment at 29.  That position directly contradicts the loose relationship CogniPower now proposes:  "at some point between the time the forward pulse begins and ends."

CogniPower's new position is also contradicted by other things it told the Examiner.  For example, it explained the following to the Examiner during an interview:

During the Interview, Examiner Deb explained that he had interpreted the term "forward pulse" to refer to the phase of power converter operation in which power is "forwarded" from the transformer to the output node.  Mr. Mendelsohn explained that the terms "forward pulse" and "flyback pulse" are known terms of art that are understood to mean the following:

• During a forward pulse, the primary-side switch is closed and power is transferred from the input port to the transformer, ***but not*** from the transformer to the output port; and

• During a flyback pulse, the primary-side switch is open and power is transferred from the transformer to the output port, ***but not*** from the input port to the transformer."

Ex. L ('713 Prosecution History) 7/18/19 Applicant Interview Summary at 2 (emphasis added).  These remarks underscore how current ***always*** flows in opposite directions during forward and flyback pulses, respectively.  There is simply no room for ***sometimes***, as CogniPower now advocates.

Critically, CogniPower also relied upon this clear division to distinguish prior art and secure allowance of its claims.  *E.g.*, Ex. L ('713 Prosecution History) 8/2/19 Amendment at 17 ("Zhu's rectifier 313 is poled to charge Zhu's capacitor 314 during <u>flyback</u> pulses, <u>not</u> during <u>forward</u> pulses, of Zhu's power converter 300, as those terms would be understood by those skilled in the art and as those terms are explicitly defined in the '152 patent.") (emphasis in original); *see also id.* at 17 (similar description of Szepesi prior art); Ex. L ('713 Prosecution History) 8/2/19 Second Lawson Dec. at ¶ 28 (re Zhu), 31-33 (re Szepesi); Ex. L ('713 Prosecution History) 7/16/19 Interview Summary at 2 ("Specifically, Applicant argued that Zhu and Zsepesi fails to teach a first rectifier (500a) poled to

34

charge a first rectifier [sic capacitor] (501a) during forward power converter pulses of the flyback converter as shown in Fig. 3 of the invention (US 9,071,152 B2).").

This Court should not permit CogniPower to back out of the deal it made with the Patent Examiner on this term, either, who was representing the public in granting CogniPower a limited patent. Instead, the Court should adopt Defendants' proposed construction, again because it is firmly rooted in the intrinsic record and because CogniPower has failed to offer a timely alternative.

### 3. Plaintiff's Reply Position

CogniPower is not "refus[ing] to reveal its own proposed construction." Rather, CogniPower believes that no additional construction of this phrase is necessary. *See* Section A above (discussing scope of duty to construe claims under *O2 Micro*).

Here, it appears the parties truly dispute only the scope of the phrase "rectifier [] poled to charge [a] capacitor during forward pulses" in two respects: (1) whether the recited rectifier should be limited to a diode, and (2) whether current must flow through the rectifier *during* the forward pulse or *whenever* the primary power switch is on during a switching cycle. Because there is no basis for limiting the term "rectifier" to "diode" or limiting the term "during" to "whenever," the Court should reject Fantasia's proposal in favor of the original claim language.

*Rectifier vs Diode.* The only true dispute between CogniPower and Fantasia regarding the term "rectifier" is whether it should be given its full scope, encompassing any collection of circuit elements arranged to perform rectification, or should be limited to a rectifier built using diodes. If the Court agrees with CogniPower that the term "rectifier" should be given its full scope, the best way to resolve the dispute is to simply reject Defendant's proposal term "diode" and use the original term "rectifier" rather than rephrasing the term for the sake of rephrasing it. *See Star Envirotech*, 2015 WL 12743875 at *3 (noting that "[w]hen claim language does not depart from the ordinary meaning of its terms, no paraphrase—however artful—will capture the meaning of those terms as precisely as the terms themselves").

As generally recognized by Fantasia's proposed construction, a rectifier is a circuit element that allows current to flow through it in one direction only. *See also* Ex. Q, Modern Dictionary of Electronics (7th ed., 2000), Rectifier, p. 631 ("[d]evice that converts alternating current into unidirectional current by permitting appreciable current in one direction only"). As previously discussed, a rectifier can be built using a number of different electronic components, including a diode, multiple diodes, a transistor, multiple transistors, or other collections of circuit elements. *See* CogniPower Opening, Section A; *see also* Ex. Q, Modern Dictionary of Electronics (7th ed., 2000), Transistor, p. 795 ("[a]n active semiconductor

36

device having three or more electrodes and capable of performing almost all the functions of tubes, ***including rectification*** and amplification") (emphasis added); Rectifier Diode, p. 631 ("[a] diode that exhibits an asymmetrical voltage-current characteristic and is used for current and voltage rectification").

Looking to the claim language as written, the question is not whether it makes sense to talk about a stand-alone diode or a stand-alone transistor as being poled; rather, the question is whether it makes sense to talk about a *rectifier* as being poled. It does. Because a rectifier allows current to flow in only one direction, the orientation of the rectifier is fundamental to its operation regardless of the underlying components used to build it. A comparison of the original claim language with Fantasia's proposed construction demonstrates that Fantasia clearly understands, as would one of ordinary skill in the art, that the term "poled" is simply being used to describe the orientation of the claimed rectifier. Indeed, Fantasia does not include the term "poled" in its proposed construction but rather replaces the phrase "poled to charge [a] capacitor" with the phrase "which is oriented to allow current to flow through it to the capacitor." In the context of the claim language as written, nothing about the term "poled" implies anything about the underlying components or topology used to build the claimed rectifier; rather, it is used to indicate the direction of current flow.

Turning to the prosecution history, as Fantasia points out, "[h]ow the claimed rectifier is poled was also a key point during prosecution." But each passage cited by Fantasia discusses how the claimed *rectifier* is poled as compared to, for example, "Zhu's *rectifier*." These discussions before the PTO are applicable to any rectifier, regardless of its particular implementation.

Further, as previously discussed, the patentees made explicitly clear that a rectifier was *not* merely a synonym for diode in responding to the Examiner's Statement of Reasons for Allowance (the "Statement"). *See* Ex. J, `031 Prosecution History, 4/20/2018 Comments on Statement of Reasons for Allowance. Because it was unclear whether the examiner viewed the terms "diode" and "rectifier" to be synonymous based on the Examiner's Statement of Reasons for Allowance, the patentees explained to the examiner that:

> [N]either independent claim 1 nor independent claim 10 recites that the second rectifier is a diode and a capacitor. . . . [T]o the extent that the Statement differs from the language of any of the independent claims, the Applicant rejects any narrowing or limitations that might possibly result from such differences.

*See* Ex. J, `031 Prosecution History, April 20, 2018 Comments on Statement of Reasons for Allowance. Patentees received their Issue Notification on August 21, 2018 without any objection from the Examiner. Ex. K, `031 Prosecution History, August 21, 2018 Issue Notification.

***During vs Whenever.*** Fantasia completely misapprehends the prosecution

history it cites. For example, the full sentence from the 1/2/29 Amendment cited by

Fantasia reads:

> In an isolated flyback power converter, current flows ***through the power transformer's secondary-side winding*** only in one direction during a forward power pulse and only in the other direction during a flyback power pulse.

Ex. L, `713 Prosecution History, 1/2/19 Amendment, p. 29 (emphasis added). This

passage is discussing current flow through the power transformer's secondary-side

winding, not the recited rectifier. The same is true for the Applicant Interview

Summary Fantasia cites. *See id.* at 7/18/19 Applicant Interview Summary, p. 2.

While the recited rectifier may be connected to the secondary winding, it does not

necessarily conduct the same current as the secondary winding. Indeed, the recited

rectifier's purpose is to limit conduction of current between the winding and the

capacitor to a certain direction during a certain time period—namely the forward

pulse. And Fantasia's proposed construction is even further removed from the

conditions of the current in the secondary-side winding. Fantasia's proposed

construction attempts to directly link the condition of the current in the recited

rectifier to the state of the primary-side switch.

Nothing cited or argued by Fantasia actually addresses CogniPower's issue

with the scope of Fantasia's proposed construction. The figure below illustrates the

difference in scope between "during" and "whenever." If Fantasia's proposed term

39

"whenever" was included in the construction, the phrase "rectifier [] poled to charge [a] capacitor during forward pulses" would apply only to the circumstance highlighted in blue below. However, keeping the actual claim language, the phrase "rectifier [] poled to charge [a] capacitor during forward pulses" applies to all circumstances shown below, and many more. In fact, it covers any circumstance where the current flows from the winding to the capacitor at some point between the time the forward pulse begins and ends.

| | Forward Pulse | Flyback Pulse | Forward Pulse | Flyback Pulse |
|---|---|---|---|---|
| Primary Switch State | On | Off | On | Off |
| Rectifier Current | Whenever | | Whenever | |
| Rectifier Current | During | | During | |
| Rectifier Current | During | | During | |
| Rectifier Current | During | | During | |

As discussed in CogniPower's opening, a diode used as a rectifier simply cannot conduct "whenever the primary power switch is on during a switching cycle" because the diode's inherent forward voltage drop will introduce a time delay between the time the forward pulse appears and the time the diode will begin conducting. *See* CogniPower's Opening, Section B. Similarly, in the case of synchronous rectification, the control signal is asserted and de-asserted such that

40

there is not perfect synchronization between the "primary power switch" and the synchronous rectifier. *See id.*

Fantasia attempts to narrow the scope of the claims without any basis. This attempt should be rejected. Again, the simplest way to resolve this dispute in claim scope is to simply reject Fantasia's proposal and keep the existing claim language.

### 4. Defendants' Sur-reply Position

**Rectifier:** CogniPower has no response to Defendants' key points that all disclosed rectifiers in the specification are diodes and that the patent lacks written description support for "synchronous rectifiers." This is confirmed by CogniPower's position in the parallel *Power Integrations* case, where CogniPower stated a patent disclosing a diode "rectifier" does not thereby automatically disclose a "synchronous rectifier." *See* Ex. P (20-cv-00015 CogniPower Invalidity Contentions Ex. A) at 1.

CogniPower also misreads the prosecution history. As explained in Defendants' answering brief, when CogniPower told the Examiner the second rectifier is not "a diode ***and*** a capacitor," it meant the capacitor was an *additional* component. *See* Ex. M ('031 Prosecution History) 4/20/18 Comments on Statement of Reasons for Allowance at 1 (emphasis added). That the rectifiers in question were diodes was beyond dispute.

41

Finally, Defendants demonstrated that "poled" proves the claimed rectifier is a diode, and CogniPower responds merely by saying that the poles of *a rectifier* depend upon its orientation.  That misses the point.  CogniPower has no counter to Defendants' proof that *a transistor* lacks poles.  That means the claimed rectifier cannot be a transistor.  It has to be diode.

**During:**  By advocating no construction, CogniPower again takes the position that the concessions it made to the Examiner should have no effect.  This is wrong.  Moreover, CogniPower's response is again based on attorney argument, including a made-up table and assertions about "time delay" with no support whatsoever.

As demonstrated in Defendants' answering brief, CogniPower told the Examiner that current flows "only in one direction" during a forward pulse, and "only in the other direction" during a flyback pulse.   Ex. L ('713 Prosecution History) 1/2/19 Amendment at 29.  That position directly contradicts the loose relationship CogniPower now proposes, where "during" just means "at some point."  To the contrary, what CogniPower told the Examiner means current flows *only* one way during the entire forward pulse—that is, whenever there is a forward pulse—and *only* the other way during the flyback pulse—that is, whenever there is a flyback pulse.  CogniPower's double use of "only" allows no other result.

CogniPower's argument that the quoted passage refers to the secondary-side winding, and not the recited rectifier, is nonsensical.  The patent says "forward pulses on the secondary winding of transformer 100c charge a capacitor."  Ex. N ('031 Patent) at 6:7-9.  In the context of the claim phrase at issue—"rectifier [] poled to charge [a] capacitor during forward pulses"—the forward pulses on the winding are the same forward pulses that pass through the rectifier and charge the capacitor.  CogniPower's quoted statement to the Examiner fully applies.

CogniPower's reply also admits that "forward pulses" refer to the time period when the primary switch is on when it says "the recited rectifier's purpose is to limit conduction of current between the winding and the capacitor to a certain direction during a certain time period—namely the forward pulse."  *See also* Ex. L ('713 Prosecution History) 1/2/19 Amendment at 29.  This means Defendants' construction is correct to state that the claimed rectifier must be oriented to allow current to flow through it to the capacitor whenever the primary switch is on.

    C.    "using a rectifier to charge a capacitor during forward pulses" (`031 Patent, claim 18)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** Using a diode that converts alternating current to direct current, which is oriented to allow current to flow through it to a capacitor whenever the primary power switch is on during a switching cycle.

43

### 1.     CogniPower's Opening Position

Fantasia's proposed construction for "using a rectifier to charge a capacitor during forward pulses" is substantively identical to its proposed construction for "rectifier [] poled to charge [a] capacitor during forward pulses," and should be rejected for the same reasons discussed in Section B.1.

### 2.     Defendants' Answering Position

This construction raises the same issues as Section B above, which is incorporated by reference.  Again, "during forward pulses" means "whenever" and not just at some "point" because this is how the invention in fact operates and is what CogniPower told the Examiner to secure allowance of its claims.

### 3.     Plaintiff's Reply Position

Fantasia's proposed construction raises the same issues as in Section B above, which is incorporated by reference.

### 4.     Defendants' Sur-reply Position

The parties agree this construction raises the same issues as Section B above, which is incorporated by reference.

### D.     "arranged in circuit" (`031 Patent, claims 1, 10, and 64)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S  PROPOSAL:** Indefinite – A POSITA would not understand this terminology in context and there is no intrinsic evidence explaining what it means to be "arranged in circuit" or not.

44

## 1.    CogniPower's Opening Position

"[A] claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'" *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 2130 n.8 (2014)). Fantasia has the burden of proving indefiniteness by clear and convincing evidence. *BASF*, 875 F.3d at 1365. Fantasia cannot meet its burden, and so its proposal must be rejected. Further, the specification gives ample examples showing elements "arranged in circuit."

In relevant part, the disputed claim term "arranged in circuit" appears in the claims as follows:

`031 Patent, claims 1, 10 and 64:

***

(i)    a primary winding ***arranged in circuit*** with the input port and the switch

(ii)    a secondary winding ***arranged in circuit*** with a [first rectifier/rectifier] and [the/an] output port

***

The `031 Patent's specification gives direct examples of a primary winding arranged in circuit with an input port. For example, the `031 Patent's specification explains the following with respect to one of many potential embodiments:

> *Terminals 11a and 12a constitute a power input port that places source 5a **in circuit** with a primary winding 101a of a transformer 100a and with a commutating switch 200a, which is usually a MOSFET but may be a BJT or any other suitable electronic switch.*

45

`031 Patent, 2:32-36 (referencing Fig. 1, emphasis added). Figure 1 of the

`031 Patent then illustrates an input port arranged in circuit with a primary winding

of a transformer as shown below:



`031 Patent, Fig. 1 (emphasis added)

The specification specifically illustrates this in additional embodiments as

well. For example, the specification explains:

> As in FIG. 1, a transformer 100c *primary winding 101c is **in circuit** with* a switch 200c and *terminals 11c and 12c.*

`031 Patent, 6:1-4 (referencing Fig. 3, emphasis added). Like Figure 1, Figure 3

illustrates an input port arranged in circuit with a primary winding of a

transformer.

46



`031 Patent, Fig. 3 (emphasis added)

Similarly, the `031 Patent's specification gives direct examples of a secondary winding arranged in circuit with an output port. For example, the `031 Patent's specification explains the following with respect to one of many potential embodiments:

> A diode 300a and a capacitor 301a form a rectifier circuit to rectify and filter voltage pulses *from winding 104a to supply power through a power output port comprising terminals 13a and 14a to an external load represented by resistor 7a connected __in circuit__ therewith*, one end of which may be referred to a floating common 8a.

`031 Patent, 2:51-56 (referencing Fig. 1, emphasis added). Figure 1 shows this:



`031 Patent, Fig. 1 (emphasis added)

The `031 Patent's specification offers many other examples of circuit elements arranged in circuit with one another. For example, the Specification explains:

> Responsive to its clock pulse, *flip-flop 220d* turns ON a *switch 200d*, preferably a MOSFET, ON Semiconductor type NDD02N60, which is ***in circuit*** with a *primary winding 101d* of a *transformer 100d*, with a *sense resistor 209d*, and with *terminals 11d and 12d*.

`031 Patent, 7:4-8 (referencing Fig. 4, emphasis added). The figures show all of these elements in circuit with one another. For example:

59788/0001-40134382v1



`031 Patent, Fig. 4 (emphasis added)

As an additional example, the specification explains:

Therefore, *transformer 100d* is fitted with an *auxiliary winding 102d*, which is connected ***in circuit*** with an *inductor 235d*, a *diode 241d*, and a *switch 233d*, preferably a MOSFET.

`031 Patent, 8:43-46 (referencing Fig. 4, emphasis added). Figure 4 then illustrates

via schematic the topology of these recited in-circuit elements:



`031 Patent, Fig. 4 (emphasis added)

Because the claim term "arranged in circuit" apprises one of ordinary skill in the art the of scope of what is claimed with reasonable certainty and therefore is not indefinite. *See Nautilus*, 572 U.S. at 901.

> 2.    Defendants' Answering Position

Defendants understand the Court may wish to decide indefiniteness at a later stage in the case, particularly if recourse to extrinsic evidence is needed, but Defendants believe the issue presented here is appropriate for resolution at the claim construction stage since the Court need only consider intrinsic evidence.

The problem is that the patent creates unresolvable ambiguity by its use of the terms "connected," "arranged in circuit," "connected in circuit," and "galvanically connected to," the latter two of which are identified in the following Sections E and F. *All* of the claim elements form an electrical circuit. So if these terms just mean directly or indirectly connected such that electricity can flow, as CogniPower argues, why do the claims specify that only certain elements are "arranged in circuit" or "connected in circuit"?

The specification, in fact, further creates ambiguity because it does provide some express definitions, but then fails to explain how the terms at issue are different. Specifically, the specification recites:

> Also for purposes of this description, the terms "couple," "coupling," "coupled," "connect," "connecting," or "connected" refer to any manner known in the art or later developed in which energy or signals are allowed to

50

> be transferred between two or more elements, and the interposition of one or
> more additional elements is contemplated, although not required.
> Conversely, the terms "directly coupled," "directly connected," etc., imply
> the absence of such additional elements.

Ex. N ('031 Patent) at 10:54-63.  This discussion fails to mention what "arranged

in circuit" or "connected in circuit" mean, or how they are the same or different

from the terms and phrases, such as "connected", that are defined.

The claims themselves fail to solve the ambiguity because they use multiple

different phrases for the relationship between elements, yet also fail to indicate

why the different terms are used.  For example, claim 1 of the '031 patent claims

"galvanic isolation *circuitry*" that includes "a primary winding *arranged in circuit*

with the input port and the switch and (ii) a secondary winding *arranged in circuit*

with a first rectifier and the output port."  If both the primary winding and the

secondary winding are part of the galvanic isolation "circuity," what is meant by

saying the primary winding is "arranged in circuit" with the input port and the

secondary winding is "arranged in circuit" with a first rectifier and the output port?

Are the two windings not also in a circuit with each other?  Is the primary winding

not in a circuit with the first rectifier?

The same claim adds to the confusion by reciting that a demand pulse

generator is "galvanically connected to the secondary winding."  As discussed

below in Section E, CogniPower argues "galvanically connected" refers to any

electrical connection, and not just a direct connection.  If so, what is special about

the galvanic connection between the demand pulse generator and the secondary winding?  Are not *all* the components in the claimed "circuitry" electrically connected?  And claim 1 also recites "a load connected to the output port," yet it is unclear how this connection is different from (or the same as) the "galvanically connected" elements or the elements "arranged in circuit."

Claim 18 adds even more confusion by reciting "the rectifier and the capacitor are *connected in circuit* with the output-port side of the galvanic isolation circuitry."  How is this different from "arranged in circuit"?

The problem is that a person of ordinary skill in the art would have no way of knowing whether components are "arranged in circuit" or "connected in circuit" because the intrinsic record fails to set forth a definition of either.  Notably, all of the specification examples that CogniPower cites refer just to "in circuit" without the words "arranged" or "connected," and none of the examples provides a test for distinguishing electrical connections that are "in circuit" from those that are not. CogniPower provides no help because it fails even to propose a construction.

CogniPower's suggestion that all of these different phrases mean the same thing is also inconsistent with the presumption that each claim term should have meaning.  *E.g.*, *Innova/Pure Water*, 381 F.3d at 1119 ("all claim terms are presumed to have meaning in a claim").  Similarly, under the doctrine of claim differentiation, differences in how claims are worded are presumed to matter.

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1252 (Fed. Cir. 2008) ("Under the doctrine of claim differentiation, 'the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.'").

The ambiguity of CogniPower's clams is a significant problem because patent claims are like deeds to land.  They are supposed to define the metes and bounds in a way the public can understand so they can avoid trespass.  *E.g.*, *Halliburton*, 514 F.3d at 1249 ("Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.*, what subject matter is covered by the exclusive rights of the patent.  Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims."; affirming summary judgment of indefiniteness).  Here, the claims do not fulfill that basic function, and should be held indefinite.

### 3.    Plaintiff's Reply Position

Fantasia's assertion that the `031 Patent's claims' inclusion of minor variations in language—namely "connected," "arranged in circuit," and "connected in circuit"—somehow renders claims 1, 10, and 64 invalid is pedantic and unsupported by law. As recognized by Fantasia, "[a]ll of the claim elements form an electrical circuit." Fantasia's Response, Section D. Faced with similar minor

53

variations, the Federal Circuit has recognized that there are limits to the general

presumption that different words and phrases carry different scopes.

For example, in *Pickholtz v. Rainbow Techs., Inc.*, the Federal Circuit

considered whether the terms "computer" and "computer system" should be given

different meaning where the term "computer system" was used in the specification

and the term "computer" was used in the claims. 284 F.3d 1365, 1373 (Fed. Cir.

2002). Noting that the patent "provide[d] no indication that the two terms mean

different things" and that "nothing in the patent itself explicates their relationship

or indicates any difference in meaning" the Federal Circuit found that the two

terms should be treated synonymously and regarded the word "system" as

surplusage. *Id; see also Skyhook Wireless, Inc. v. Google, Inc.*, 2012 WL 4076180,

at *13 (D. Mass. Sept. 14, 2012) ("The court sees no difference between

'substantially all' and 'all but an insignificant number,' and the latter term provides

no additional clarity. The term does not require construction").

Here, as in *Pickholtz* and as noted by Fantasia, the specification does not

delineate a difference in meaning between the phrases "connected," "arranged in

circuit," and "connected in circuit." 284 F.3d at 1373; Fantasia's Response,

Section D. Further, Fantasia's acknowledgement that "[a]ll of the claim elements

form an electrical circuit" demonstrates that Fantasia knows what these phrases

mean. Fantasia's Response, Section D. These phrases should be treated

synonymously, and this Court should reject Fantasia's contention that the claims including these phrases are indefinite.

### 4. Defendants' Sur-reply Position

CogniPower invites error by asking the Court to rewrite the claims to avoid indefiniteness. Even where a claim makes no sense as drafted, it is not the job of the Court to rewrite claims to preserve their validity. *Chef Am., Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1374 (Fed. Cir. 2004) (the Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity."); *see also Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("It is not our function to rewrite claims to preserve their validity . . . Moreover, it is of no moment that the contradiction is obvious: semantic indefiniteness of claims 'is not rendered unobjectionable merely because it *could* have been corrected'"; declining to rewrite claims and finding them indefinite).

Here, the fact that all claimed elements are already part of an electrical circuit is the problem, not the solution. A person of skill in the art has no way to judge whether particular elements are "arranged in circuit," "connected in circuit," or "galvanically connected to," as claimed. And arguing, as CogniPower does, that all of these expressions just mean "connected" flies in the face of the rule against rewriting claims. *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365 (Fed. Cir.

2002), cited by CogniPower, is not to the contrary.  It merely held the terms "computer," as used in *claims* of a patent, and "computer system," as used in the *specification*, were synonymous.  *Id.* at 1373.  Indefiniteness was not even at issue.

The Court should hold the claim terms "arranged in circuit" and "connected in circuit" indefinite.

E.    "connected in circuit" (`031 Patent, claims 18, 24, 35, 36, 48, 51, and 63)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** Indefinite – A POSITA would not understand this terminology in context and there is no intrinsic evidence explaining what it means to be "connected in circuit" or not.

1.    CogniPower's Opening Position

As with "arranged in circuit," Fantasia cannot meet its burden of proving indefiniteness by clear and convincing evidence, and its contention should be rejected. Further, the specification gives ample examples showing elements "connected in circuit."

In relevant part, the disputed claim term "connected in circuit" appears in the claims as follows:

`031 Patent, claim 18:

*** 

wherein the rectifier and the capacitor are ***connected in circuit*** with the output-port side of the galvanic isolation circuitry

***

56

`031 Patent, claims 24, 35, 36, 48, 51, and 63:

\*\*\*

an input-side coupled inductor ***connected in circuit*** to [an/the] [input-side commutating switch/switch]; and

an output-side coupled inductor ***connected in circuit*** to [a/the] [demand pulse generator/second pulse source circuitry].

\*\*\*

Like the secondary winding arranged in circuit with the output port, the

`031 Patents' specification describes and gives an exemplar schematic of a rectifier

(a diode in the example, although it could be a synchronous rectifier or other

topology as described above) and capacitor connected in circuit with an output

port:

> *A diode 300a and a capacitor 301a form a rectifier circuit to rectify and filter voltage pulses from winding 104a to supply power through a power output port comprising terminals 13a and 14a to an external load represented by resistor 7a **connected in circuit** therewith, one end of which may be referred to a floating common 8a.*

`031 Patent, 2:51-56 (referencing Fig. 1, emphasis added). Figure 1 shows this:



`031 Patent, Fig. 1 (emphasis added)

57

The claim term "connected in circuit" apprises one of ordinary skill in the art the scope of what is claimed with reasonable certainty and therefore is not indefinite. *See Nautilus*, 572 U.S. at 901.

### 2.   Defendants' Answering Position

This construction raises the same issues as Section D above, which is incorporated by reference.

### 3.   Plaintiff's Reply Position

Fantasia's assertion of indefiniteness raises the same issues as in Section D above, which is incorporated by reference.

### 4.   Defendants' Sur-reply Position

The parties agree this construction raises the same issues as Section D above, which is incorporated by reference.

F.   "galvanically connected to" (`031 Patent, claims 1 and 10)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** Having a direct electrical connection to, on the same side of a galvanic isolation barrier.

### 1.   CogniPower's Opening Position

Fantasia's proposal should be rejected because it directly contradicts the specification. The specification states:

> Also for purposes of this description, the terms "couple," "coupling," "coupled," "connect," "connecting," or "***connected***" refer to any

manner known in the art or later developed in which energy or signals are allowed to be transferred between two or more elements, and ***the interposition of one or more additional elements is contemplated***, although not required. Conversely, the terms "directly coupled," "***directly connected***," etc., ***imply the absence of such additional elements***.

`031 Patent, 10:54-62.

The claim term "galvanically connected to" does not include the word "direct" or any other indication that a direct connection—i.e., a connection between two elements without the interposition of additional elements—is required. By including the term "*direct* electrical connection," Fantasia's proposed construction burdens the meaning of "galvanically connected to" with additional limitations that are not present or contemplated. Because Fantasia's proposal contradicts the specification and is unduly narrow it should be rejected.

### 2.     Defendants' Answering Position

If "galvanically connected to" simply means any electrical connection, as CogniPower argues, then this claim element raises the same indefiniteness problem discussed in Section D.  How is "galvanically connected" different from "arranged in circuit," and if they are the same thing, why are different words used?  CogniPower offers no explanation.

However, unlike CogniPower, Defendants have proposed a construction of "galvanically connected to" that gives it meaning.  Moreover, while the term "galvanically connected to" does not appear in the specification or prosecution

59

history, Defendants' proposal is consistent with one of the purposes of the invention, which is to provide "galvanic isolation" circuitry. *See* Ex. N ('031 Patent) at Abstract ("The present invention provides a switched-mode power converter with regulation demand pulses sent across a galvanic isolation barrier."). It makes sense that "galvanically connected" circuitry refers to components present on the same side of a "galvanic isolation barrier"; if the connection reached across the isolation barrier, the power converter as a whole would not be galvanically isolated. In other words, the same components cannot both be "galvanically isolated" and "galvanically connected" as CogniPower seems to be contending. Rather, the use of "galvanically connected" suggests the opposite of galvanically isolated, and therefore must mean that the components described as "galvanically connected" must have a direct electrical connection to each other on the same side of the galvanic isolation barrier.

Because Defendants' proposal is consistent with the intrinsic record and avoids indefiniteness, and because CogniPower has not provided a timely alternative construction, the Court should adopt Defendants' construction.

### 3.     Plaintiff's Reply Position

As recognized by Fantasia, the specification *does* give express meaning to the term "direct." `031 Patent, 10:54-62; Fantasia's Response, Section D. The predominant problem with Fantasia's proposed construction for "galvanically

connected to" is that it includes the term "direct" without respecting the specification's use of that term. As explained in the specification, "connected," for example, refers to "any manner known in the art or later developed in which energy or signals are allowed to be transferred between two or more elements, and the interposition of one or more additional elements is contemplated, although not required." `031 Patent, 10:54-62. The phrase "directly connected," however, "impl[ies] the absence of such additional elements," but the claims and specification give examples of galvanically connected elements that *do* include the interposition of additional elements. *Id.*

For example, `031 Patent Claims 1 and 10 recite a capacitor and a second rectifier "both galvanically connected to" the secondary winding of a transformer. In the example embodiment of FIG. 4, capacitor 419d is an example of the recited capacitor, rectifier 418d is an example of the recited second rectifier, and winding 104d of power transformer 100d is an example of the recited secondary winding. As shown below, exemplar second rectifier 418d does not have a "direct" connection to winding 104d because of the interposition of capacitors 416d and 419d, the interposition of rectifier 417d, and the interposition of auxiliary regulator 420d. Nevertheless it is galvanically connected to winding 104d.

61



`031 Patent, Fig. 4 (emphasis added)

Further, note that exemplar capacitor 419d is galvanically connected to winding 104d *and* has a "direct electrical connection" this winding.

As illustrated above, importing the term "directly" into any construction of the phrase "galvanically connected to" would exclude embodiments shown in the patent and therefore must be rejected.

### 4.   Defendants' Sur-reply Position

CogniPower says the specification defines "direct" connections, but ignores the fact that there is no definition given for "galvanic" connections.  If the Court gives no construction, as CogniPower urges, that would make this term indefinite too.  But that need not be the result, because Defendants' proposed construction gives the claim term meaning.  CogniPower argues against the use of the word

62

"direct," but says nothing about "on the same side of a galvanic isolation barrier." In addition, CogniPower is wrong that the patent discloses examples of galvanically connected components that are not directly connected. CogniPower's assertion that Figure 4 depicts a capacitor and second rectifier indirectly connected to the secondary winding is unsupported attorney argument (and also wrong).

Because CogniPower has failed to propose an alternate construction, the Court should adopt Defendants' proposal.

G.    [intentionally omitted because of the parties' agreement regarding the previously disputed "selectively gate" / "gating" terms]

H.    "a leading edge of a single demand pulse will turn on the switch independent of other demand pulses" (`031 Patent, claims 32, 34, 45, 47, 60, and 62)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** Indefinite – A POSITA would not understand this terminology in context and there is no intrinsic evidence explaining what it means to be "independent of other demand pulses"

1.    CogniPower's Opening Position

"[A] claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'" *Media Rights*, 800 F.3d at 1371. Fantasia has the burden of proving indefiniteness by clear and convincing evidence. *BASF*, 875 F.3d at 1365. Fantasia cannot meet its burden, and so its proposal must be rejected. CogniPower will

63

revisit Fantasia's argument if necessary once Fantasia clarifies its purported confusion.

### 2.    Defendants' Answering Position

Defendants again understand the Court may prefer to defer indefiniteness to the summary judgment stage, but Defendants preserve the issue here and suggest the Court may wish to resolve the issue presented now, because it turns on the intrinsic evidence and the plain English meaning of the word "independent."

As background, the claim term at issue is curious because it recites a feature never discussed in the patent specification.  The specification never says the "leading edge" of a "single demand pulse" turns the switch on independent of other demand pulses, or describes the invention that way.  Indeed, the specification never even mentions "independent," "leading edge" or "single demand pulse."

In addition, the claims' use of the word "independent" is indefinite because it contradicts how the invention is described and claimed in the patent.  Turning on the switch ***depends upon*** "other demand pulses" because the generation of demand pulses is a continuous process performed in response to a closed feedback loop.  In other words, because the output is regulated in a closed loop, and the demand pulses are the feedback, the turn on timing in any given cycle will be dependent on the prior stream of previous feedback demand pulses.  Therefore, "a single demand pulse" cannot turn on the switch "***independent*** of other demand pulses."

64

The "independent" limitation appears in claims that explicitly include feedback loops.  For example, claim 32 contains the "independent" limitation and depends upon claim 18, which recites that the switch is regulated by "comparing a feedback signal based on a voltage or current at the output port with a reference signal that is galvanically associated therewith."  Other claims do not use the word "feedback," but CogniPower made clear that "demand pulses," which appear in all asserted claims, imply "feedback."  *See* Ex. L, ('713 Prosecution History) 11/6/18 Interview Summary Agenda at 4 ("Feedback (i.e., demand pulses)"); Ex. L ('713 Prosecution History) 1/2/19 Amendment at 15 ("the feedback in Fig. 1 [of CogniPower's patent] consists of demand pulses").  The patent specification also confirms that the patented invention uses a feedback signal:  "Resistor 405b, preferably about 82K for a 5V output, provides feedback by robbing resistor 404b current from the current mirror of dual-transistor 402b as output voltage increases, thus setting operating frequency roughly in proportion to the demand of load 7b."  Ex. N ('031 Patent) at 5:56-60.  Furthermore, the patent explains that such feedback loops were a known technique for regulating converter output:

> Converters are also known wherein an analog voltage reflection of the converter output voltage seen on a primary-side winding is processed to generate a primary-side analog feedback signal which is used to control the commutating signals applied to the commutating switch to regulate converter output on its secondary side.

Ex. N ('031 Patent) at 1:59-65.

Thus, turning on the switch *depends* not only on the current demand pulse, but also on previous demand pulses, due to the feedback mechanism. This creates the indefiniteness problem. It is simply not possible for turn on in a given cycle to depend on one pulse and be "independent" of others, as the word "independent" is used in ordinary English.[6] Moreover, as noted above, the specification nowhere mentions "independent," "leading edge," or "single demand pulse," so the patentee has not chosen to be a lexicographer, and CogniPower has offered no timely construction.

This means the claims reciting "independent" cannot be understood by a person of ordinary skill and are indefinite. *E.g.*, *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1366-67 (affirming finding of indefiniteness where claims were internally inconsistent; "[T]he claims describe the step of extracting machine code instructions from something that does not have machine code instructions. The claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite.") (citation omitted). This Court should hold the same.

---

[6] For example, Google says independent means "not connected with another or with each other; separate." *See* https://www.google.com ("define independent," definition 4).

66

### 3.     Plaintiff's Reply Position

Fantasia's contention that "'a single demand pulse' cannot turn on the switch 'independent of other demand pulses'" is nonsensical. For example, the first demand pulse will turn on the switch even though, by definition, there have not been any prior demand pulses. The second demand pulse will also turn on the switch, but in that case, there has been a prior demand pulse. In both cases—the first where "other demand pulses" do not exist and the second where "other demand pulses" do exist—the switch is turned on. The word "independent" does not create an internal inconsistency; instead, it highlights the fact that whether the switch is turned on in response to the leading edge of a given demand pulse *does not depend on* the existence of "other demand pulses."

Of note, Fantasia's entire argument for indefiniteness of this claim term rests on an alleged internal inconsistency that does not exist. Fantasia has not claimed that the phrases "independent," "leading edge," or "single demand pulse," standing alone are indefinite. Because Fantasia cannot meet its burden of proving indefiniteness by clear and convincing evidence, its request to invalidate `031 Patent, claims 32, 34, 45, 47, 60, and 62 should be denied. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

4.    Defendants' Sur-reply Position

CogniPower's reply confirms there is an indefiniteness problem. It says that Defendants do not challenge the meaning of "independent," "leading edge" or "single demand pulse"—but they do, because these terms do not appear in the specification, and do not make sense in the claims.

In addition, putting aside the "first" demand pulse, CogniPower does not dispute that each demand pulse depends upon previous demand pulses in the sense that they are part of a feedback loop. CogniPower fails to explain how a demand pulse that is derived from previous demand pulses can be "independent" of them in the ordinary sense of that word.

Finally, if CogniPower is arguing the claim only applies to the first demand pulse, this creates a new indefiniteness problem because that is not how the claim is phrased. Moreover, at the time of the first demand pulse, no other demand pulse exists, so it does not make sense to talk about whether one pulse is independent of another. If desired, Defendants can supply an expert declaration to explain in further detail why this limitation is unclear to a person of ordinary skill.

I.    "wherein the determination of when to turn off the primary-side switch is originated on the primary side and not on the secondary side" (`713 Patent, claims 18 and 48)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

68

**FANTASIA'S PROPOSAL:** When the primary switch turns off in any given cycle is dependent solely on inputs generated on the primary side with no control from any secondary side signals.

      1.    CogniPower's Opening Position

Fantasia's proposed construction introduces additional limitations that unduly narrow the scope of the claims and should be rejected. The claim language is plain on its face, and no further construction is required.

Here, the phrase "dependent solely on inputs generated on the primary side with no control from any secondary side signals" suffers the same flaws as the "plays no role" phrase suffered with respect to demand pulse. *See* Section A.1. `713 Patent, claims 45, 49, 58, and 61, all of which ultimately depend on claim 18, claim a controller on the primary side that establishes a maximum duration for the switch to stay on as described in Section A.1. Because the primary-side controller may implement such a maximum ON time, it may consider "inputs" generated on the secondary side. As explained above, in an embodiment with a maximum ON time, the primary-side controller will turn off the switch within a time period triggered by the receipt of a demand pulse from the secondary side. Thus, while the primary-side controller makes the *determination* of when to turn off the primary-side switch, that determination may be based on the time of the receipt of the previous demand pulse. Adopting Fantasia's proposed construction would read-out

claim limitations and exclude preferred embodiments, and therefore must be rejected. *Vitronics*, 90 F.3d at 1583.

> 2.    Defendants' Answering Position

This construction raises the same issue as "a pulse signal that determines only when to turn on a primary switch and plays no role in determining when to turn off the switch," discussed in Section A above, as CogniPower acknowledges. "Plays no role" and "is dependent solely on" refer to the same concept. Defendants therefore incorporate Section A by reference.

For example, CogniPower told the Examiner "OFF time of switch 200a is controlled **solely** by primary side."  Ex. L ('713 Prosecution History) 11/6/18 Interview Summary Agenda at 4 (emphasis added).  CogniPower's position in this case thus directly contradicts what it told the Patent Office to secure allowance. CogniPower also again fails to offer a timely alternative construction.  The Court should therefore adopt Defendants' proposal.

> 3.    Plaintiff's Reply Position

Fantasia expressly states that its proposed phrase "plays no role" (appearing in its proposed construction in Section A) and its proposed phrase "is dependent solely on" (appearing in its proposed construction here) "refer to the same concept." *See* Fantasia's Response, Section I. Just as CogniPower has never taken the position that a demand pulse "plays no role in determining when to turn off the

switch," it has never taken the position that "when the primary switch turns off in any given cycle is dependent solely on inputs generated on the primary side." Again, CogniPower simply explained that the secondary-side circuitry does not **control** when to turn off the switch. *See* Section A above. The proposed construction's inclusion of both the phrase "is dependent solely on"—which Fantasia has expressly equated to the concept of "plays no role"—and the phrase "with no control from any" further highlights that the concept of "plays no role" and the concept of "no control" are different. Fantasia's proposed construction should be rejected for the same reasons discussed in Section A above, which is incorporated by reference.

4.    Defendants' Sur-reply Position

The parties agree this construction raises the same issues as Section A above, which is incorporated by reference.

J.    [Intentionally omitted because of the parties' agreement regarding the previously disputed term "selectively blocks certain oscillator pulses"]

59788/0001-40134382v1

K.  "the primary-side switch turning on is in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses conveyed from the secondary side to the primary side and independent of any other pulse edges appearing on the primary side" (`713 Patent, claims 25 and 54)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** Indefinite – A POSITA would not understand this terminology in context and there is no intrinsic evidence explaining what it means to be "independent of other demand pulses" and "independent of any other pulse edges appearing on the primary side"

1.  CogniPower's Opening Position

Fantasia's assertion of indefiniteness should be rejected for the same reasons discussed in Section H.1. CogniPower will revisit Fantasia's argument if necessary once Fantasia clarifies its purported confusion.

2.  Defendants' Answering Position

This construction raises the same "independent" issue as Section H above, as CogniPower acknowledges.  Defendants therefore incorporate Section H by reference.  Again, the word "independent" is not discussed in the specification, and the ordinary English meaning is contradicted by the invention's use of a feedback loop, which makes turning on the switch ***depend*** upon previous pulses.  Because the recitation of "independent" cannot be understood by a person of ordinary skill under these circumstances, the Court should hold the claims indefinite.

### 3. Plaintiff's Reply Position

Fantasia's assertion of indefiniteness raises the same issues as in Section H above, which is incorporated by reference.

### 4. Defendants' Sur-reply Position

The parties agree this construction raises the same issues as Section H above, which is incorporated by reference.

L. "such that the demand pulses regulate the output port by driving the feedback signal to match the reference signal; the flyback converter regulates the output port to have the feedback signal match the reference signal" (`713 Patent, claim 52)

**COGNIPOWER'S PROPOSAL:** No construction necessary.

**FANTASIA'S PROPOSAL:** Indefinite – unclear what these limitations mean as they appear wholly redundant of each other and so do not provide patentably distinct limitations to the claim.

### 1. CogniPower's Opening Position

While Fantasia's argument for indefiniteness of this claim term is unclear, it appears that Fantasia may be arguing that redundancy in claim language necessarily renders a claim indefinite. Without addressing whether claim 52 includes redundant claim language, the mere assertion that claim language is redundant fails to raise a legitimate basis for an assertion that a claim is indefinite. *See, e.g.*, *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, No. 2:17-CV-00235-JRG, 2018 WL 1353116, at *12 (E.D. Tex. Mar. 15, 2018) (stating that "[t]he Court disagrees that redundancy of limitations in a claim necessarily renders the

73

claim invalid"); *Omni MedSci, Inc. v. Apple Inc.*, No. 2:18-CV-00429-RWS, 2019 WL 3818762, at *15 (E.D. Tex. Aug. 14, 2019) (explaining that "if there is only one reasonable interpretation of a claim then the meaning of the claim is reasonably certain, even with redundant terms"). CogniPower will revisit Fantasia's argument if necessary once Fantasia has briefed its position on the matter.

### 2.    Defendants' Answering Position

Claim 52 confusingly recites the same limitation twice with only slight differences in phrasing:  that "the demand pulses **regulate the output port** by driving the **feedback signal** to **match** the **reference signal**" and "the flyback converter **regulates the output port** to have the **feedback signal match** the **reference signal**."  The confusion is exacerbated by CogniPower's failure to propose a construction, and by the patent's failure to describe criteria to determine whether signals "match."  Indeed, "match" appears nowhere in the specification.

It is well established that superfluous claim limitations can render a claim indefinite.  *E.g. Skyhook Wireless, Inc. v. Google, Inc.,* 2012 WL 4076180, at *14 (D. Mass. Sept. 14, 2012) ("Since such a construction would render the term superfluous, and the court is left with no alternative construction, the term is insolubly ambiguous and therefore indefinite."), *citing Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) ("Patent claims

74

function to delineate the precise scope of a claimed invention and to give notice to the public, including potential competitors, of the patentee's right to exclude. This notice function would be undermined, however, if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous.") (citation omitted).

The cases cited by CogniPower are distinguishable. They both contain a similar footnote stating that redundancy does not "necessarily" render a claim invalid if the proper claim construction is *otherwise clear*. *See Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, 2018 WL 1353116, at n.13 (E.D. Tex. Mar. 15, 2018); *Omni MedSci, Inc. v. Apple Inc.*, 2019 WL 3818762, at n.10 (E.D. Tex. Aug. 14, 2019). However, in this case, CogniPower has failed to propose a timely construction that makes the claim language understandable. In addition, the language at issue is indefinite not just because it is superfluous but also because the patent specification fails to provide criteria to inform what it means for signals to "match." The Court should hold the claims indefinite.

### 3. Plaintiff's Reply Position

Fantasia's contention that the alleged redundancy renders `713 Patent, claim 52 indefinite rests on its assertion that the specification does not explain what it means for signals to match. First, patent specifications are not required to re-explain every claim terms understood by those skilled in the art. *See Hybritech,*

*Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed.Cir.1986) ("a patent need not teach, and preferably omits, what is well known in the art"). Further, in discussing a claim that included the phrase "the flyback converter regulates the output port to have the feedback signal match the reference signal," patentees explained to the PTO that support for the feature "is found, for example, in column 8, lines 6-19." Ex. L, `713 Prosecution History, 1/2/2019 Amendment, p. 47. This passage discusses regulation of the output port, explaining in part that oscillator pulses are gated by flip-flop 412d based on the voltage at node Dc. `713 Patent, 8:6-19. Two paragraphs later, the specification, discussing Fig. 4, explains node Dc:

> [B]etween terminals **13d** and **14d** is disposed a voltage divider comprising resistors **408d** and **409d,** the voltage at the junction of which is applied to an input of a comparator **401d.** ***Should the voltage at that junction exceed the voltage of a reference 400d, also applied to a comparator 401d input, an output of comparator 401d will drop to a logic low, drawing current through a diode 410d, thus presenting a logic low at node Dc and, after clocking, responsively at node Qc, inhibiting pulses through gate 509d that would otherwise turn ON switch 200d.*** Thus, the voltage between terminals **13d** and **14d** is regulated responsive to the voltage of reference **400d.**

`713 Patent, 8:29-42 (emphasis added).



`031 Patent, Fig. 4 (emphasis added)

While not the only implementation, this provides an explicit example of how to "regulate[] the output port to have the feedback signal match the reference signal." Thus, to the extent one of ordinary skill in the art did not already understand the claim language, a review of the prosecution history would provide that clarity.

Given that the phrases at issue are readily understood, particularly in view of the prosecution history, any redundancy that may exist would have no effect "precisely because it is redundant." *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, No. 2:17-CV-00235-JRG, 2018 WL 1353116, at *12 (E.D. Tex. Mar. 15, 2018) (explaining "Claim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated" (quoting *ICU*

77

*Med., Inc. v. Alaris Med. Sys.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009)); *see also PPS Data, LLC v. Jack Henry & Assocs., Inc.*, No. 2:18-CV-00007-JRG, 2019 WL 1040742, at *17 (E.D. Tex. Mar. 4, 2019) ("[a]lthough the recital of both 'electronic check data' and 'check image data' therefore appears to be redundant, '[t]he Court disagrees that redundancy of limitations in a claim necessarily renders the claim invalid'") (quoting *Team Worldwide*, 2018 WL 1353116, at *12).

Because Fantasia cannot meet its burden of proving indefiniteness by clear and convincing evidence, its request to invalidate `713 Patent, claim 52 should be denied. *See BASF*, 875 F.3d at 1365.

### 4.   Defendants' Sur-reply Position

CogniPower's cases merely establish that claim construction may save redundant claim language from being indefinite.  However, CogniPower has failed to offer any construction for this language.  In addition, the language at issue is indefinite not just because one phrase is superfluous of the other, but also because the patent fails to provide criteria on what it means for signals to "match."  The Court should hold these claims indefinite.  If desired, Defendants can supply an expert declaration to explain in further detail why this claim language is unclear to a person of ordinary skill.

**COLE SCHOTZ P.C.**

*/s/ Andrew L. Cole*
Michael F. Bonkowski (No. 2219)
Andrew L. Cole (No. 5712)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 652-3131 (Telephone)
(302) 652-3117 (Facsimile)
mbonkowski@coleschotz.com
acole@coleschotz.com

OF COUNSEL:

Gary R. Sorden
Texas Bar No. 24066124
gsorden@coleschotz.com
Timothy J.H. Craddock
Texas Bar No. 24082868
tcraddock@coleschotz.com
Niky R. Bagley
Texas Bar No. 24078287
nbagely@coleschotz.com
James R. Perkins 24074881
Texas Bar No.
jperkins@coleschotz.com

COLE SCHOTZ, P.C.
901 Main Street, Suite 4120
Dallas, Texas 75202
Tel: (469) 557-9390
Fax: (469) 533-1587

**ATTORNEYS FOR PLAINTIFF
COGNIPOWER LLC**

Dated:  February 5, 2021

**FISH & RICHARDSON P.C.**

*/s/ Warren K. Mabey, Jr.*
Douglas E. McCann  (No. 3852)
Warren K. Mabey, Jr. (No. 5775)
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801
Telephone: (302) 652-5070
Email:  dmccann@fr.com;
mabey@fr.com

Frank E. Scherkenbach
One Marina Park Drive
Boston, MA  02210-1878
Telephone: (617) 542-5070
Email: scherkenbach@fr.com

Howard G. Pollack
Michael R. Headley
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Email: pollack@fr.com;
headley@fr.com

**ATTORNEYS FOR DEFENDANTS
FANTASIA TRADING, LLC D/B/A
ANKERDIRECT AND ANKER
INNOVATIONS LIMITED**

## **CERTIFICATE OF COMPLIANCE WITH STANDING ORDERS**

The undersigned counsel for Plaintiff hereby certifies that it has complied with this Court's November 6, 2019 Standing Order regarding Briefing in All Cases and Paragraph 16 of the Court's July 30, 2020 Scheduling Order  (D.I. 23) in that its Opening Position contains 5,449 words and its Reply Position contains 5,489 as calculated by Microsoft Word and that it is typed in Times New Roman 14-point font.

Dated: February 5, 2021                      */s/ Timothy J.H. Craddock*
                                                                Timothy J.H. Craddock


The undersigned counsel for Defendants hereby certifies that it has complied with this Court's November 6, 2019 Standing Order regarding Briefing in All Cases and Paragraph 16 of the Court's July 30, 2020 Scheduling Order  (D.I. 23) in that its Response Position contains 8,178 words and its Sur-Reply Position contains 2,068 words as calculated by Microsoft Word and that it is typed in Times New Roman 14-point font.

Dated:  February 5, 2021                      */s/ Warren K. Mabey, Jr.*
                                                                Warren K. Mabey, Jr.

59788/0001-40134382v1

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew L. Cole, hereby certify that, on February 5, 2021, I caused a true and correct copy of the foregoing document to be served on the following counsel in the manner indicated:

**<u>BY E-MAIL</u>**

Warren K. Mabey, Jr.
Douglas E. McCann
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19801
mabey@fr.com
dmccann@fr.com

Michael R. Headley
500 Arguello Street, Suite 500
Redwood City, CA 94063
headley@fr.com

**ATTORNEYS FOR DEFENDANTS
FANTASIA TRADING, LLC
D/B/A ANKERDIRECT AND
ANKER INNOVATIONS LIMITED**

59788/0001-40134382v1