# EXHIBIT 1



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 18, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *RE47,031*
ISSUE DATE: *September 4, 2018*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Wanda Montgomery
Certifying Officer

CP0000077



US00RE47031E

(19) **United States**

(12) **Reissued Patent**
Morong et al.

(10) Patent Number: **US RE47,031 E**

(45) Date of Reissued Patent: **Sep. 4, 2018**

(54) **POWER CONVERTER WITH DEMAND PULSE ISOLATION**

(71) Applicant: **CogniPower, LLC**, Malvern, PA (US)

(72) Inventors: **William H. Morong**, Paoli, PA (US); **Thomas E. Lawson**, Malvern, PA (US)

(73) Assignee: **CogniPower, LLC**, Malvern, PA (US)

(21) Appl. No.: **15/090,929**

(22) Filed: **Apr. 5, 2016**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **9,071,152**
    Issued: **Jun. 30, 2015**
    Appl. No.: **13/923,394**
    Filed: **Jun. 21, 2013**

U.S. Applications:
(60) Provisional application No. 61/667,473, filed on Jul. 3, 2012, provisional application No. 61/727,795, filed on Nov. 19, 2012.

(51) **Int. Cl.**
    *H02M 3/335*    (2006.01)

(52) **U.S. Cl.**
    CPC ...  *H02M 3/33523* (2013.01); *H02M 3/33507* (2013.01); *H02M 3/33515* (2013.01)

(58) **Field of Classification Search**
    None
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,889,173 A | | 6/1975 | Khusmann et al. |
| 4,119,103 A | * | 10/1978 | Jirak .................... A61N 1/365 607/9 |
| 4,209,847 A | * | 6/1980 | Noda .................. G05B 19/414 700/181 |
| 4,459,651 A | | 7/1984 | Fenter |
| 4,597,036 A | | 6/1986 | Paulik et al. |
| 4,758,937 A | * | 7/1988 | Usui et al. ...................... 363/19 |
| 4,937,727 A | | 6/1990 | Leonardi |
| 4,958,268 A | * | 9/1990 | Nagagata et al. .............. 363/16 |
| 4,996,638 A | | 2/1991 | Orr |
| 5,498,995 A | | 3/1996 | Szepesi et al. |
| 5,719,755 A | * | 2/1998 | Usui ................................ 363/19 |
| 5,973,945 A | | 10/1999 | Balakrishnan et al. |
| 6,072,702 A | * | 6/2000 | Nakao et al. ................... 363/19 |
| 6,456,511 B1 | * | 9/2002 | Wong ...................... H02M 1/36 363/21.13 |
| 6,504,267 B1 | | 1/2003 | Giannopoulos |
| 7,368,880 B2 | * | 5/2008 | Lyle, Jr. ............. H05B 41/2824 315/224 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        2717499 A1    4/2014

OTHER PUBLICATIONS

Frank, R., et al. "LM3001/LM3101 A 1 MHz Off-Line PWM Controller Chipset with Pulse Communication for Voltage-Current-or Charge-Mode Control," 1994, National Semiconductor Application Note 918, pp. 1-8.

(Continued)

*Primary Examiner* — Jeffrey R Jastrzab

(74) *Attorney, Agent, or Firm* — Mendelsohn Dunleavy, P.C.; Steve Mendelsohn

(57) **ABSTRACT**

The present invention provides a switched-mode power converter with regulation demand pulses sent across a galvanic isolation barrier.

**60 Claims, 4 Drawing Sheets**



**US RE47,031 E**
Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| 7,450,402 B2 * | 11/2008 | Jitaru ............................. 363/20 |
| 7,835,163 B2 | 11/2010 | Chou |
| 7,876,583 B2 | 1/2011 | Polivka et al. |
| 8,000,115 B2 | 8/2011 | Polivka et al. |
| 8,125,799 B2 | 2/2012 | Zhu et al. |
| 8,243,477 B2 | 8/2012 | Polivka et al. |
| 8,823,353 B2 | 9/2014 | Zhang et al. |
| 8,976,561 B2 | 3/2015 | Balakrishnan et al. |
| 9,035,435 B2 | 5/2015 | Balakrishnan et al. |
| 9,083,251 B2 | 7/2015 | Zhang et al. |
| 9,178,411 B2 | 11/2015 | Djenguerian et al. |
| 9,246,392 B2 | 1/2016 | Balakrishnan et al. |
| 9,275,946 B2 | 3/2016 | Balakrishnan et al. |
| 9,374,019 B2 * | 6/2016 | Li ........................ H02M 7/219 |
| 2005/0254266 A1 * | 11/2005 | Jitaru ............................. 363/16 |
| 2008/0278975 A1 * | 11/2008 | Degen et al. ............. 363/21.18 |
| 2010/0026268 A1 | 2/2010 | Chang et al. |
| 2010/0157630 A1 | 6/2010 | Polivka et al. |
| 2011/0000018 A1 | 1/2011 | Tai et al. |
| 2011/0000026 A1 | 1/2011 | Strijker |
| 2011/0018590 A1 | 1/2011 | Tai et al. |
| 2011/0026277 A1 | 2/2011 | Strijker |
| 2011/0096573 A1 * | 4/2011 | Zhu et al. ................ 363/21.17 |
| 2011/0096578 A1 * | 4/2011 | Fang et al. .................. 363/127 |
| 2012/0153921 A1 | 6/2012 | Brokaw |
| 2012/0281439 A1 | 11/2012 | Polivka et al. |
| 2013/0100710 A1 | 4/2013 | Kang et al. |

OTHER PUBLICATIONS

"LTC3706: Secondary-Side Synchronous Forward Controller with PolyPhase Capability," Linear Technology, 2005, pp. 1-22 as retrieved from: http://www.linear.com/product/LTC3706#notify.

"LTC3725: Single-Switch Forward Controller and Gate Driver," Linear Technology, 2005, pp. 1-20 as retrieved from: of http://www.linear.com/product/LTC3725.

"MAX630/MAX4193: CMOS Micropower Step-Up Switching Regulator," Maxim, 2008, pp. 1-14.

"Feedback Isolation Augments Power-Supply Safety and Performance," Jan. 22, 2001, Maxim, as retrieved from: https://www.maximintegrated.com/en/app-notes/index.mvp/id/664, 6 pages.

"Isolated Transformer Driver for PCMCIA Applications," as retrieved from: https://www.maximintegrated.com/en/products/power/isolated-power/MAX845.html, Feb. 2017, pp. 1-16.

"12V or Adjustable, High-Efficiency, Low IQ, Step-Up DC-DC Controller," as retrieved from: https://www.maximintegrated.com/en/products/power/switching-regulators/MAX1771.html, Feb. 2017, pp. 1-16.

Power Integrations Design Example Report, "3 W Single Output, <10 mW No-load Consumption, Isolated Adapter Using LinkSwitch-XT", Applications Engineering Department, DER-227, Oct. 6, 2009, Revision 1.1, pp. 1-28, Retrieved from http://www.powerint.com/sites/default/files/PDFFiles/der227.pdf.

* cited by examiner



**Fig. 1**



Fig. 2

CP0000081



Fig. 3



**Fig. 4**

CP0000083

US RE47,031 E

1

# POWER CONVERTER WITH DEMAND PULSE ISOLATION

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue; a claim printed with strikethrough indicates that the claim was canceled, disclaimed, or held invalid by a prior post-patent action or proceeding.

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application *is a reissue application of U.S. Pat. No. 9,071,152, which issued on Jun. 30, 2015 from U.S. patent application Ser. No. 13/923,394, which was filed on Jun. 21, 2013 and which* claims the benefit of the filing dates of U.S. provisional application Nos. 61/667,473, filed on Jul. 03, 2012, and 61/727,795, filed on Nov. 19, 2012, the teachings of [both] *all* of which are incorporated herein by reference in their entirety.

## BACKGROUND

1. Field of the Invention

The present invention relates to electronics and, more specifically but not exclusively, to switched-mode power converters.

2. Description of the Related Art

This section introduces aspects that may help facilitate a better understanding of the invention. Accordingly, the statements of this section are to be read in this light and are not to be understood as admissions about what is prior art or what is not prior art.

Switched-mode DC-DC power converters, often powered by rectified DC from AC mains, are ubiquitous as plug-in adapters used to power a plethora of electronic devices.

A typical such converter is copiously documented in the Power Integrations Design example report DER-227. Such converters are also taught in U.S. Pat. No. 4,459,651 and U.S. Patent Application Publication Nos. 2011/0026277 A1 and 2011/0018590 A1. Such converters typically generate commutation pulses on the mains side of galvanic isolation circuitry.

Some known converters use forms of absorption modulation to convey feedback information through the power transformer. In U.S. Pat. No. 8,000,115, a temporary decrease in the loading of a transformer secondary winding during a flyback pulse generates a corresponding voltage disruption of the same pulse, which disruption is detected on another transformer winding to effect primary-winding-side converter control. In U.S. Pat. No. 5,973,945, a similar method is taught, but instead of unloading a flyback pulse, temporary loading of a forward power pulse is taught. The circuitry for extracting the resulting information-bearing current disruption in the transformer primary circuit is quite involved. A similar absorption modulator is taught in U.S. Pat. No. 4,996,638.

Converters are also known wherein an analog voltage reflection of the converter output voltage seen on a primary-side winding is processed to generate a primary-side analog feedback signal which is used to control the commutating signals applied to the commutating switch to regulate converter output on its secondary side. Such feedback methods are taught in U.S. Pat. Nos. 4,597,036 and 3,889,173. Such methods are becoming less common due to the difficulty of

2

reliably processing the analog information reflected into a primary-side winding to obtain an accurate feedback signal.

U.S. Pat. No. 4,937,727 teaches a mains-side pulse generator that is pulse-width controlled by a voltage-responsive clamp on the output side of a galvanic isolation barrier.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other embodiments of the invention will become more fully apparent from the following detailed description, the appended claims, and the accompanying drawings in which like reference numerals identify similar or identical elements.

FIG. 1 shows a schematic diagram of a power converter according to an embodiment of the present invention using a blocking oscillator.

FIG. 2 shows a schematic diagram of a power converter according to another embodiment of the present invention using a blocking oscillator.

FIG. 3 shows a schematic diagram of a power converter according to an embodiment of the present invention using a simple transformer.

FIG. 4 shows a schematic diagram of a power converter according to an embodiment of the present invention using a separate pulse transformer.

## DETAILED DESCRIPTION

FIG. 1 shows a schematic diagram of a power converter 10a. A DC voltage source 5a, external to this converter, which may be derived from AC mains, may be connected to an earth ground 6a. Terminals 11a and 12a constitute a power input port that places source 5a in circuit with a primary winding 101a of a transformer 100a and with a commutating switch 200a, which is usually a MOSFET but may be a BJT or any other suitable electronic switch. For the diagrammed embodiment, switch 200a is a MOSFET having a source S, a gate G, and a drain D. Transformer 100a also comprises a regeneration winding 102a which is referenced to source S of MOSFET 200a, is connected through a capacitor 202a to gate G of MOSFET 200a, and is poled to provide regenerative feedback to gate G of MOSFET 200a. Connected between terminal 11a and gate G of MOSFET 200a is a resistor 201a which charges capacitor 202a to enhance MOSFET 200a at a slow pulse rate. Thus, MOSFET 200a, transformer 100a, capacitor 202a, and resistor 201a form an input-side blocking oscillator which acts as a driver circuit toggling ON and OFF MOSFET 200a.

Transformer 100a also comprises a secondary winding 104a which may be connected to a floating common terminal 14a. A diode 300a and a capacitor 301a form a rectifier circuit to rectify and filter voltage pulses from winding 104a to supply power through a power output port comprising terminals 13a and 14a to an external load represented by resistor 7a connected in circuit therewith, one end of which may be referred to a floating common 8a. The power input port 11a/12a and the power output port 13a/14a may be galvanically isolated from each other.

Flyback pulses of transformer 100a occur when MOSFET 200a ceases conduction, i.e., turns OFF. Winding 104a is poled to cause diode 300a to rectify only these flyback pulses.

Forward pulses, of opposite polarity to the flyback pulses, occur while MOSFET 200a is ON. Another diode 500a, poled to rectify forward pulses, and another capacitor 501a form an auxiliary rectifier circuit to rectify and filter forward pulses from winding 104a, and to store energy for triggering

CP0000084

US RE47,031 E

3

the input-side blocking oscillator formed by MOSFET 200a, transformer 100a, capacitor 202a, and resistor 201a. Resistor 201a is made sufficiently large to set a low free-running frequency of the blocking oscillator, perhaps 1 KHz or less, to minimize power consumption. Nevertheless, the miniscule power thus provided suffices to charge capacitor 501a to a voltage related, through the turns ratio of transformer 100a, to the voltage at the power input port, even with the power output port short-circuited.

This magnetically-coupled blocking oscillator may be triggered through any transformer winding magnetically coupled thereto. Therefore, just as MOSFET 200a may be turned ON through winding 102a, it may as easily be triggered through winding 104a. To trigger thusly, diode 500a is briefly short-circuited by a switch 502a which is driven by a demand pulse generator 503a to source a pulse of energy from capacitor 501a into transformer 100a. When this is done, the voltage at the cathode of diode 500a falls rapidly to the voltage on its anode, also being the voltage across capacitor 501a. Since winding 104a is coupled to winding 101a, the voltage on drain D of MOSFET 200a also rapidly falls from near the voltage on terminal 11a to near the voltage on terminal 12a. Since winding 102a is also magnetically coupled, the voltage at its node shared with capacitor 202a abruptly rises, turning ON MOSFET 200a. This triggering action occurs in a few tens of nanoseconds. Until regeneration is established in MOSFET 200a through winding 102a, triggering energy is supplied by capacitor 501a of the auxiliary rectifier circuit. However, once regeneration is established in MOSFET 200a, capacitor 501a is charged for the duration of the ON time of MOSFET 200a, fully replacing any energy lost during triggering. The demand pulse generator 503a may be used to adjust the commutation frequency of the converter 10a to cause its output to attain a desired value, as will be described below.

It is important to understand certain important advantages of this embodiment. Firstly, this embodiment allows minimal, simple, and robust circuitry to be galvanically associated with the power input port where high voltages and mains transients may be expected. According to this embodiment, more complex and vulnerable regulation circuitry may be galvanically associated with the power output port where voltages are often lower and protection is more easily implemented. Secondly, the control of a flyback converter that may cross from the discontinuous conduction mode (DCM), through the critical conduction mode, to the continuous conduction mode (CCM), is well known to be problematic. This embodiment simply avoids that problem. In the embodiment shown in FIG. 1, transformer 100a is used during the conduction of MOSFET 200a as a forward converter supplying the auxiliary rectifier circuit, and during the flyback of transformer 100a as a flyback converter supplying power to the power output port. During these cycle portions, it is difficult and impractical to re-trigger the blocking oscillator through transformer 100a to generate another energy-bearing cycle. Once the flyback pulse has reset the inductance of transformer 100a, i.e., has depleted energy from its magnetic field, transformer 100a is free, until the next ON time of MOSFET 200a, to be used as a magnetically coupled isolator to convey trigger information between its windings. In FIG. 1, the information thus conveyed is a pulse from pulse generator 503a which, responsive to the output of comparator 401a, indicates the need for another energy-bearing cycle, and moreover retriggers the blocking oscillator to provide that energybearing cycle. Since it is difficult or impractical to re-trigger until transformer 100a energy has been depleted, this con

4

verter will, if driven as hard as possible, approach critical conduction, but refuse to enter the critical conduction mode.

This converter may be fitted with a reference voltage 400a and a comparison circuit 401a. When the voltage at terminal 13a falls below the comparison voltage, comparison circuit 401a causes pulse generator circuit 503a to pulse, turning ON switch 502a, triggering an energy-bearing ON cycle of the blocking oscillator, and charging capacitor 301a. As load 7a drains capacitor 301a, terminal 13a voltage repeatedly falls to the voltage of reference 400a, causing comparison circuit 401a to initiate energy-bearing ON cycles. An interesting property of this embodiment is that the bottom of its output ripple corresponds to the voltage of reference 400a, and the amplitude of its ripple decreases with increased current in load 7a.

FIG. 2 shows a schematic diagram of a power converter 10b. As in converter 10a of FIG. 1 above, converter 10b is powered, through terminals 11b and 12b, from an external source 5b, that may be referred to earth ground 6b. Power from converter 10b flows through terminals 13b and 14b through a load 7b, which may be referred to a floating common 8b. A MOSFET 200b, preferably ON Semiconductor type NDD02N60, forms an input-side blocking oscillator with a (preferably 1 nF) capacitor 202b, a (preferably 66 megohm) resistor 201b, and a transformer 100b. Transformer 100b comprises a winding 101b, preferably about 250 uH, and windings 102b and 104b, preferably about 3.09 uH each, and a winding 103b, preferably about 193 nH, which may be a single turn. A capacitor 212b provides a short local circuit for high frequency currents and preferably comprises a 4.7 uF capacitor and a 100 nF capacitor (neither explicitly shown) in parallel. A resistor 210b, preferably about 180 ohms, and a capacitor 211b, preferably about 10 pF, filter out capacitive spikes generated by fast transitions of MOSFET 200b. When MOSFET 200b is turned on, the current therein rises, but is limited by a transistor 208b, the base of which is driven by a voltage across a resistor 209b, which voltage is responsive to current through MOSFET 200b. When MOSFET 200b current reaches about 250 mA, transistor 208b shunts current at gate G of MOSFET 200b to ground, limiting gate G voltage to prevent further current rise. With current rise prevented, the voltages across the windings of transformer 100b collapse. Thus, a regenerative turn-OFF of MOSFET 200b begins, and the voltage at its drain D flies positive past the voltage on terminal 11b until the energy in its magnetic field finds a current path through one of its windings. A corresponding negative voltage occurs at the shared node of winding 102b and a capacitor 204b, preferably about 100 pF, which immediately couples through a resistor 207b, preferably about 47 ohms, vigorously turning off MOSFET 200b. Within a few nanoseconds, the same transition couples through a resistor 203b, preferably about 1K, and a capacitor 202b, preferably about 1 nF, to join the signal passing through capacitor 204b, to reinforce the OFF transition at gate G of MOSFET 200b. Both the OFF and ON transitions at gate G of MOSFET 200b are regenerative and follow the path just described. To prevent damage to MOSFET 200b, its gate voltage should be limited. Resistor 203b and a diode 205b, preferably an 8.2 volt zener, form an L-network to limit that voltage. Since the voltage at the cathode of diode 205b is capacitively coupled to resistor 207b, and resistor 201b is pulling up on resistor 207b, the gate G voltage of MOSFET 200b would be free to rise, turn ON MOSFET 200b continually, and perhaps damage its gate, if means for limiting that gate voltage were not provided. Another zener diode 206b, preferably the zenered base-emitter junction of an NXP type PMBT 3904, is used

CP0000085

US RE47,031 E

5

to limit the gate voltage rise. This device is used because, at high temperature, excess leakage of diode 205b would shunt to ground the current of resistor 201b, preventing the blocking oscillator from starting. Most of the current from winding 102b, being too great for diode 206b to conduct without damage, flows in diode 205b.

As in FIG. 1, when the voltage at the node of winding 104b and a diode 300b, preferably type 1N4148, flies back, the energy in transformer 100b is dumped into a capacitor 301b, preferably 4.7 uF, to be consumed by load 7b. As in FIG. 1, a diode 500b, preferably type 1N4148, and a capacitor 501b, preferably 220 nF, form a forward converter to supply an auxiliary voltage.

Please note that, in this embodiment, the poling of winding 104b, diode 300b, and diode 500b are reversed, and the output polarity is reversed, with respect to FIG. 1. This reversal illustrates that this embodiment will function with either poling, and that polarity is of little practical concern in an isolated supply. The rectifiers and windings are so poled that the auxiliary supply forms a forward converter, and the output forms a flyback converter with the remaining circuitry. A switch 502b is, in this embodiment, a PNP transistor, preferably type MMBT 3906. This switch also coacts with another winding 103b of transformer 100b, which may be a single turn, and a capacitor 504b, to form an output-side triggering blocking oscillator 503b corresponding to pulse generator 503a of FIG. 1, which triggering blocking oscillator is magnetically coupled through transformer 100b to the above-described input-side, power-blocking oscillator comprising MOSFET 200b. Thus, an input-side, master blocking oscillator comprising MOSFET 200b and an output-side, slave blocking oscillator comprising switch 502b are magnetically coupled to each other through transformer 100b. The auxiliary voltage of capacitor 501b flows through a resistor 406b, preferably 27K, to feed another zener diode 400b, preferably another zenered PMBT3904, corresponding to reference 400a of FIG. 1. A capacitor 407b, preferably 100 nF, bypasses diode 400b at high frequencies. A dual transistor 402b, preferably NXP type BS846, is connected as a current mirror, and mirrors the current in a resistor 404b, the latter current being set by the reference voltage of diode 400b. This current sets the free running oscillation frequency of blocking oscillator/pulse generator 503b. Since the transformer 100b current flowing in MOSFET 200b is set by transistor 208b, the per-cycle energy in transformer 100b is quantized. Setting the current in resistor 404b, preferably 100K, therefore sets a maximum frequency of blocking oscillator/demand-pulse generator 503b, thereby setting the maximum frequency for these energy-quantized cycles, thus limiting maximum converter power, even in the event of an output short-circuit. A diode 403b, preferably type 1N4148, compensates the base-emitter voltage of dual-transistor 402b. Dual transistor 402b, resistor 404b, diode 403b, and a resistor 405b form a current comparator corresponding to comparator 401a of FIG. 1. Resistor 405b, preferably about 82K for a 5V output, provides feedback by robbing resistor 404b current from the current mirror of dual-transistor 402b as output voltage increases, thus setting operating frequency roughly in proportion to the demand of load 7b.

FIG. 3 shows a schematic diagram of a power converter 10c arranged to use a simple, two-winding transformer. The function of converter 10c closely parallels that of converters 10a and 10b of FIGS. 1 and 2, save that components have been added to replace the functions of regenerative (tickler) windings needed by blocking oscillators. As in the previous figures, a source 5c may be referenced to an earth ground 6c,

6

and load 7c may be referenced to a floating common 8c. As in FIG. 1, a transformer 100c primary winding 101c is in circuit with a switch 200c and terminals 11c and 12c. As in FIG. 1, flyback pulses on a secondary winding 104c of transformer 100c charge a capacitor 301c through a diode 300c to supply energy to the load 7c through terminals 13c and 14c. As in FIG. 1, forward pulses on the secondary winding of transformer 100c charge a capacitor 501c through a diode 500c. As in FIG. 1, a comparison circuit 401c compares the voltage on the output terminal 13c with a reference 400c. As in FIG. 1, a switch 502c is driven by a demand pulse generator 503c.

We now depart from the FIGS. 1 and 2 function. A fast oscillator 505c, preferably about 100 KHz, drives an AND gate 506c which is also driven by comparison circuit 401c. If the voltage between terminals 13c and 14c is smaller than that of reference 400c, gate 506c passes oscillator 505c pulses to trigger pulse generator 503c, which initiates, through transformer 100c additional energy-bearing pulses by eventually driving switch 200c, as described below. If, however, the output voltage is adequate, then gate 506c does not pass oscillator 505c pulses.

The pulses of energy from capacitor 501c sourced to transformer 100c, though a switch 502c, during the pulse of generator 503c, under the command of gate 506c, appear as voltage pulses across the primary winding of transformer 100c. These pulses are detected and processed to logic levels by a demand pulse detector 215c and passed through an OR gate 214c to a pulse generator that turns ON switch 200c to energize transformer 100c to begin an energy-bearing cycle. When switch 200c turns OFF, the subsequent flyback pulse charges capacitor 301c through diode 300c, as previously described. Since capacitor 501c is charged from the converter forward pulse, its voltage persists even in the presence of a short-circuit load, allowing the converter to recover once the short-circuit is removed.

Had no energy-bearing cycle ever occurred, there might be insufficient, or no, charge in capacitor 501c to be used to initiate energy-bearing cycles as described above. Therefore, a slow pulse oscillator 213c, preferably about 1 KHz, is also connected to gate 214c, through which it initiates energy-bearing cycles by triggering a pulse generator 216c, thus turning on switch 200c. These infrequent pulses cause energy-bearing cycles that are sufficient to charge capacitor 501c, which also may supply power to generator 503c, gate 506c, oscillator 505c, reference 400c, and comparison circuit 401c. Of course, slow oscillator 213c must somehow be powered along with gate 214c and pulse generator 216c. A bias supply (not shown but well known in the art) powered from terminals 11c and 12c, may be used to power these components of the circuit.

FIG. 4 shows a schematic diagram of a power converter 10d, comprising a separate transformer 110d to transmit demand pulses across a galvanic isolation barrier. As in FIG. 1 above, converter 10d is powered, through terminals 11d and 12d, from an external source 5d, and power output from converter 10d flows through terminals 13d and 14d.

Input voltage from terminals 11d and 12d powers a slow oscillator 213d, preferably of less than 1 KHz frequency, and a start-up regulator 232d which, through a supply node +5d, initially powers, with a voltage preferably about 4V, logic and drive circuitry described below. Each label "+5d" in FIG. 4 refers to a supply node that is initially about 4 volts when the input-side logic is starting to function and about 5 volts when in regulation. A capacitor 221d and a resistor 222d differentiate transitions of a slow pulse oscillator 213d

CP0000086

US RE47,031 E

7

to provide pulses of about 200 nS duration. These pulses pass though a NAND gate 223d to clock a D-type flip-flop 220d through a nane CKa.

Responsive to its clock pulse, flip-flop 220d turns ON a switch 200d, preferably a MOSFET, ON Semiconductor type NDD02N60, which is in circuit with a primary winding 101d of a transformer 100d, with a sense resistor 209d, and with terminals 11d and 12d. Current then flows in this circuit, and the voltage of source 5d is impressed upon primary winding 101d. According to the turns-ratio between primary winding 101d and a secondary winding 104d of transformer 100d, a voltage appears across winding 104d. This latter voltage charges a capacitor 416d through a diode 417d.

As current in resistor 209d rises, a voltage is applied to an input of a comparator 217d, which voltage is compared with a reference 216d, also connected to an input of comparator 217d. When current in resistor 209d exceeds a value set by reference 216d, comparator 217d issues a reset signal which propagates through NAND gates 218d and 219d to a node /Ra where the reset signal resets flip-flop 220d, turning OFF switch 200d.

When switch 200d is turned ON, unavoidable gate-to-source capacitance of MOSFET switch 200d causes a current spike in resistor 209d. To prevent comparator 217d from prematurely resetting flip-flop 220d responsive to this spike, the rise of node Qa charges a capacitor 231d through a resistor 230d to reach the threshold of a gate 219d in about 75 nS, prior to which the low voltage of capacitor 231d inhibits gate 219d from resetting flip-flop 220d.

Prior to its rise, node Qa has been low, and a complementary node/Qa has been high. When node Qa rises, node/Qa falls, discharging a capacitor 229d through a resistor 228d to the threshold of NAND gate 218d in about 2 uS, and though NAND gate 219d resetting flip-flop 220d, thus limiting the maximum ON time of switch 200d, should comparator 217d fail to reset flip-flop 220d.

In addition to limiting ON times of switch 200d, it is desirable to limit maximum frequency of these ON times. To this end, the voltage across a capacitor 226d is charged to a logic high through a resistor 225d and applied to a node Da, the D-input of flip-flop 220d. When node/Qa falls, capacitor 226d is discharged through a diode 227d, slowly to be recharged through resistor 225d. Until the capacitor 226d voltage is recharged to the D-input threshold voltage, flip-flop 220d is inhibited from turning ON switch 200d.

When switch 200d is turned OFF, the energy in the magnetic field of transformer 100d generates flyback voltage across its windings. Flyback voltage of winding 104d is rectified by a diode 300d and begins to charge a filter capacitor 301d to begin to supply output voltage to terminals 13d and 14d. This flyback voltage also raises the voltage on capacitor 416d, causing diode 417d to turn OFF and a diode 418d to turn ON, charging a capacitor 419d. Voltage across capacitor 419d supplies an auxiliary regulator 420d, which in turn powers a fast oscillator 505d, preferably of about 60 KHz frequency. Regulator 420d also powers logic and drive circuitry on the winding 104d side of the power converter.

The ON pulses of switch 200d responsive to oscillator 213d are sufficiently frequent to start the converter of this embodiment, but insufficiently frequent to drive it to full output. To initiate more frequent pulses, an oscillator 505d drives a capacitor 507d and a resistor 508d to supply differentiated pulses of about 100 nS width to a NAND gate 509d, which in turn drives a primary winding 111d of demand pulse transformer 110d, thus producing demand pulses across a secondary winding 112d thereof. These

8

winding 112d pulses are conveyed through a NAND gate 223d to clock flip-flop 220d at up to the frequency of oscillator 505d.

If all of the pulses of oscillator 505d were allowed to clock flip-flop 220d, under some conditions, the converter of this embodiment would produce excess output. To regulate this output, a flip-flop 412d is used to gate the pulses passed by NAND gate 509d. At a node CKc, oscillator 505d clocks a flip-flop 412d, which generates a logic high at a node Qc only when a logic high is present at a node Dc at the rising edge of its clock. Thus, pulses driving transformer 110d are permitted responsive to a logic high only at node Dc.

It would be wasteful of power to drive winding 111d for the full duration of the differentiated pulse at resistor 508d. Therefore, when switch 200d turns ON causing a negative transition at the dotted end of winding 101d, a corresponding negative transition appears at the dotted end of winding 104d. This transition is coupled through a small capacitor 414d, preferably about 10 pF, through a current-limiting resistor 415d to a node/Rc, the reset input of flip-flop 412d, which is normally held high by a resistor 413d. Thus, once the turning ON of switch 200d has propagated through transformer 100d, flip-flop 412d is reset, usually in less than 20 nS.

Node Dc is usually held at a logic high by a resistor 411d, thus enabling pulses gated by flip-flop 412d. However, between terminals 13d and 14d is disposed a voltage divider comprising resistors 408d and 409d, the voltage at the junction of which is applied to an input of a comparator 401d. Should the voltage at that junction exceed the voltage of a reference 400d, also applied to a comparator 401d input, an output of comparator 401d will drop to a logic low, drawing current through a diode 410d, thus presenting a logic low at node Dc and, after clocking, responsively at node Qc, inhibiting pulses through gate 509d that would otherwise turn ON switch 200d. Thus, the voltage between terminals 13d and 14d is regulated responsive to the voltage of reference 400d.

Since the voltage between terminals 11d and 12d may be high, perhaps 375V, and the desired regulated voltage at node +5d is typically 5V, it might be inefficient to obtain the power to supply the logic and drive circuitry associated with winding 101d from regulator 232d. Therefore, transformer 100d is fitted with an auxiliary winding 102d, which is connected in circuit with an inductor 235d, a diode 241d, and a switch 233d, preferably a MOSFET. While switch 200d is ON, current flows in this circuit. When switch 200d turns OFF, diode 241d also turns OFF and energy in inductor 235d generates a positive flyback voltage, causing current through a diode 236d to charge a filter capacitor 237d, raising the voltage of node +5d. As node +5d approaches 5V, regulator 232d ceases to supply energy to node +5d, but continues to power a voltage reference 242d, which drives an input of a comparator 240d. Should the voltage of node +5d exceed 5V, the voltage at the junction of resistors 238d and 239d, connected to another input of comparator 240d, will exceed that of reference 242d, causing the output of comparator 240d at node Db to drop to a logic low.

A flip-flop 234d drives node Qb to turn ON switch 233d responsive to clock pulses on node Qa, and to a logic high being present at node Db. When node Db drops to a logic low, node Qb follows it upon the next clock, and switch 233d turns OFF. In this state, inductor 235d no longer receives energy and no longer charges capacitor 237d through diode 236d. Thus, node +5d is regulated to approximately 5V, and the energy supplying node +5d is provided efficiently through transformer 100d.

CP0000087

US RE47,031 E

9

In one embodiment, the invention is a switched-mode power-converter comprising a power input port, a transformer comprising windings, a commutating switch connected in circuit with the input port and a winding of the transformer, a driver circuit for toggling the commutating switch, a power output port, a rectifier circuit for supplying power to the power output port, a reference voltage or current source, a comparison circuit for comparing the voltage or current at the power output port with the reference voltage or current, and a demand pulse source circuit coupled to the transformer for transmitting galvanically isolated trigger information through the transformer to the driver circuit responsive to the comparison circuit.

The converter may comprise as its driver circuit a blocking oscillator comprising the converter transformer. The converter may further comprise an input-side, master blocking oscillator for power conversion and an output-side, slave blocking oscillator for generating demand pulses. Both blocking oscillators may be mutually coupled through the converter power transformer or may drive separate transformers.

The converter may comprise inductive, capacitive, opto-coupled, or piezoelectric galvanic isolation circuitry to transmit demand pulses across the galvanic isolation barrier.

The converter may have one or more output rectifier circuits poled to rectify flyback pulses of its transformer.

The converter may comprise one or more auxiliary rectifier circuits which may be poled as forward converters.

The converter may be powered by a rectifier circuit to provide an AC/DC converter.

It should be understood that replicas of pulses generated and applied to one winding of the power transformer appear, suitably modified by turns-ratio, across all other windings of the power transformer.

Though blocking oscillators usually require tickler windings, single output embodiments of this invention may comprise a power transformer with as few as two, and in excess of five windings, with multiple output embodiments possibly comprising yet more windings.

Startup pulse generation circuitry resides on the powered side of the isolation barrier, though its pulses appear on both sides of the isolation barrier. This circuitry may comprise a blocking oscillator, another form of oscillator with drive circuitry to turn ON the commutating switch, or this circuitry may comprise an external source of pulses.

Demand pulse generator circuitry resides with the output port to be regulated, though its pulses appear on both sides of the isolation barrier. This circuitry may comprise a slave blocking oscillator, another form of oscillator with drive circuitry to turn ON the demand pulse generator switch, or may be externally applied.

Demand pulses may be generated to regulate the power converter to provide either a desired output voltage or a desired output current responsive to the voltage across or a current through an output port.

Between the commencement of start-up and the attainment of regulation, a pulse generator sources pulses to turn ON the commutating switch. This pulse generator may be the same generator that sources regulation pulses, or may be a separate pulse generator.

Each internal pulse generator is powered. The startup pulse generator is powered from the input port. The demand pulse generator is only indirectly powered from the input port by DC-DC power conversion through the power transformer and one or more rectifiers and filters powering the power output port with which the generator is associated.

10

Power for pulse generation circuitry may be rectified from either forward pulses, from flyback pulses, or both, appearing across one or more power transformer windings. Rectification of forward pulses helps to assure startup.

Windings, switches, and diodes may be poled to provide either polarity of input, and either polarity of output.

In each of the embodiments of FIGS. 1-4, galvanic isolation circuitry transfers (i) power from the input-port side to the output-port side of the power converter and (ii) demand pulses from the output-port side to the input-port side. In particular, in FIG. 1, the galvanic isolation circuitry consists of transformer 100a, which transfers (i) power from winding 101a to winding 104a and (ii) demand pulses from winding 104a to winding 102a. In FIG. 2, the galvanic isolation circuitry consists of transformer 100b, which transfers (i) power from winding 101b to winding 104b and (ii) demand pulses from winding 104b to winding 102b. In FIG. 3, the galvanic isolation circuitry consists of transformer 100c, which transfers (i) power from winding 101c to winding 104c and (ii) demand pulses from winding 104c to winding 101c. In FIG. 4, the galvanic isolation circuitry consists of (i) transformer 100d, which transfers power from winding 101d to winding 104d and (ii) transformer 110d, which transfers demand pulses from winding 111d to winding 112d. Winding 102d generates the bias supply for powering the +5d node.

In each of the embodiments of FIGS. 1-4, a demand pulse generator on the output-port side of the converter generates the demand pulses that are conveyed to the input-port side of the converter via the galvanic isolation circuitry. In FIGS. 1, 2, and 3, the demand pulse generator comprises elements 503a, 503b, and 503c, respectively. In FIG. 4, the demand pulse generator comprises NAND Gate 509d and flip-flop 412d.

In each of the embodiments of FIGS. 1-4, slow-pulse source circuitry generates pulses on the input side of the power converter. In FIGS. 1 and 2, the slow-pulse source circuitry is the corresponding input-side blocking oscillator. In FIGS. 3 and 4, the slow-pulse source circuitry is slow oscillator 213c and slow oscillator 213d, respectively. Note that, depending on the particular implementation, the slow-pulse source circuitry may be implemented internal to or external to the switched-mode power converter. Similarly, depending on the particular implementation, fast oscillator 505c and fast oscillator 505d of FIGS. 3 and 4, respectively, may be implemented internal to or external to the switched-mode power converter.

Embodiments of the invention may be implemented as (analog, digital, or a hybrid of both analog and digital) circuit-based processes, including possible implementation as one or more integrated circuits (such as an ASIC or an FPGA), a multichip module, a single card, or a multicard circuit pack.

Also for purposes of this description, the terms "couple," "coupling," "coupled," "connect," "connecting," or "connected" refer to any manner known in the art or later developed in which energy or signals are allowed to be transferred between two or more elements, and the interposition of one or more additional elements is contemplated, although not required. Conversely, the terms "directly coupled," "directly connected," etc., imply the absence of such additional elements.

Also, for purposes of this disclosure, it is understood that all gates are powered from a fixed voltage power domain (or domains) and ground unless shown otherwise. Accordingly, all digital signals generally have voltages that range from approximately ground potential to that of one of the power

CP0000088

US RE47,031 E

11

domains and transition (slew) quickly. However and unless stated otherwise, ground may be considered a power source having a voltage of approximately zero volts, and a power source having any desired voltage may be substituted for ground. Therefore, all gates may be powered by at least two power sources, with the attendant digital signals therefrom having voltages that range between the approximate voltages of the power sources.

Signals and corresponding nodes or ports may be referred to by the same name and are interchangeable for purposes here.

Transistors are typically shown as single devices for illustrative purposes. However, it is understood by those with skill in the art that transistors will have various sizes (e.g., gate width and length) and characteristics (e.g., threshold voltage, gain, etc.) and may consist of multiple transistors coupled in parallel to get desired electrical characteristics from the combination. Further, the illustrated transistors may be composite transistors.

The terms "source," "drain," and "gate" should be understood to refer either to the source, drain, and gate of a MOSFET or to the emitter, collector, and base of a bipolar device when an embodiment of the invention is implemented using bi-polar transistor technology. p Unless explicitly stated otherwise, each numerical value and range should be interpreted as being approximate as if the word "about" or "approximately" preceded the value of the value or range.

It will be further understood that various changes in the details, materials, and arrangements of the parts which have been described and illustrated in order to explain embodiments of this invention may be made by those skilled in the art without departing from embodiments of the invention encompassed by the following claims.

The use of figure numbers and/or figure reference labels in the claims is intended to identify one or more possible embodiments of the claimed subject matter in order to facilitate the interpretation of the claims. Such use is not to be construed as necessarily limiting the scope of those claims to the embodiments shown in the corresponding figures.

It should be understood that the steps of the exemplary methods set forth herein are not necessarily required to be performed in the order described, and the order of the steps of such methods should be understood to be merely exemplary. Likewise, additional steps may be included in such methods, and certain steps may be omitted or combined, in methods consistent with various embodiments of the invention.

Although the elements in the following method claims, if any, are recited in a particular sequence with corresponding labeling, unless the claim recitations otherwise imply a particular sequence for implementing some or all of those elements, those elements are not necessarily intended to be limited to being implemented in that particular sequence.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments necessarily mutually exclusive of other embodiments. The same applies to the term "implementation."

The embodiments covered by the claims in this application are limited to embodiments that (1) are enabled by this

12

specification and (2) correspond to statutory subject matter. Non-enabled embodiments and embodiments that correspond to nonstatutory subject matter are explicitly disclaimed even if they fall within the scope of the claims.

What is claimed is:

1. Apparatus configured to provide switched-mode power conversion, the apparatus comprising:
   an input port configured to receive input power;
   a switch configured to commutate the input power;
   galvanic isolation circuitry configured to provide galvanic isolation between the input port and an output port, wherein the galvanic isolation circuitry comprises a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a *first* rectifier and the output port, wherein the transformer is configured to transfer power from the input port to supply voltage or current to a load connected to the output port; [and]
   a demand pulse generator galvanically connected to the secondary winding, configured to generate demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load; *and*
   *a capacitor and a second rectifier both galvanically connected to the secondary winding, wherein:*
      *the second rectifier is different from the first rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and*
      *the demand pulse generator is powered by energy stored in the capacitor to generate the demand pulses.*

2. The apparatus of claim 1, further comprising:
   a source configured to provide a reference signal; and
   comparison circuitry configured to compare *a feedback signal based on* the output port voltage or current to the reference signal wherein frequency of the demand pulses is responsive to the comparison between *the feedback signal based on* the output port voltage or current and the reference signal.

3. The apparatus of claim 1, further comprising input-side blocking oscillator circuitry configured to drive the switch.

4. The apparatus of claim 3, wherein the demand pulse generator comprises output-side blocking oscillator circuitry configured to generate the demand pulses.

5. The apparatus of claim 1, [further comprising] *wherein the demand pulse generator comprises:*
   [a fast] *an* oscillator configured to [initiate the generation of the demand] *generate oscillator* pulses; and
   logic circuitry configured to [provide gating of] *selectively gate the oscillator pulses to generate* the demand pulses applied to the galvanic isolation circuitry.

6. The apparatus of claim 1, wherein the galvanic isolation circuitry further comprises dedicated circuitry configured to convey the demand pulses across the galvanic isolation.

7. The apparatus of claim 1, wherein the demand pulses are conveyed from the demand pulse generator [to the switch] *across the galvanic isolation* via the transformer.

8. The apparatus of claim 1, wherein:
   the galvanic isolation circuitry divides the apparatus into (i) an input side corresponding to the primary winding of the transformer and (ii) an output side corresponding to the secondary winding of the transformer; and
   the demand pulse generator is located on the output side of the apparatus.

CP0000089

US RE47,031 E

13

[9. The apparatus of claim 1, further comprising a capacitor and a diode both galvanically connected to the secondary winding, wherein:

the diode is different from the rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the demand pulse generator is powered by energy stored in the capacitor to generate the demand pulses.]

10. Apparatus configured to provide galvanically isolated switched-mode power conversion, the apparatus comprising:

an input port configured to receive input power;

a switch configured to commutate the input power;

a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a *first rectifier* and an output port, wherein the transformer is configured to supply power from the input port to a load connected to the output port; and

a first pulse source circuitry located on an input side of the apparatus and configured to generate pulses to control the switch to start the power conversion; [and]

a second pulse source circuitry located on an output side of the apparatus and configured to generate *demand* pulses to control the switch to continue the power conversion after being started by the first pulse source circuitry; *and*

*a capacitor and a second rectifier both galvanically connected to the secondary winding, wherein:*

*the second rectifier is different from the first rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and*

*the second pulse source circuitry is powered by energy stored in the capacitor to generate the demand pulses.*

11. The apparatus of claim 10, wherein the frequency of *the demand* pulses generated by the second pulse source circuitry is different from the frequency of *the* pulses generated by the first pulse source circuitry.

12. The apparatus of claim 11, wherein the frequency of *the demand* pulses generated by the second pulse source circuitry is greater than the frequency of *the* pulses generated by the first pulse source circuitry.

13. The apparatus of claim 10, wherein the frequency of *the* pulses generated by the first pulse source circuitry is about 1 KHz or smaller.

14. The apparatus of claim 13, wherein the frequency of *the demand* pulses generated by the second pulse source circuitry is about 60 KHz or greater.

[15. The apparatus of claim 10, further comprising a capacitor and a diode both galvanically connected to the secondary winding, wherein:

the diode is different from the rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the second pulse source circuitry is powered by energy stored in the capacitor to generate the pulses.]

[16. In an isolated switched-mode power converter having an input port and an output port, a method of regulation comprising:

(a) comparing a voltage or current at the output port with a reference that is galvanically associated therewith;

(b) generating or gating demand pulses responsive to that comparison;

(c) applying the demand pulses to an output-port side of galvanic isolation circuitry;

14

(d) receiving replicas of the demand pulses from an input-port side of the galvanic isolation circuitry; and

(e) adjusting commutation frequency of the converter responsive to the demand pulses to cause the voltage or current at the output port to attain a desired value. ]

[17. The method of claim 16, wherein step (b) comprises:

(b1) using a diode to charge a capacitor during forward pulses of the power converter, wherein the diode and the capacitor are galvanically connected within the output-port side of the galvanic isolation circuitry; and

(b2) generating or gating the demand pulses using energy stored in the capacitor.]

*18. In an isolated switched-mode power converter having an input port and an output port, a method of regulation comprising:*

*(a) comparing a feedback signal based on a voltage or current at the output port with a reference signal that is galvanically associated therewith;*

*(b) generating demand pulses responsive to that comparison;*

*(c) applying the demand pulses to an output-port side of galvanic isolation circuitry;*

*(d) receiving the demand pulses at an input-port side of the galvanic isolation circuitry; and*

*(e) controlling the converter responsive to the demand pulses to supply the voltage or current at the output port, wherein step (b) comprises:*

*(b1) using a rectifier to charge a capacitor during forward pulses of the power converter, wherein the rectifier and the capacitor are connected in circuit with the output-port side of the galvanic isolation circuitry; and*

*(b2) generating the demand pulses using energy stored in the capacitor.*

*19. The method of claim 18, wherein:*

*step (b2) comprises:*

*(b2i) generating a stream of output-side pulses using an output-side free-running oscillator; and*

*(b2ii) gating the stream of output-side pulses using output-side logic circuitry to generate the demand pulses;*

*step (e) comprises:*

*(e1) generating a stream of input-side pulses using an input-side free-running oscillator; and*

*(e2) gating the stream of input-side pulses and the demand pulses using input-side logic circuitry to generate control signals for the switch.*

*20. The method of claim 19, wherein, unless gated by the input-side logic circuitry, each demand pulse results in an input-side commutating switch being turned on, wherein the input-side logic circuitry determines when to turn off the input-side commutating switch.*

*21. The method of claim 19, wherein an input-side commutating switch is turned on for a duration that is independent of duration of the demand pulses.*

*22. The method of claim 19, wherein step (b2i) comprises generating the stream of output-side pulses independent of any pulses received from the input side of the power converter.*

*23. The method of claim 18, wherein a demand pulse generator comprises:*

*an oscillator that generates oscillator pulses; and*

*logic circuitry that selectively gates the oscillator pulses to generate the demand pulses applied to the galvanic isolation circuitry.*

US RE47,031 E

15

24. The method of claim 18, wherein the galvanic isolation circuitry comprises dedicated circuitry that conveys the demand pulses, wherein the dedicated circuitry comprises:

an input-side coupled inductor connected in circuit to an input-side commutating switch; and

an output-side coupled inductor connected in circuit to a demand pulse generator.

25. The method of claim 18, wherein signals responsive to the demand pulses are applied to an input-side commutating switch to adjust a frequency of switching of input power from the input port to supply a desired amount of voltage or current to a load connected to the output port.

26. The method of claim 18, wherein, at power up, an input-side oscillator and input-side logic circuitry turn on an input-side commutating switch in order to transfer input power to an output side of the power converter via a power transformer to energize the capacitor in order to power an output-side oscillator and output-side logic circuitry to generate the demand pulses.

27. The method of claim 18, wherein signals generated on an output side of the power converter do not instruct an input-side controller to turn off an input-side commutating switch.

28. The method of claim 18, wherein an input-side controller avoids premature turnoff of an input-side commutating switch due to capacitive charging of the input-side commutating switch.

29. The method of claim 18, wherein an input-side controller establishes a maximum duration for which an input-side commutating switch is allowed to stay on.

30. The method of claim 18, wherein a load is connected to the output port and powered by the power converter.

31. The method of claim 18, wherein an input-side controller determines when to turn off an input-side commutating switch based on current flowing through the input-side commutating switch.

32. The method of claim 18, wherein a leading edge of a single demand pulse will turn on an input-side commutating switch independent of other demand pulses.

33. The method of claim 18, wherein the power converter comprises a power transformer having only one secondary winding.

34. The method of claim 18, wherein:

unless gated by an input-side controller, each demand pulse results in an input-side commutating switch being turned on, wherein the input-side controller determines when to turn off the input-side commutating switch;

the input-side commutating switch is turned on for a duration that is independent of duration of the demand pulses;

signals responsive to the demand pulses are applied to the input-side commutating switch to adjust a frequency of switching of input power from the input port to supply a desired amount of voltage or current to a load connected to the output port;

signals generated on the output side of the power converter do not instruct the input-side controller to turn off the input-side commutating switch;

the input-side controller avoids premature turnoff of the input-side commutating switch due to capacitive charging of the input-side commutating switch; and

a leading edge of a single demand pulse will turn on the input-side commutating switch independent of other demand pulses.

35. The method of claim 34, wherein one or more of A, B, C, D, E, and F as follows:

A: a demand pulse generator comprises:

16

an oscillator that generates oscillator pulses; and

logic circuitry that selectively gates the oscillator pulses to generate the demand pulses applied to the galvanic isolation circuitry;

B: the galvanic isolation circuitry comprises dedicated circuitry that conveys the demand pulses, wherein the dedicated circuitry comprises:

an input-side coupled inductor connected in circuit to the input-side commutating switch; and

an output-side coupled inductor connected in circuit to the demand pulse generator;

C: at power up, an input-side oscillator and input-side logic circuitry turn on the input-side commutating switch in order to transfer input power to the output side of the power converter via a power transformer to energize the capacitor in order to power the demand pulse generator to generate the demand pulses;

D: the input-side controller establishes a maximum duration for which the input-side commutating switch is allowed to stay on;

E: the input-side controller determines when to turn off the input-side commutating switch based on current flowing through the input-side commutating switch; and

F: the power transformer comprises only one secondary winding.

36. The apparatus of claim 6, wherein the dedicated circuitry comprises:

an input-side coupled inductor connected in circuit to the switch; and

an output-side coupled inductor connected in circuit to the demand pulse generator.

37. The apparatus of claim 1, wherein, unless gated by an input-side controller, each demand pulse results in the switch being turned on, wherein the input-side controller determines when to turn off the switch.

38. The apparatus of claim 1, wherein the switch is turned on for a duration that is independent of duration of the demand pulses.

39. The apparatus of claim 1, wherein, at power up, an input-side oscillator and input-side logic circuitry are configured to turn on the switch in order to transfer input power via the transformer to energize the capacitor in order to power the demand pulse generator to generate the demand pulses.

40. The apparatus of claim 1, wherein signals generated on an output side of the apparatus do not instruct an input-side controller to turn off the switch.

41. The apparatus of claim 1, wherein an input-side controller avoids premature turnoff of the switch due to capacitive charging of the switch.

42. The apparatus of claim 1, wherein an input-side controller is configured to establish a maximum duration for which the switch is allowed to stay on.

43. The apparatus of claim 1, further comprising the load.

44. The apparatus of claim 1, wherein an input-side controller is configured to determine when to turn off the switch based on current flowing through the switch.

45. The apparatus of claim 1, wherein a leading edge of a single demand pulse will turn on the switch independent of other demand pulses.

46. The apparatus of claim 1, the transformer comprises only one secondary winding.

47. The apparatus of claim 1, further comprising:

a source configured to provide a reference signal; and

comparison circuitry configured to compare a feedback signal based the output port voltage or current to the

US RE47,031 E

**17**

reference signal wherein frequency of the demand pulses is responsive to the comparison between the feedback signal and the reference signal, wherein:

unless gated by an input-side controller, each demand pulse results in the switch being turned on, wherein the input-side controller determines when to turn off the switch;

the switch is turned on for a duration that is independent of duration of the demand pulses;

signals generated on an output side of the apparatus do not instruct the input-side controller to turn off the switch;

the input-side controller avoids premature turnoff of the switch due to capacitive charging of the switch; and

a leading edge of a single demand pulse will turn on the switch independent of other demand pulses.

48. The method of claim 47, wherein one or more of A, B, C, D, E, and F as follows:

A: the demand pulse generator comprises:
an oscillator that generates oscillator pulses; and
logic circuitry that selectively gates the oscillator pulses to generate the demand pulses applied to the galvanic isolation circuitry;

B: the galvanic isolation circuitry comprises dedicated circuitry that conveys the demand pulses, wherein the dedicated circuitry comprises:
an input-side coupled inductor connected in circuit to the switch; and
an output-side coupled inductor connected in circuit to the demand pulse generator;

C: at power up, an input-side oscillator and input-side logic circuitry are configured to turn on the switch in order to transfer input power via the transformer to energize the capacitor in order to cause the demand pulse generator to generate the demand pulses;

D: the input-side controller is configured to establish a maximum duration for which the switch is allowed to stay on;

E: the input-side controller is configured to determine when to turn off the switch based on current flowing through the switch; and

F: the transformer comprises only one secondary winding.

49. The apparatus of claim 10, further comprising:
a source configured to provide a reference signal; and
comparison circuitry configured to compare a feedback signal based the output port voltage or current to the reference signal wherein frequency of the demand pulses is responsive to the comparison between the feedback signal and the reference signal.

50. The apparatus of claim 10, wherein the second pulse source circuitry comprises:
an oscillator configured to generate oscillator pulses; and
logic circuitry configured to selectively gate the oscillator pulses to generate the demand pulses.

51. The apparatus of claim 10, further comprising dedicated circuitry configured to convey the demand pulses from the output side to the input side of the apparatus, wherein the dedicated circuitry comprises:
an input-side coupled inductor connected in circuit to the switch; and
an output-side coupled inductor connected in circuit to the second pulse source circuitry.

52. The apparatus of claim 10, wherein, unless gated by an input-side controller, each demand pulse results in the switch being turned on, wherein the input-side controller determines when to turn off the switch.

**18**

53. The apparatus of claim 10, wherein the switch is turned on for a duration that is independent of duration of the demand pulses.

54. The apparatus of claim 10, wherein signals responsive to the demand pulses are applied to the switch to adjust a frequency of switching of input power from the input port to supply a desired amount of voltage or current to the load.

55. The apparatus of claim 10, wherein signals generated by an output-side controller do not instruct an input-side controller to turn off the switch.

56. The apparatus of claim 10, wherein an input-side controller avoids premature turnoff of the switch due to capacitive charging of the switch.

57. The apparatus of claim 10, wherein an input-side controller is configured to establish a maximum duration for which the switch is allowed to stay on.

58. The apparatus of claim 10, further comprising the load.

59. The apparatus of claim 10, wherein an input-side controller is configured to determine when to turn off the switch based on current flowing through the switch.

60. The apparatus of claim 10, wherein a leading edge of a single demand pulse will turn on the switch independent of other demand pulses.

61. The apparatus of claim 10, wherein the transformer comprises only one secondary winding.

62. The apparatus of claim 10, further comprising:
a source configured to provide a reference signal; and
comparison circuitry configured to compare a feedback signal based the output port voltage or current to the reference signal wherein frequency of the demand pulses is responsive to the comparison between the feedback signal and the reference signal, wherein:
unless gated by an input-side controller, each demand pulse results in the switch being turned on, wherein the input-side controller determines when to turn off the switch;
the switch is turned on for a duration that is independent of duration of the demand pulses;
signals responsive to the demand pulses are applied to the switch to adjust a frequency of switching of input power from the input port to supply a desired amount of voltage or current to the load;
signals generated by an output-side controller do not instruct the input-side controller to turn off the switch;
the input-side controller avoids premature turnoff of the switch due to capacitive charging of the switch; and
a leading edge of a single demand pulse will turn on the switch independent of other demand pulses.

63. The apparatus of claim 62, wherein at least one of A, B, C, D, and E as follows:

A: the second pulse source circuitry comprises:
an oscillator configured to generate oscillator pulses; and
logic circuitry configured to selectively gate the oscillator pulses to generate the demand pulses;

B: further comprising dedicated circuitry configured to convey the demand pulses from the output side to the input side of the apparatus, wherein the dedicated circuitry comprises:
an input-side coupled inductor connected in circuit to the switch; and
an output-side coupled inductor connected in circuit to the second pulse source circuitry;

US RE47,031 E

19

20

C: the input-side controller is configured to establish a maximum duration for which the switch is allowed to stay on;

D: the input-side controller is configured to determine when to turn off the switch based on current flowing through the switch; and

E: the transformer comprises only one secondary winding.

64. Apparatus configured to provide galvanically isolated switched-mode power conversion, the apparatus comprising:

an input port configured to receive input power;

a switch configured to commutate the input power;

a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a rectifier and an output port, wherein the transformer is configured to supply power from the input port to a load connected to the output port;

a first pulse source circuitry located on an input side of the apparatus and configured to generate pulses to control the switch to start the power conversion; and

a second pulse source circuitry located on an output side of the apparatus and configured to generate demand pulses to control the switch to continue the power conversion after being started by the first pulse source circuitry, wherein the frequency of the demand pulses generated by the second pulse source circuitry is greater than the frequency of the pulses generated by the first pulse source circuitry.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : RE47,031 E
APPLICATION NO.   : 15/090929                                   Page 1 of 1
DATED             : September 4, 2018
INVENTOR(S)       : Morong et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, Line 11, above the heading, "CROSS-REFERENCE TO RELATED APPLICATIONS"
insert: -- More than one reissue application has been filed for the reissue of Patent No. 9,071,152.
The reissue applications are (i) U.S. application No. 15/168,998, filed on 5/31/2016, and (ii) U.S.
application No. 15/202,746, filed on 7/6/2016, both are continuation reissue applications of a reissue
application No. 15/090,929 (the present application), filed on 4/5/2016, now U.S. Patent No.
RE47,031 E, which is a reissue of Patent No. 9,071,152. --.

Signed and Sealed this
Fourth Day of December, 2018

Andrei Iancu
*Director of the United States Patent and Trademark Office*

CP0000094

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : RE47,031 E                                                Page 1 of 1
APPLICATION NO.     : 15/090929
DATED               : September 4, 2018
INVENTOR(S)         : Morong et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, Line 11, above the heading, "CROSS-REFERENCE TO RELATED APPLICATIONS" insert: -- More than one reissue application has been filed for the reissue of Patent No. 9,071,152. The reissue applications are (i) U.S. application No. 15/168,998, filed on 5/31/2016, (ii) U.S. application No. 15/202,746, filed on 7/6/2016, (iii) U.S. application No. 16/547,850, filed on 8/22/2019, and (iv) U.S. application No. 16/548,897, filed on 8/22/2019, are continuation reissue applications of a reissue application No. 15/090,929 (the present application), filed on 4/5/2016, now U.S. Patent No. RE47,031 E, which is a reissue of Patent No. 9,071,152. --.

This certificate supersedes the Certificate of Correction issued December 4, 2018.

Signed and Sealed this
Twenty-eighth Day of July, 2020

Andrei Iancu
Director of the United States Patent and Trademark Office

### Disclaimer and Dedication

**RE. 47,031 E** - Morong, William H., Paoli, (PA); Lawson, Thomas E., Malvern, (PA). POWER CONVERTER WITH DEMAND PULSE ISOLATION. Patent dated September 4, 2018. Disclaimer filed February 25, 2021 by the assignee, CogniPower, LLC.

I hereby disclaim the complete claims in said patent 64.

*(Official Gazette, November 2, 2021)*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : RE47,031 E                                                    Page 1 of 1
APPLICATION NO.     : 15/090929
DATED               : September 4, 2018
INVENTOR(S)         : Morong et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, under the heading "CROSS-REFERENCE TO RELATED APPLICATIONS," please replace Lines 15-20 (approx.), with the following:

--NOTICE: More than one reissue application has been filed for the reissue of U.S. Patent No. 9,071,152 B2. The reissue applications are U.S. Reissue Patent Application Serial No. 16/987,654, filed on August 7, 2020, which is a continuation reissue of U.S. Reissue Patent Application Serial No. 16/547,850, filed on August 22, 2019, which together with U.S. Reissue Patent Application Serial No. 16/548,897, filed on August 23, 2019, are each ('897 and '850) a continuation reissue application of U.S. Reissue Patent Application Serial No. 15/202,746, filed on July 6, 2016, now U.S. Reissue Patent No. RE47,714 E, issued November 5, 2019, which together with U.S. Reissue Patent Application Serial No. 15/168,998, filed on May 31, 2016, now U.S. Reissue Patent No. RE47,713 E, issued November 5, 2019, each of which ('746 and '998) are a continuation reissue application of U.S. Reissue Patent Application Serial No. 15/090,929 (the present application), filed on April 5, 2016, now U.S. Reissue Patent No. RE47,031 E, issued September 4, 2018, which is a reissue application of U.S. Patent Application Serial No. 13/923,394, filed on June 21, 2013, now U.S. Patent No. 9,071,152 B2, issued June 30, 2015, which claims the benefit of the filing dates of U.S. Provisional Patent Application No. 61/667,473, filed on July 3, 2012, now expired, and U.S. Provisional Patent Application No. 61/727,795, filed on November 19, 2012, now expired, the teachings--

This certificate supersedes both the Certificate of Correction issued July 28, 2020 and the Certificate of Correction issued December 4, 2018.

Signed and Sealed this
Second Day of August, 2022

Katherine Kelly Vidal

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

CP0000098

# EXHIBIT 2

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

May 18, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

**PATENT NUMBER:** *RE47,713*
**ISSUE DATE:** *November 5, 2019*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Wanda Montgomery
Certifying Officer



US00RE47713E

(19) **United States**

(12) **Reissued Patent**
Morong et al.

(10) Patent Number: **US RE47,713 E**
(45) **Date of Reissued Patent:**     *Nov. 5, 2019

(54) **POWER CONVERTER WITH DEMAND PULSE ISOLATION**

(71) Applicant: **CogniPower, LLC**, Malvern, PA (US)

(72) Inventors: **William H. Morong**, Paoli, PA (US);
**Thomas E. Lawson**, Malvern, PA (US)

(73) Assignee: **COGNIPOWER, LLC**, Malvern, PA (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/168,998**

(22) Filed: **May 31, 2016**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **9,071,152**
     Issued:     **Jun. 30, 2015**
     Appl. No.:  **13/923,394**
     Filed:      **Jun. 21, 2013**

U.S. Applications:
(63) Continuation of application No. 15/090,929, filed on Apr. 5, 2016, now Pat. No. Re. 47,031, which is an application for the reissue of Pat. No. 9,071,152.

(60) Provisional application No. 61/667,473, filed on Jul. 3, 2012, provisional application No. 61/727,795, filed on Nov. 19, 2012.

(51) **Int. Cl.**
     *H02M 3/335*     (2006.01)
(52) **U.S. Cl.**
     CPC ... *H02M 3/33523* (2013.01); *H02M 3/33507* (2013.01); *H02M 3/33515* (2013.01)
(58) **Field of Classification Search**
     CPC ......... H02M 3/33523; H02M 3/33515; H02M 3/33507; H02M 2001/0016
     USPC ...................................................... 363/21.15
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,321,685 A * | 5/1967 | Johannes | H02H 7/0833 318/400.22 |
| 3,889,173 A | 6/1975 | Klusmann et al. | |
| 4,119,103 A | 10/1978 | Jirak | |
| 4,209,847 A | 6/1980 | Noda et al. | |
| 4,438,486 A * | 3/1984 | Ferraro | H03K 17/08146 363/134 |
| 4,459,651 A | 7/1984 | Fenter | |
| 4,597,036 A | 6/1986 | Paulik et al. | |
| 4,758,937 A * | 7/1988 | Usui et al. | 363/19 |
| 4,937,727 A | 6/1990 | Leonardi | |
| 4,958,268 A * | 9/1990 | Nagagata et al. | H02M 3/33584 363/16 |
| 4,996,638 A | 2/1991 | Orr | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP     2717499 A1     4/2014

OTHER PUBLICATIONS

Frank, R., et al. "LM3001/LM3101 A 1 MHz Off-Line PWM Controller Chipset with Pulse Communication for Voltage-Current- or Charge-Mode Control," 1994, National Semiconductor Application Note 918, pp. 1-8.

(Continued)

*Primary Examiner* — Anjan K Deb
(74) *Attorney, Agent, or Firm* — Mendelsohn Dunleavy, P.C.; Steve Mendelsohn

(57)     **ABSTRACT**

The present invention provides a switched-mode power converter with regulation demand pulses sent across a galvanic isolation barrier.

**44 Claims, 4 Drawing Sheets**



**US RE47,713 E**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,161,022 A | * | 11/1992 | Ichimura ............ H02M 3/33507 |
| | | | 348/725 |
| 5,498,995 A | * | 3/1996 | Szepesi ............. H02M 3/33507 |
| | | | 327/101 |
| 5,642,267 A | | 6/1997 | Brkovic et al. |
| 5,719,755 A | * | 2/1998 | Usui ................................ 363/19 |
| 5,825,640 A | * | 10/1998 | Quigley ................ H03L 7/0895 |
| | | | 363/60 |
| 5,973,945 A | | 10/1999 | Balakrishnan et al. |
| 6,072,702 A | * | 6/2000 | Nakao et al. .................... 363/19 |
| 6,301,135 B1 | * | 10/2001 | Mammano ........ H02M 3/33523 |
| | | | 363/132 |
| 6,456,511 B1 | | 9/2002 | Wong |
| 6,504,267 B1 | | 1/2003 | Giannopoulos |
| 6,563,718 B1 | | 5/2003 | Li et al. |
| 6,738,267 B1 | | 5/2004 | Navas Sabater et al. |
| 7,368,880 B2 | | 5/2008 | Lyle, Jr. et al. |
| 7,450,402 B2 | * | 11/2008 | Jitaru ................................ 363/20 |
| 7,835,163 B2 | | 11/2010 | Chou |
| 7,876,583 B2 | | 1/2011 | Polivka et al. |
| 8,000,115 B2 | | 8/2011 | Polivka et al. |
| 8,125,799 B2 | | 2/2012 | Zhu et al. |
| 8,243,477 B2 | | 8/2012 | Polivka et al. |
| 8,823,353 B2 | | 9/2014 | Zhang et al. |
| 8,976,561 B2 | | 3/2015 | Balakrishnan et al. |
| 9,035,435 B2 | | 5/2015 | Balakrishnan et al. |
| 9,083,251 B2 | | 7/2015 | Zhang et al. |
| 9,178,411 B2 | | 11/2015 | Djenguerian et al. |
| 9,246,392 B2 | | 1/2016 | Balakrishnan et al. |
| 9,275,946 B2 | | 3/2016 | Balakrishnan et al. |
| 9,374,019 B2 | | 6/2016 | Li et al. |
| 10,008,942 B1 | * | 6/2018 | Horwitz ................. H02M 1/38 |
| 2005/0254266 A1 | * | 11/2005 | Jitaru ................................ 363/16 |
| 2006/0267514 A1 | * | 11/2006 | Xu ................ H05B 33/0815 |
| | | | 315/291 |
| 2007/0024254 A1 | | 2/2007 | Radecker et al. |
| 2008/0181316 A1 | | 7/2008 | Crawley et al. |
| 2008/0267212 A1 | | 10/2008 | Crawley et al. |
| 2008/0278975 A1 | * | 11/2008 | Degen et al. ............. 363/21.18 |
| 2008/0310191 A1 | | 12/2008 | Zhu et al. |
| 2010/0026268 A1 | | 2/2010 | Chang et al. |
| 2010/0157630 A1 | | 6/2010 | Polivka et al. |
| 2010/0231279 A1 | * | 9/2010 | Walker ................ H03K 5/15066 |
| | | | 327/237 |
| 2011/0018590 A1 | | 1/2011 | Tai et al. |
| 2011/0022867 A1 | * | 1/2011 | Chang .................. G06F 1/3218 |
| | | | 713/323 |
| 2011/0026277 A1 | | 2/2011 | Strijker |
| 2011/0096573 A1 | * | 4/2011 | Zhu et al. ......... H02M 3/33523 |
| | | | 363/21.17 |
| 2011/0096573 A1 | * | 4/2011 | Fang et al. .................... 363/127 |
| 2012/0153921 A1 | | 6/2012 | Brokaw |
| 2012/0281439 A1 | | 11/2012 | Polivka et al. |
| 2013/0100710 A1 | | 4/2013 | Kang et al. |
| 2013/0299841 A1 | | 11/2013 | Ranglack et al. |
| 2016/0079877 A1 | | 3/2016 | Lin et al. |

OTHER PUBLICATIONS

"Feedback Isolation Augments Power-Supply Safety and Performance," Jan. 22, 2001, Maxim, as retrieved from: https://www.maximintegrated.com/en/app-notes/index.mvp/id/664, 6 pages.

"Isolated Transformer Driver for PCMCIA Applications," as retrieved from: https://www.maximintegrated.com/en/products/power/isolated-power/MAX845.html, Feb. 2017, pp. 1-16.

"12V or Adjustable, High-Efficiency, Low IQ, Step-Up DC-DC Controller," as retrieved from: https://www.maximintegrated.com/en/products/power/switching-regulators/MAX1771.html, Feb. 2017, pp. 1-16.

"LTC3706: Secondary-Side Synchronous Forward Controller with PolyPhase Capability," Linear Technology, 2005, pp. 1-22 as retrieved from: http://www.linear.com/product/LTC3706#notify.

"LTC3725: Single-Switch Forward Controller and Gate Driver," Linear Technology, 2005, pp. 1-20 as retrieved from: http://www.linear.com/product/LTC3725.

"MAX630/MAX4193: CMOS Micropower Step-Up Switching Regulator," Maxim, 2008, pp. 1-14.

"LM3001 Primary-Side PWM Driver," 1995, National Semiconductor, 21 pages.

"LM3101 Secondary-Side PWM Controller," 1995, National Semiconductor, pp. 1-20.

Final Office Action dated Jul. 23, 2019 for U.S. Appl. No. 15/202,746.

Vu, Tue T. et al. "Primary-side sensing for a flyback converter in both continuous and discontinuous conduction mode," IET Irish Signals and Systems Conference (ISSC 2012) , Jun. 2012, pp. 1-6, IET, Maynooth, Ireland.

Power Integrations Design Example Report, "3 W Single Output, <10 mW No-load Consumption, Isolated Adapter Using LinkSwitch-XT", Applications Engineering Department, DER-227, Oct. 6, 2009, Revision 1.1, pp. 1-28, Retrieved from http://www.powerint.com/sites/default/files/PDFFiles/der227.pdf.

* cited by examiner



**Fig. 1**

CP0000004



Fig. 2

U.S. Patent      Nov. 5, 2019      Sheet 3 of 4      US RE47,713 E



Fig. 3



**Fig. 4**

US RE47,713 E

**1**

# POWER CONVERTER WITH DEMAND PULSE ISOLATION

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue; a claim printed with strikethrough indicates that the claim was canceled, disclaimed, or held invalid by a prior post-patent action or proceeding.

### CROSS-REFERENCE TO RELATED APPLICATIONS

[This application] *Notice: The following multiple reissue applications have been filed for the reissue of U.S. Pat. No. 9,071,152: (1) reissue application Ser. No. 15/090,929, filed on Apr. 5, 2016 and reissued as U.S. Reissue Pat. No. RE47,031; (2) reissue application Ser. No. 15/168,998 (the present application), filed on May 31, 2016, which is a reissue continuation of Ser. No. 15/090,929; and (3) reissue application Ser. No. 15/202,746, filed on Jul. 6, 2016, which is a reissue continuation of Ser. No. 15/090,929. U.S. Pat. No. 9,071,152 claims the benefit of the filing dates of U.S. provisional application Nos. 61/667,473, filed on Jul. 03, 2012, and 61/727,795, filed on Nov. 19, 2012, the teachings of both of which are incorporated herein by reference in their entirety.*

### BACKGROUND

1. Field of the Invention

The present invention relates to electronics and, more specifically but not exclusively, to switched-mode power converters.

2. Description of the Related Art

This section introduces aspects that may help facilitate a better understanding of the invention. Accordingly, the statements of this section are to be read in this light and are not to be understood as admissions about what is prior art or what is not prior art.

Switched-mode DC-DC power converters, often powered by rectified DC from AC mains, are ubiquitous as plug-in adapters used to power a plethora of electronic devices.

A typical such converter is copiously documented in the Power Integrations Design example report DER-227. Such converters are also taught in U.S. Pat. No. 4,459,651 and U.S. Patent Application Publication Nos. 2011/0026277 A1 and 2011/0018590 A1. Such converters typically generate commutation pulses on the mains side of galvanic isolation circuitry.

Some known converters use forms of absorption modulation to convey feedback information through the power transformer. In U.S. Pat. No. 8,000,115, a temporary decrease in the loading of a transformer secondary winding during a flyback pulse generates a corresponding voltage disruption of the same pulse, which disruption is detected on another transformer winding to effect primary-winding-side converter control. In U.S. Pat. No. 5,973,945, a similar method is taught, but instead of unloading a flyback pulse, temporary loading of a forward power pulse is taught. The circuitry for extracting the resulting information-bearing current disruption in the transformer primary circuit is quite involved. A similar absorption modulator is taught in U.S. Pat. No. 4,996,638.

Converters are also known wherein an analog voltage reflection of the converter output voltage seen on a primary-

**2**

side winding is processed to generate a primary-side analog feedback signal which is used to control the commutating signals applied to the commutating switch to regulate converter output on its secondary side. Such feedback methods are taught in U.S. Pat. Nos. 4,597,036 and 3,889,173. Such methods are becoming less common due to the difficulty of reliably processing the analog information reflected into a primary-side winding to obtain an accurate feedback signal.

U.S. Pat. No. 4,937,727 teaches a mains-side pulse generator that is pulse-width controlled by a voltage-responsive clamp on the output side of a galvanic isolation barrier.

### BRIEF DESCRIPTION OF THE DRAWINGS

Other embodiments of the invention will become more fully apparent from the following detailed description, the appended claims, and the accompanying drawings in which like reference numerals identify similar or identical elements.

FIG. 1 shows a schematic diagram of a power converter according to an embodiment of the present invention using a blocking oscillator.

FIG. 2 shows a schematic diagram of a power converter according to another embodiment of the present invention using a blocking oscillator.

FIG. 3 shows a schematic diagram of a power converter according to an embodiment of the present invention using a simple transformer.

FIG. 4 shows a schematic diagram of a power converter according to an embodiment of the present invention using a separate pulse transformer.

### DETAILED DESCRIPTION

FIG. 1 shows a schematic diagram of a power converter 10a. A DC voltage source 5a, external to this converter, which may be derived from AC mains, may be connected to an earth ground 6a. Terminals 11a and 12a constitute a power input port that places source 5a in circuit with a primary winding 101a of a transformer 100a and with a commutating switch 200a, which is usually a MOSFET but may be a BJT or any other suitable electronic switch. For the diagrammed embodiment, switch 200a is a MOSFET having a source S, a gate G, and a drain D. Transformer 100a also comprises a regeneration winding 102a which is referenced to source S of MOSFET 200a, is connected through a capacitor 202a to gate G of MOSFET 200a, and is poled to provide regenerative feedback to gate G of MOSFET 200a. Connected between terminal 11a and gate G of MOSFET 200a is a resistor 201a which charges capacitor 202a to enhance MOSFET 200a at a slow pulse rate. Thus, MOSFET 200a, transformer 100a, capacitor 202a, and resistor 201a form an input-side blocking oscillator which acts as a driver circuit toggling ON and OFF MOSFET 200a.

Transformer 100a also comprises a secondary winding 104a which may be connected to a floating common terminal 14a. A diode 300a and a capacitor 301a form a rectifier circuit to rectify and filter voltage pulses from winding 104a to supply power through a power output port comprising terminals 13a and 14a to an external load represented by resistor 7a connected in circuit therewith, one end of which may be referred to a floating common 8a. The power input port 11a/12a and the power output port 13a/14a may be galvanically isolated from each other.

Flyback pulses of transformer 100a occur when MOSFET 200a ceases conduction, i.e., turns OFF. Winding 104a is poled to cause diode 300a to rectify only these flyback pulses.

US RE47,713 E

3

Forward pulses, of opposite polarity to the flyback pulses, occur while MOSFET 200a is ON. Another diode 500a, poled to rectify forward pulses, and another capacitor 501a form an auxiliary rectifier circuit to rectify and filter forward pulses from winding 104a, and to store energy for triggering the input-side blocking oscillator formed by MOSFET 200a, transformer 100a, capacitor 202a, and resistor 201a. Resistor 201a is made sufficiently large to set a low free-running frequency of the blocking oscillator, perhaps 1 KHz or less, to minimize power consumption. Nevertheless, the miniscule power thus provided suffices to charge capacitor 501a to a voltage related, through the turns ratio of transformer 100a, to the voltage at the power input port, even with the power output port short-circuited.

This magnetically-coupled blocking oscillator may be triggered through any transformer winding magnetically coupled thereto. Therefore, just as MOSFET 200a may be turned ON through winding 102a, it may as easily be triggered through winding 104a. To trigger thusly, diode 500a is briefly short-circuited by a switch 502a which is driven by a demand pulse generator 503a to source a pulse of energy from capacitor 501a into transformer 100a. When this is done, the voltage at the cathode of diode 500a falls rapidly to the voltage on its anode, also being the voltage across capacitor 501a. Since winding 104a is coupled to winding 101a, the voltage on drain D of MOSFET 200a also rapidly falls from near the voltage on terminal 11a to near the voltage on terminal 12a. Since winding 102a is also magnetically coupled, the voltage at its node shared with capacitor 202a abruptly rises, turning ON MOSFET 200a. This triggering action occurs in a few tens of nanoseconds. Until regeneration is established in MOSFET 200a through winding 102a, triggering energy is supplied by capacitor 501a of the auxiliary rectifier circuit. However, once regeneration is established in MOSFET 200a, capacitor 501a is charged for the duration of the ON time of MOSFET 200a, fully replacing any energy lost during triggering. The demand pulse generator 503a may be used to adjust the commutation frequency of the converter 10a to cause its output to attain a desired value, as will be described below.

It is important to understand certain important advantages of this embodiment. Firstly, this embodiment allows minimal, simple, and robust circuitry to be galvanically associated with the power input port where high voltages and mains transients may be expected. According to this embodiment, more complex and vulnerable regulation circuitry may be galvanically associated with the power output port where voltages are often lower and protection is more easily implemented. Secondly, the control of a flyback converter that may cross from the discontinuous conduction mode (DCM), through the critical conduction mode, to the continuous conduction mode (CCM), is well known to be problematic. This embodiment simply avoids that problem. In the embodiment shown in FIG. 1, transformer 100a is used during the conduction of MOSFET 200a as a forward converter supplying the auxiliary rectifier circuit, and during the flyback of transformer 100a as a flyback converter supplying power to the power output port. During these cycle portions, it is difficult and impractical to re-trigger the blocking oscillator through transformer 100a to generate another energy-bearing cycle. Once the flyback pulse has reset the inductance of transformer 100a, i.e., has depleted energy from its magnetic field, transformer 100a is free, until the next ON time of MOSFET 200a, to be used as a magnetically coupled isolator to convey trigger information between its windings. In FIG. 1, the information thus conveyed is a pulse from pulse generator 503a which,

4

responsive to the output of comparator 401a, indicates the need for another energy-bearing cycle, and moreover retriggers the blocking oscillator to provide that energy-bearing cycle. Since it is difficult or impractical to re-trigger until transformer 100a energy has been depleted, this converter will, if driven as hard as possible, approach critical conduction, but refuse to enter the critical conduction mode.

This converter may be fitted with a reference voltage 400a and a comparison circuit 401a. When the voltage at terminal 13a falls below the comparison voltage, comparison circuit 401a causes pulse generator circuit 503a to pulse, turning ON switch 502a, triggering an energy-bearing ON cycle of the blocking oscillator, and charging capacitor 301a. As load 7a drains capacitor 301a, terminal 13a voltage repeatedly falls to the voltage of reference 400a, causing comparison circuit 401a to initiate energy-bearing ON cycles. An interesting property of this embodiment is that the bottom of its output ripple corresponds to the voltage of reference 400a, and the amplitude of its ripple decreases with increased current in load 7a.

FIG. 2 shows a schematic diagram of a power converter 10b. As in converter 10a of FIG. 1 above, converter 10b is powered, through terminals 11b and 12b, from an external source 5b, that may be referred to earth ground 6b. Power from converter 10b flows through terminals 13b and 14b through a load 7b, which may be referred to a floating common 8b. A MOSFET 200b, preferably ON Semiconductor type NDD02N60, forms an input-side blocking oscillator with a (preferably 1 nF) capacitor 202b, a (preferably 66 megohm) resistor 201b, and a transformer 100b. Transformer 100b comprises a winding 101b, preferably about 250 uH, and windings 102b and 104b, preferably about 3.09 uH each, and a winding 103b, preferably about 193 nH, which may be a single turn. A capacitor 212b provides a short local circuit for high frequency currents and preferably comprises a 4.7 uF capacitor and a 100 nF capacitor (neither explicitly shown) in parallel. A resistor 210b, preferably about 180 ohms, and a capacitor 211b, preferably about 10 pF, filter out capacitive spikes generated by fast transitions of MOSFET 200b. When MOSFET 200b is turned on, the current therein rises, but is limited by a transistor 208b, the base of which is driven by a voltage across a resistor 209b, which voltage is responsive to current through MOSFET 200b. When MOSFET 200b current reaches about 250 mA, transistor 208b shunts current at gate G of MOSFET 200b to ground, limiting gate G voltage to prevent further current rise. With current rise prevented, the voltages across the windings of transformer 100b collapse. Thus, a regenerative turn-OFF of MOSFET 200b begins, and the voltage at its drain D flies positive past the voltage on terminal 11b until the energy in its magnetic field finds a current path through one of its windings. A corresponding negative voltage occurs at the shared node of winding 102b and a capacitor 204b, preferably about 100 pF, which immediately couples through a resistor 207b, preferably about 47 ohms, vigorously turning off MOSFET 200b. Within a few nanoseconds, the same transition couples through a resistor 203b, preferably about 1K, and a capacitor 202b, preferably about 1 nF, to join the signal passing through capacitor 204b, to reinforce the OFF transition at gate G of MOSFET 200b. Both the OFF and ON transitions at gate G of MOSFET 200b are regenerative and follow the path just described. To prevent damage to MOSFET 200b, its gate voltage should be limited. Resistor 203b and a diode 205b, preferably an 8.2 volt zener, form an L-network to limit that voltage. Since the voltage at the cathode of diode 205b is capacitively coupled to resistor 207b, and resistor 201b is pulling up on resistor

CP0000009

US RE47,713 E

5

207b, the gate G voltage of MOSFET 200b would be free to rise, turn ON MOSFET 200b continually, and perhaps damage its gate, if means for limiting gate voltage were not provided. Another zener diode 206b, preferably the zenered base-emitter junction of an NXP type PMBT 3904, is used to limit the gate voltage rise. This device is used because, at high temperature, excess leakage of diode 205b would shunt to ground the current of resistor 201b, preventing the blocking oscillator from starting. Most of the current from winding 102b, being too great for diode 206b to conduct without damage, flows in diode 205b.

As in FIG. 1, when the voltage at the node of winding 104b and a diode 300b, preferably type 1N4148, flies back, the energy in transformer 100b is dumped into a capacitor 301b, preferably 4.7 nF, ultimately to be consumed by load 7b. As in FIG. 1, a diode 500b, preferably type 1N4148, and a capacitor 501b, preferably 220 nF, form a forward converter to supply an auxiliary voltage.

Please note that, in this embodiment, the poling of winding 104b, diode 300b, and diode 500b are reversed, and the output polarity is reversed, with respect to FIG. 1. This reversal illustrates that this embodiment will function with either poling, and that polarity is of little practical concern in an isolated supply. The rectifiers and windings are so poled that the auxiliary supply forms a forward converter, and the output forms a flyback converter with the remaining circuitry. A switch 502b is, in this embodiment, a PNP transistor, preferably type MMBT 3906. This switch also coacts with another winding 103b of transformer 100b, which may be a single turn, and a capacitor 504b, to form an output-side triggering blocking oscillator 503b corresponding to pulse generator 503a of FIG. 1, which triggering blocking oscillator is magnetically coupled through transformer 100b to the above-described input-side, power-blocking oscillator comprising MOSFET 200b. Thus, an input-side, master blocking oscillator comprising MOSFET 200b and an output-side, slave blocking oscillator comprising switch 502b are magnetically coupled to each other through transformer 100b. The auxiliary voltage of capacitor 501b flows through a resistor 406b, preferably 27K, to feed another zener diode 400b, preferably another zenered PMBT3904, corresponding to reference 400a of FIG. 1. A capacitor 407b, preferably 100 nF, bypasses diode 400b at high frequencies. A dual transistor 402b, preferably NXP type BS846, is connected as a current mirror, and mirrors the current in a resistor 404b, the latter current being set by the reference voltage of diode 400b. This current sets the free running oscillation frequency of blocking oscillator/pulse generator 503b. Since the transformer 100b current flowing in MOSFET 200b is set by transistor 208b, the per-cycle energy in transformer 100b is quantized. Setting the current in resistor 404b, preferably 100K, therefore sets a maximum frequency of blocking oscillator/demand-pulse generator 503b, thereby setting the maximum frequency for these energy-quantized cycles, thus limiting maximum converter power, even in the event of an output short-circuit. A diode 403b, preferably type 1N4148, compensates the base-emitter voltage of dual-transistor 402b. Dual transistor 402b, resistor 404b, diode 403b, and a resistor 405b form a current comparator corresponding to comparator 401a of FIG. 1. Resistor 405b, preferably about 82K for a 5V output, provides feedback by robbing resistor 404b current from the current mirror of dual-transistor 402b as output voltage increases, thus setting operating frequency roughly in proportion to the demand of load 7b.

FIG. 3 shows a schematic diagram of a power converter 10c arranged to use a simple, two-winding transformer. The

6

function of converter 10c closely parallels that of converters 10a and 10b of FIGS. 1 and 2, save that components have been added to replace the functions of regenerative (tickler) windings needed by blocking oscillators. As in the previous figures, a source 5c may be referenced to an earth ground 6c, and load 7c may be referenced to a floating common 8c. As in FIG. 1, a transformer 100c primary winding 101c is in circuit with a switch 200c and terminals 11c and 12c. As in FIG. 1, flyback pulses on a secondary winding 104c of transformer 100c charge a capacitor 301c through a diode 300c to supply energy to the load 7c through terminals 13c and 14c. As in FIG. 1, forward pulses on the secondary winding of transformer 100c charge a capacitor 501c through a diode 500c. As in FIG. 1, a comparison circuit 401c compares the voltage on the output terminal 13c with a reference 400c. As in FIG. 1, a switch 502c is driven by a demand pulse generator 503c.

We now depart from the FIGS. 1 and 2 function. A fast oscillator 505c, preferably about 100 KHz, drives an AND gate 506c which is also driven by comparison circuit 401c. If the voltage between terminals 13c and 14c is smaller than that of reference 400c, gate 506c passes oscillator 505c pulses to trigger pulse generator 503c, which initiates, through transformer 100c additional energy-bearing pulses by eventually driving switch 200c, as described below. If, however, the output voltage is adequate, then gate 506c does not pass oscillator 505c pulses.

The pulses of energy from capacitor 501c sourced to transformer 100c, [though] *through* a switch 502c, during the pulse of generator 503c, under the command of gate 506c, appear as voltage pulses across the primary winding of transformer 100c. These pulses are detected and processed to logic levels by a demand pulse detector 215c and passed through an OR gate 214c to a pulse generator that turns ON switch 200c to energize transformer 100c to begin an energy-bearing cycle. When switch 200c turns OFF, the subsequent flyback pulse charges capacitor 301c through diode 300c, as previously described. Since capacitor 501c is charged from the converter forward pulse, its voltage persists even in the presence of a short-circuit load, allowing the converter to recover once the short-circuit is removed.

Had no energy-bearing cycle ever occurred, there might be insufficient, or no, charge in capacitor 501c to be used to initiate energy-bearing cycles as described above. Therefore, a slow pulse oscillator 213c, preferably about 1 KHz, is also connected to gate 214c, through which it initiates energy-bearing cycles by triggering a pulse generator 216c, thus turning on switch 200c. These infrequent pulses cause energy-bearing cycles that are sufficient to charge capacitor 501c, which also may supply power to generator 503c, gate 506c, oscillator 505c, reference 400c, and comparison circuit 401c. Of course, since oscillator 213c must somehow be powered along with gate 214c and pulse generator 216c. A bias supply (not shown but well known in the art) powered from terminals 11c and 12c, may be used to power these components of the circuit.

FIG. 4 shows a schematic diagram of a power converter 10d, comprising a separate transformer 110d to transmit demand pulses across a galvanic isolation barrier. As in FIG. 1 above, converter 10d is powered, through terminals 11d and 12d, from an external source 5d, and power output from converter 10d flows through terminals 13d and 14d.

Input voltage from terminals 11d and 12d powers a slow oscillator 213d, preferably of less than 1 KHz frequency, and a start-up regulator 232d which, through a supply node +5d, initially powers, with a voltage preferably about 4V, logic and drive circuitry described below. Each label "+5d" in

US RE47,713 E

7

FIG. 4 refers to a supply node that is initially about 4 volts when the input-side logic is starting to function and about 5 volts when in regulation. A capacitor 221d and a resistor 222d differentiate transitions of a slow pulse oscillator 213d to provide pulses of about 200 nS duration. These pulses pass [though] *through* a NAND gate 223d to clock a D-type flip-flop 220d through a node CKa.

Responsive to its clock pulse, flip-flop 220d turns ON a switch 200d, preferably a MOSFET, ON Semiconductor type NDD02N60, which is in circuit with a primary winding 101d of a transformer 100d, with a sense resistor 209d, and with terminals 11d and 12d. Current then flows in this circuit, and the voltage of source 5d is impressed upon primary winding 101d. According to the turns-ratio between primary winding 101d and a secondary winding 104d of transformer 100d, a voltage appears across winding 104d. This latter voltage charges a capacitor 416d through a diode 417d.

As current in resistor 209d rises, a voltage is applied to an input of a comparator 217d, which voltage is compared with a reference 216d, also connected to an input of comparator 217d. When current in resistor 209d exceeds a value set by reference 216d, comparator 217d issues a reset signal which propagates through NAND gates 218d and 219d to a node/Ra where the reset signal resets flip-flop 220d, turning OFF switch 200d.

When switch 200d is turned ON, unavoidable gate-to-source capacitance of MOSFET switch 200d causes a current spike in resistor 209d. To prevent comparator 217d from prematurely resetting flip-flop 220d responsive to this spike, the rise of node Qa charges a capacitor 231d through a resistor 230d to reach the threshold of a gate 219d in about 75 nS, prior to which the low voltage of capacitor 231d inhibits gate 219d from resetting flip-flop 220d.

Prior to its rise, node Qa has been low, and a complementary node/Qa has been high. When node Qa rises, node/Qa falls, discharging a capacitor 229d through a resistor 228d to the threshold of NAND gate 218d in about 2 uS, and [though] *through* NAND gate 219d resetting flip-flop 220d, thus limiting the maximum ON time of switch 200d, should comparator 217d fail to reset flip-flop 220d.

In addition to limiting ON times of switch 200d, it is desirable to limit maximum frequency of these ON times. To this end, the voltage across a capacitor 226d is charged to a logic high through a resistor 225d and applied to a node Da, the D-input of flip-flop 220d. When node/Qa falls, capacitor 226d is discharged through a diode 227d, slowly to be recharged through resistor 225d. Until the capacitor 226d voltage is recharged to the D-input threshold voltage, flip-flop 220d is inhibited from turning ON switch 200d.

When switch 200d is turned OFF, the energy in the magnetic field of transformer 100d generates flyback voltage across its windings. Flyback voltage of winding 104d is rectified by a diode 300d and begins to charge a filter capacitor 301d to begin to supply output voltage to terminals 13d and 14d. This flyback voltage also raises the voltage on capacitor 416d, causing diode 417d to turn OFF and a diode 418d to turn ON, charging a capacitor 419d. Voltage across capacitor 419d supplies an auxiliary regulator 420d, which in turn powers a fast oscillator 505d, preferably of about 60 KHz frequency. Regulator 420d also powers logic and drive circuitry on the winding 104d side of the power converter. The ON pulses of switch 200d responsive to oscillator 213d are sufficiently frequent to start the converter of this embodiment, but insufficiently frequent to drive it to full output. To initiate more frequent pulses, an oscillator 505d drives a capacitor 507d and a resistor 508d to supply

8

differentiated pulses of about 100 nS width to a NAND gate 509d, which in turn drives a primary winding 111d of demand pulse transformer 110d, thus producing demand pulses across a secondary winding 112d thereof. These winding 112d pulses are conveyed through a NAND gate 223d to clock flip-flop 220d at up to the frequency of oscillator 505d.

If all of the pulses of oscillator 505d were allowed to clock flip-flop 220d, under some conditions, the converter of this embodiment would produce excess output. To regulate this output, a flip-flop 412d is used to gate the pulses passed by NAND gate 509d. At a node CKc, oscillator 505d clocks a flip-flop 412d, which generates a logic high at a node Qc only when a logic high is present at a node Dc at the rising edge of its clock. Thus, pulses driving transformer 110d are permitted responsive to a logic high only at node Dc.

It would be wasteful of power to drive winding 111d for the full duration of the differentiated pulse at resistor 508d. Therefore, when switch 200d turns ON causing a negative transition at the dotted end of winding 101d, a corresponding negative transition appears at the dotted end of winding 104d. This transition is coupled through a small capacitor 414d, preferably about 10 pF, through a current-limiting resistor 415d to a node/Rc, the reset input of flip-flop 412d, which is normally held high by a resistor 413d. Thus, once the turning ON of switch 200d has propagated through transformer 100d, flip-flop 412d is reset, usually in less than 20 nS.

Node Dc is usually held at a logic high by a resistor 411d, thus enabling pulses gated by flip-flop 412d. However, between terminals 13d and 14d is disposed a voltage divider comprising resistors 408d and 409d, the voltage at the junction of which is applied to an input of a comparator 401d. Should the voltage at that junction exceed the voltage of a reference 400d, also applied to a comparator 401d input, an output of comparator 401d will drop to a logic low, drawing current through a diode 410d, thus presenting a logic low at node Dc and, after clocking, responsively at node Qc, inhibiting pulses through gate 509d that would otherwise turn ON switch 200d. Thus, the voltage between terminals 13d and 14d is regulated responsive to the voltage of reference 400d.

Since the voltage between terminals 11d and 12d may be high, perhaps 375V, and the desired regulated voltage at node +5d is typically 5V, it might be inefficient to obtain the power to supply the logic and drive circuitry associated with winding 101d from regulator 232d. Therefore, transformer 100d is fitted with an auxiliary winding 102d, which is connected in circuit with an inductor 235d, a diode 241d, and a switch 233d, preferably a MOSFET. While switch 200d is ON, current flows in this circuit. When switch 200d turns OFF, diode 241d also turns OFF and energy in inductor 235d generates a positive flyback voltage, causing current through a diode 236d to charge a filter capacitor 237d, raising the voltage of node +5d. As node +5d approaches 5V, regulator 232d ceases to supply energy to node +5d, but continues to power a voltage reference 242d, which drives an input of a comparator 240d. Should the voltage of node +5d exceed 5V, the voltage at the junction of resistors 238d and 239d, connected to another input of comparator 240d, will exceed that of reference 242d, causing the output of comparator 240d at node Db to drop to a logic low.

A flip-flop 234d drives node Qb to turn ON switch 233d responsive to clock pulses on node Qa, and to a logic high being present at node Db. When node Db drops to a logic low, node Qb follows it upon the next clock, and switch 233d turns OFF. In this state, inductor 235d no longer

US RE47,713 E

9

receives energy and no longer charges capacitor **237d** through diode **236d**. Thus, node **+5d** is regulated to approximately 5V, and the energy supplying node **+5d** is provided efficiently through transformer **100d**.

In one embodiment, the invention is a switched-mode power-converter comprising a power input port, a transformer comprising windings, a commutating switch connected in circuit with the input port and a winding of the transformer, a driver circuit for toggling the commutating switch, a power output port, a rectifier circuit for supplying power to the power output port, a reference voltage or current source, a comparison circuit for comparing the voltage or current at the power output port with the reference voltage or current, and a demand pulse source circuit coupled to the transformer for transmitting galvanically isolated trigger information through the transformer to the driver circuit responsive to the comparison circuit.

The converter may comprise as its driver circuit a blocking oscillator comprising the converter transformer. The converter may further comprise an input-side, master blocking oscillator for power conversion and an output-side, slave blocking oscillator for generating demand pulses. Both blocking oscillators may be mutually coupled through the converter power transformer or may drive separate transformers.

The converter may comprise inductive, capacitive, optocoupled, or piezoelectric galvanic isolation circuitry to transmit demand pulses across the galvanic isolation barrier.

The converter may have one or more output rectifier circuits poled to rectify flyback pulses of its transformer.

The converter may comprise one or more auxiliary rectifier circuits which may be poled as forward converters.

The converter may be powered by a rectifier circuit to provide an AC/DC converter.

It should be understood that replicas of pulses generated and applied to one winding of the power transformer appear, suitably modified by turns-ratio, across all other windings of the power transformer.

Though blocking oscillators usually require tickler windings, single output embodiments of this invention may comprise a power transformer with as few as two, and in excess of five windings, with multiple output embodiments possibly comprising yet more windings.

Startup pulse generation circuitry resides on the powered side of the isolation barrier, though its pulses appear on both sides of the isolation barrier. This circuitry may comprise a blocking oscillator, another form of oscillator with drive circuitry to turn ON the commutating switch, or this circuitry may comprise an external source of pulses.

Demand pulse generator circuitry resides with the output port to be regulated, though its pulses appear on both sides of the isolation barrier. This circuitry may comprise a slave blocking oscillator, another form of oscillator with drive circuitry to turn ON the demand pulse generator switch, or may be externally applied.

Demand pulses may be generated to regulate the power converter to provide either a desired output voltage or a desired output current responsive to the voltage across or a current through an output port.

Between the commencement of start-up and the attainment of regulation, a pulse generator sources pulses to turn ON the commutating switch. This pulse generator may be the same generator that sources regulation pulses, or may be a separate pulse generator.

Each internal pulse generator is powered. The startup pulse generator is powered from the input port. The demand pulse generator is only indirectly powered from the input

10

port by DC-DC power conversion through the power transformer and one or more rectifiers and filters powering the power output port with which the generator is associated.

Power for pulse generation circuitry may be rectified from either forward pulses, from flyback pulses, or both, appearing across one or more power transformer windings. Rectification of forward pulses helps to assure startup.

Windings, switches, and diodes may be poled to provide either polarity of input, and either polarity of output.

In each of the embodiments of FIGS. 1-4, galvanic isolation circuitry transfers (i) power from the input-port side to the output-port side of the power converter and (ii) demand pulses from the output-port side to the input-port side. In particular, in FIG. 1, the galvanic isolation circuitry consists of transformer **100a**, which transfers (i) power from winding **101a** to winding **104a** and (ii) demand pulses from winding **104a** to winding **102a**. In FIG. 2, the galvanic isolation circuitry consists of transformer **100b**, which transfers (i) power from winding **101b** to winding **104b** and (ii) demand pulses from winding **104b** to winding **102b**. In FIG. 3, the galvanic isolation circuitry consists of transformer **100c**, which transfers (i) power from winding **101c** to winding **104c** and (ii) demand pulses from winding **104c** to winding **101c**. In FIG. 4, the galvanic isolation circuitry consists of (i) transformer **100d**, which transfers power from winding **101d** to winding **104d** and (ii) transformer **110d**, which transfers demand pulses from winding **111d** to winding **112d**. Winding **102d** generates the bias supply for powering the **+5d** node.

In each of the embodiments of FIGS. 1-4, a demand pulse generator on the output-port side of the converter generates the demand pulses that are conveyed to the input-port side of the converter via the galvanic isolation circuitry. In FIGS. 1, 2, and 3, the demand pulse generator comprises elements **503a**, **503b**, and **503c**, respectively. In FIG. 4, the demand pulse generator comprises NAND Gate **509d** and flip-flop **412d**.

In each of the embodiments of FIGS. 1-4, slow-pulse source circuitry generates pulses on the input side of the power converter. In FIGS. 1 and 2, the slow-pulse source circuitry is the corresponding input-side blocking oscillator. In FIGS. 3 and 4, the slow-pulse source circuitry is slow oscillator **213c** and slow oscillator **213d**, respectively. Note that, depending on the particular implementation, the slow-pulse source circuitry may be implemented internal to or external to the switched-mode power converter. Similarly, depending on the particular implementation, fast oscillator **505c** and fast oscillator **505d** of FIGS. 3 and 4, respectively, may be implemented internal to or external to the switched-mode power converter.

Embodiments of the invention may be implemented as (analog, digital, or a hybrid of both analog and digital) circuit-based processes, including possible implementation as one or more integrated circuits (such as an ASIC or an FPGA), a multichip module, a single card, or a multicard circuit pack.

Also for purposes of this description, the terms "couple," "coupling," "coupled," "connect," "connecting," or "connected" refer to any manner known in the art or later developed in which energy or signals are allowed to be transferred between two or more elements, and the interposition of one or more additional elements is contemplated, although not required. Conversely, the terms "directly coupled," "directly connected," etc., imply the absence of such additional elements.

Also, for purposes of this disclosure, it is understood that all gates are powered from a fixed voltage power domain (or

US RE47,713 E

11                                                          12

domains) and ground unless shown otherwise. Accordingly, all digital signals generally have voltages that range from approximately ground potential to that of one of the power domains and transition (slew) quickly. However and unless stated otherwise, ground may be considered a power source having a voltage of approximately zero volts, and a power source having any desired voltage may be substituted for ground. Therefore, all gates may be powered by at least two power sources, with the attendant digital signals therefrom having voltages that range between the approximate voltages of the power sources.

Signals and corresponding nodes or ports may be referred to by the same name and are interchangeable for purposes here.

Transistors are typically shown as single devices for illustrative purposes. However, it is understood by those with skill in the art that transistors will have various sizes (e.g., gate width and length) and characteristics (e.g., threshold voltage, gain, etc.) and may consist of multiple transistors coupled in parallel to get desired electrical characteristics from the combination. Further, the illustrated transistors may be composite transistors.

The terms "source," "drain," and "gate" should be understood to refer either to the source, drain, and gate of a MOSFET or to the emitter, collector, and base of a bipolar device when an embodiment of the invention is implemented using bi-polar transistor technology. p Unless explicitly stated otherwise, each numerical value and range should be interpreted as being approximate as if the word "about" or "approximately" preceded the value of the value or range.

It will be further understood that various changes in the details, materials, and arrangements of the parts which have been described and illustrated in order to explain embodiments of this invention may be made by those skilled in the art without departing from the embodiments of the invention encompassed by the following claims.

The use of figure numbers and/or figure reference labels in the claims is intended to identify one or more possible embodiments of the claimed subject matter in order to facilitate the interpretation of the claims. Such use is not to be construed as necessarily limiting the scope of those claims to the embodiments shown in the corresponding figures.

It should be understood that the steps of the exemplary methods set forth herein are not necessarily required to be performed in the order described, and the order of the steps of such methods should be understood to be merely exemplary. Likewise, additional steps may be included in such methods, and certain steps may be omitted or combined, in methods consistent with various embodiments of the invention.

Although the elements in the following method claims, if any, are recited in a particular sequence with corresponding labeling, unless the claim recitations otherwise imply a particular sequence for implementing some or all of those elements, those elements are not necessarily intended to be limited to being implemented in that particular sequence.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative

embodiments necessarily mutually exclusive of other embodiments. The same applies to the term "implementation."

The embodiments covered by the claims in this application are limited to embodiments that (1) are enabled by this specification and (2) correspond to statutory subject matter. Non-enabled embodiments and embodiments that correspond to nonstatutory subject matter are explicitly disclaimed even if they fall within the scope of the claims.

What is claimed is:

[1. Apparatus configured to provide switched-mode power conversion, the apparatus comprising:

an input port configured to receive input power;

a switch configured to commutate the input power;

galvanic isolation circuitry configured to provide galvanic isolation between the input port and an output port, wherein the galvanic isolation circuitry comprises a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a rectifier and the output port, wherein the transformer is configured to transfer power from the input port to supply voltage or current to a load connected to the output port; and

a demand pulse generator galvanically connected to the secondary winding and configured to generate demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load.]

[2. The apparatus of claim 1, further comprising:

a source configured to provide a reference signal; and

comparison circuitry configured to compare the output port voltage or current to the reference signal wherein frequency of the demand pulses is responsive to the comparison between the output port voltage or current and the reference signal.]

[3. The apparatus of claim 1, further comprising input-side blocking oscillator circuitry configured to drive the switch.]

[4. The apparatus of claim 3, wherein the demand pulse generator comprises output-side blocking oscillator circuitry configured to generate the demand pulses.]

[5. The apparatus of claim 1, further comprising:

a fast oscillator configured to initiate the generation of the demand pulses; and

logic circuitry configured to provide gating of the demand pulses applied to the galvanic isolation circuitry.]

[6. The apparatus of claim 1, wherein the galvanic isolation circuitry further comprises dedicated circuitry configured to convey the demand pulses across the galvanic isolation.]

[7. The apparatus of claim 1, wherein the demand pulses are conveyed from the demand pulse generator to the switch via the transformer.]

[8. The apparatus of claim 1, wherein:

the galvanic isolation circuitry divides the apparatus into (i) an input side corresponding to the primary winding of the transformer and (ii) an output side corresponding to the secondary winding of the transformer; and

the demand pulse generator is located on the output side of the apparatus.]

[9. The apparatus of claim 1, further comprising a capacitor and a diode both galvanically connected to the secondary winding, wherein:

US RE47,713 E

<table>
<tr><td>13</td><td>14</td></tr>
</table>

the diode is different from the rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the demand pulse generator is powered by energy stored in the capacitor to generate the demand pulses.]

[10. Apparatus configured to provide galvanically isolated switched-mode power conversion, the apparatus comprising:

an input port configured to receive input power;

a switch configured to commutate the input power;

a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a rectifier and an output port, wherein the transformer is configured to supply power from the input port to a load connected to the output port; and

a first pulse source circuitry located on an input side of the apparatus and configured to generate pulses to control the switch to start the power conversion; and

a second pulse source circuitry located on an input side of the apparatus and configured to generate pulses to control the switch to continue the power conversion after being started by the first pulse source circuitry.]

[11. The apparatus of claim 10, wherein the frequency of pulses generated by the second pulse source circuitry is different from the frequency of pulses generated by the first pulse source circuitry.]

[12. The apparatus of claim 11, wherein the frequency of pulses generated by the second pulse source circuitry is greater than the frequency of pulses generated by the first pulse source circuitry.]

[13. The apparatus of claim 10, wherein the frequency of pulses generated by the first pulse source circuitry is about 1 KHz or smaller.]

[14. The apparatus of claim 13, wherein the frequency of pulses generated by the second pulse source circuitry is about 60 KHz or greater.]

[15. The apparatus of claim 10, further comprising a capacitor and a diode both galvanically connected to the secondary winding, wherein:

the diode is different from the rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the second pulse source circuitry is powered by energy stored in the capacitor to generate the pulses.]

[16. In an isolated switched-mode power converter having an input port and an output port, a method of regulation comprising:

(a) comparing a voltage or current at the output port with a reference that is galvanically associated therewith;

(b) generating or gating demand pulses responsive to that comparison;

(c) applying the demand pulses to an output-port side of galvanic isolation circuitry;

(d) receiving replicas of the demand pulses from an input-port side of the galvanic isolation circuitry; and

(e) adjusting commutation frequency of the converter responsive to the demand pulses to cause the voltage or current at the output port to attain a desired value.]

[17. The method of claim 16, wherein step (b) comprises:

(b1) using a diode to charge a capacitor during forward pulses of the power converter, wherein the diode and the capacitor are galvanically connected within the output-port side of the galvanic isolation circuitry; and

(b2) generating or gating the demand pulses using energy stored in the capacitor.]

18. An article of manufacture comprising a flyback converter, the flyback converter comprising:

a primary side comprising an input port;

a secondary side comprising an output port, wherein the secondary side is galvanically isolated from the primary side; and

a power transformer configured to transfer input power received at the input port to provide output power at the output port, wherein:

the primary side further comprises a primary-side switch configured to selectively enable the input power at the input port to be transferred via the power transformer to the output power at the output port;

the secondary side further comprises a demand pulse generator that (i) determines when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generates corresponding demand pulses;

the primary side comprises a primary-side magnetically coupled conductor;

the secondary side comprises a secondary-side magnetically coupled conductor configured to be magnetically coupled to the primary-side magnetically coupled conductor to convey the demand pulses from the secondary side to the primary side;

the primary-side switch is turned on in response to the demand pulses conveyed from the secondary side to the primary side, wherein the determination of when to turn off the primary-side switch is originated on the primary side and not on the secondary side;

frequency with which the primary-side switch is turned on is adjusted by the demand pulses conveyed from the secondary side to the primary side to regulate the output voltage or the output current at the output port; and

the secondary side further comprises:

a first capacitor; and

a first rectifier poled to charge the first capacitor during forward power converter pulses of the flyback converter, wherein the demand pulses are generated using energy stored in the first capacitor.

19. The article of claim 18, wherein the secondary side further comprises a second capacitor, different from the first capacitor, and a second rectifier, different from the first rectifier, wherein flyback voltage of the power transformer is rectified by the second rectifier and charges the second capacitor to supply output voltage or current to the output port.

20. The article of claim 18, wherein the secondary side is configured to charge the first capacitor during flyback pulses of the flyback converter.

21. The article of claim 18, wherein the secondary side is configured to charge the first capacitor during forward power converter pulses of the flyback converter even if the output port is short-circuited.

22. The article of claim 18, wherein the demand pulse generator is configured to generate a demand pulse when a feedback signal based on the output voltage or the output current is lower in magnitude than a magnitude of a reference signal such that the demand pulses regulate the output port by driving the feedback signal to match the reference signal.

23. The article of claim 22, wherein the flyback converter regulates the output port to have the feedback signal match the reference signal.

CP0000014

US RE47,713 E

15

24. The article of claim 18, wherein feedback from the secondary side to the primary side for regulating the output voltage or the output current is provided solely by the demand pulses generated by the demand pulse generator.

25. The article of claim 18, wherein:

each demand pulse conveyed from the secondary side to the primary side has a leading edge; and

when a particular demand pulse results in a particular occurrence of the primary-side switch turning on, the particular occurrence of the primary-side switch turning on is in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses conveyed from the secondary side to the primary side and independent of any other pulse edges appearing on the primary side.

26. The article of claim 18, wherein the demand pulse generator comprises:

an oscillator that generates oscillator pulses, each oscillator pulse representing logic 1; and

logic circuitry that selectively blocks certain oscillator pulses in generating the demand pulses applied to the secondary-side magnetically coupled conductor.

27. The article of claim 26, wherein the logic circuitry is not an OR gate.

28. The article of claim 18, wherein the demand pulse generator comprises:

an oscillator that generates oscillator pulses, each oscillator pulse representing logic 1; and

logic circuitry that selectively blocks certain oscillator pulses from becoming demand pulses that would otherwise result in the primary-side switch being turned on, while selectively allowing other oscillator pulses to become the demand pulses that do result in the primary-side switch being turned on.

29. The article of claim 18, wherein frequency of the demand pulses generated by the demand pulse generator is greater than frequency of pulses initiated on the primary side that turn on the primary-side switch.

30. The article of claim 18, wherein the demand pulse generator generates a demand pulse whenever a magnitude of the output voltage or the output current is below a magnitude of the output port's regulation voltage or regulation current.

31. The article of claim 18, wherein the demand pulse generator processes a secondary-side stream of pulses based on a comparator output to generate the demand pulses.

32. The article of claim 18, wherein the demand pulse generator comprises:

a comparator configured to generate a comparator output based on a comparison between (i) a feedback signal based on the output voltage or the output current and (ii) a reference signal;

an oscillator configured to generate a stream of pulses independent of the comparator output; and

logic circuitry configured to (i) receive the comparator output and the stream of pulses and (ii) process the stream of pulses based on the comparator output to generate the demand pulses.

33. The article of claim 18, wherein regulation of the output port is based solely on the demand pulses generated on the secondary side.

34. The article of claim 18, wherein the determination of when to turn off the primary-side switch is always originated on the primary side and never on the secondary side.

16

35. The article of claim 18, wherein the power transformer is configured to transfer unipolar input power received at the input port to provide the output power at the output port.

36. The article of claim 18, wherein, unless the primary-side switch is already on due to a pulse generated on the primary side, the primary-side switch is turned on once for each different demand pulse.

37. The article of claim 18, wherein:

the power transformer has a primary-side winding and a secondary-side winding;

the primary-side switch is connected in series with the primary-side winding of the power transformer;

the secondary-side winding of the power transformer is connected to the output port;

the primary-side magnetically coupled conductor is different from the primary-side winding of the power transformer; and

the secondary-side magnetically coupled conductor is the secondary-side winding of the power transformer.

38. The article of claim 18, wherein:

the power transformer has a primary-side winding and a secondary-side winding;

the primary-side switch is connected in series with the primary-side winding of the power transformer;

the secondary-side winding of the power transformer is connected to the output port;

the primary-side magnetically coupled conductor is different from the primary-side winding of the power transformer; and

the secondary-side magnetically coupled conductor is different from the secondary-side winding of the power transformer.

39. The article of claim 18, wherein:

the power transformer has a primary-side winding and a secondary-side winding;

the primary-side switch is connected in series with the primary-side winding of the power transformer;

the secondary-side winding of the power transformer is connected to the output port;

the primary-side magnetically coupled conductor is the primary-side winding of the power transformer; and

the secondary-side magnetically coupled conductor is the secondary-side winding of the power transformer.

40. The article of claim 18, wherein:

the primary side comprises a primary-side oscillator configured to generate one or more primary-side pulses; and

the primary-side switch is configured to be turned on based on (i) the one or more primary-side pulses generated by the primary-side oscillator or (ii) the demand pulses received from the secondary side.

41. The article of claim 18, wherein the primary-side switch is turned on for a duration that is independent of duration of the demand pulse that caused the primary-side switch to be turned on.

42. The article of claim 18, wherein the primary side is configured to turn on the primary-side switch at power up, in order to transfer input power to the secondary side via the power transformer to power the demand pulse generator to generate the demand pulses.

43. The article of claim 18, wherein the secondary side does not generate pulses instructing the primary side to turn off the primary-side switch.

US RE47,713 E

17

*44. The article of claim 18, wherein the primary side is configured to avoid premature turnoff of the primary-side switch due to capacitive charging of the primary-side switch.*

*45. The article of claim 18, wherein the primary side is configured to establish a maximum duration for which the primary-side switch is allowed to stay on.*

*46. The article of claim 18, wherein the primary side further comprises a bias winding configured to assist in powering the primary side.*

*47. The article of claim 18, wherein the article further comprises a load connected to the output port and configured to be powered by the flyback converter.*

*48. A flyback converter comprising:*

*a primary side comprising an input port;*

*a secondary side comprising an output port, wherein the secondary side is galvanically isolated from the primary side; and*

*a power transformer configured to transfer input power received at the input port to provide output power at the output port, wherein:*

*the primary side further comprises a primary-side switch configured to selectively enable the input power at the input port to be transferred via the power transformer to the output power at the output port;*

*the secondary side further comprises a demand pulse generator that (i) determines when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generates corresponding demand pulses;*

*the primary side comprises a primary-side magnetically coupled conductor;*

*the secondary side comprises a secondary-side magnetically coupled conductor configured to be magnetically coupled to the primary-side magnetically coupled conductor to convey the demand pulses from the secondary side to the primary side;*

*the primary-side switch is turned on in response to the demand pulses conveyed from the secondary side to the primary side, wherein the determination of when to turn off the primary-side switch is originated on the primary side and not on the secondary side;*

*frequency with which the primary-side switch is turned on is adjusted by the demand pulses conveyed from the secondary side to the primary side to regulate the output voltage or the output current at the output port; and*

*the secondary side further comprises:*

*a first capacitor; and*

*a first rectifier poled to charge the first capacitor during forward power converter pulses of the flyback converter, wherein the demand pulses are generated using energy stored in the first capacitor.*

*49. The article of claim 18, wherein the primary side is configured to determine when to turn off the primary-side switch based on either (i) current flowing through the primary-side switch or (ii) a maximum duration for which the primary-side switch is allowed to stay on.*

*50. The article of claim 18, wherein the demand pulse generator is configured to adjust a frequency of turning on the primary-side switch to supply a desired amount of voltage or current to the output port in order to regulate the output port.*

*51. The article of claim 18, wherein the secondary side comprises:*

18

*a source configured to provide a reference signal; and*

*a secondary-side comparator configured to compare a feedback signal based on the output port voltage or current to the reference signal wherein the frequency of the demand pulses is responsive to the comparison between the feedback signal and the reference signal.*

*52. The article of claim 18, wherein:*

*the demand pulse generator is configured to generate a demand pulse when a feedback signal based on the output voltage or the output current is lower in magnitude than a magnitude of a reference signal such that the demand pulses regulate the output port by driving the feedback signal to match the reference signal;*

*the flyback converter regulates the output port to have the feedback signal match the reference signal;*

*frequency of the demand pulses generated by the demand pulse generator is greater than frequency of pulses initiated on the primary side that turn on the primary-side switch;*

*the demand pulse generator generates a demand pulse whenever a magnitude of the output voltage or the output current is below a magnitude of the output port's regulation voltage or regulation current;*

*the primary-side switch is turned on for a duration that is independent of duration of the demand pulse that caused the primary-side switch to be turned on;*

*the article is the flyback converter;*

*the demand pulse generator is configured to adjust a frequency of turning on the primary-side switch to supply a desired amount of voltage or current to the output port in order to regulate the output port; and*

*the secondary side comprises:*

*a source configured to provide a reference signal; and*

*a secondary-side comparator configured to compare a feedback signal based on the output port voltage or current to the reference signal wherein the frequency of the demand pulses is responsive to the comparison between the feedback signal and the reference signal.*

*53. The article of claim 52, wherein:*

*the secondary side further comprises a second capacitor, different from the first capacitor, and a second rectifier, different from the first rectifier, wherein flyback voltage of the power transformer is rectified by the second rectifier and charges the second capacitor to supply output voltage or current to the output port;*

*the secondary side is configured to charge the first capacitor during flyback pulses of the flyback converter;*

*the secondary side is configured to charge the first capacitor during forward power converter pulses of the flyback converter even if the output port is short-circuited;*

*feedback from the secondary side to the primary side for regulating the output voltage or the output current is provided solely by the demand pulses generated by the demand pulse generator;*

*the secondary-side comparator generates a comparator output;*

*the demand pulse generator comprises:*

*an oscillator configured to generate a stream of oscillator pulses independent of the comparator output; and*

*logic circuitry configured to (i) receive the comparator output and the stream of oscillator pulses and (ii) process the stream of oscillator pulses based on the comparator output to generate the demand pulses by selectively blocking certain oscillator pulses;*

CP0000016

US RE47,713 E

**19**

regulation of the output port is based solely on the demand pulses generated on the secondary side;

the power transformer is configured to transfer unipolar input power received at the input port to provide the output power at the output port;

the power transformer has a primary-side winding and a secondary-side winding;

the primary-side switch is connected in series with the primary-side winding of the power transformer;

the secondary-side winding of the power transformer is connected to the output port;

the primary-side magnetically coupled conductor is different from the primary-side winding of the power transformer;

the secondary-side magnetically coupled conductor is different from the secondary-side winding of the power transformer;

the primary side comprises a primary-side oscillator configured to generate one or more primary-side pulses;

the primary-side switch is configured to be turned on based on (i) the one or more primary-side pulses generated by the primary-side oscillator or (ii) the demand pulses received from the secondary side;

the primary side is configured to turn on the primary-side switch at power up, in order to transfer input power to the secondary side via the power transformer to power the demand pulse generator to generate the demand pulses; and

the secondary side does not generate pulses instructing the primary side to turn off the primary-side switch.

54. The article of claim 53, wherein

each demand pulse conveyed from the secondary side to the primary side has a leading edge; and

**20**

when a particular demand pulse results in a particular occurrence of the primary-side switch turning on, the particular occurrence of the primary-side switch turning on is in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses conveyed from the secondary side to the primary side and independent of any other pulse edges appearing on the primary side.

55. The article of claim 53, wherein the determination of when to turn off the primary-side switch is always originated on the primary side and never on the secondary side.

56. The article of claim 53, wherein, unless the primary-side switch is already on due to a pulse generated on the primary side, the primary-side switch is turned on once for each different demand pulse.

57. The article of claim 53, wherein the primary side is configured to avoid premature turnoff of the primary-side switch due to capacitive charging of the primary-side switch.

58. The article of claim 53, wherein the primary side is configured to establish a maximum duration for which the primary-side switch is allowed to stay on.

59. The article of claim 53, wherein the primary side further comprises a bias winding configured to assist in powering the primary side.

60. The article of claim 53, wherein the article further comprises a load connected to the output port and configured to be powered by the flyback converter.

61. The article of claim 53, wherein the primary side is configured to determine when to turn off the primary-side switch based on either (i) current flowing through the primary-side switch or (ii) a maximum duration for which the primary-side switch is allowed to stay on.

* * * * *

CP0000018

EXHIBIT 3

# EXHIBIT 4

# EXHIBIT 5

# EXHIBIT 6

# EXHIBIT 7

# EXHIBIT 8

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

COGNIPOWER LLC

       Plaintiff,

  v.

FANTASIA TRADING, LLC D/B/A
ANKERDIRECT and
ANKER INNOVATIONS LIMITED

       Defendant,

POWER INTEGRATIONS, INC.

       Movant-Intervenor.

Civ. No. 19-2293-CFC-SRF

**FANTASIA TRADING, LLC D/B/A ANKERDIRECT'S**
**INVALIDITY CONTENTIONS**

Pursuant to paragraph 5 of the Court's Scheduling Order (D.I. 23), Fantasia Trading, LLC, d/b/a AnkerDirect ("Fantasia") provides the following disclosure of Invalidity Contentions to CogniPower, LLC ("CogniPower") regarding U.S. Reissue Patent No. RE47,031 ("the '031 patent") and U.S. Reissue Patent No. RE47,713 ("the '713 patent") (collectively, "the asserted patents"). These invalidity contentions are made only as to the asserted claims: 1, 2, 5, 6, 8, 10-12, and 18-64 of the '031 patent; 18-36, 38, and 40-61 of the '713 patent. Fantasia reserves the right to supplement or modify these invalidity contentions based on further discovery and in a manner consistent with the Federal Rules of Civil Procedure and the Court's rules, including the Court's Scheduling Order.

This initial identification of prior art and these contentions are based in part on CogniPower's August 31, 2020 disclosures pursuant to paragraph 3 of the Scheduling Order. In those disclosures, CogniPower alleged that the asserted claims of the asserted patents are entitled

to a priority date of November 19, 2012. More than six weeks after the deadline for disclosing the alleged priority date, and two days before the deadline for Fantasia's invalidity contentions, CogniPower served "corrected" contentions that purported to claim a new priority date of July 3, 2012, without explanation. CogniPower's untimely change on the eve of the invalidity contentions deadline has prejudiced Fantasia's ability to prepare its invalidity defense.

Fantasia reserves any and all rights to the extent that CogniPower purports to and is permitted to rely on a priority date prior to November 19, 2012. Fantasia also reserves the right to amend its invalidity contentions to substitute or add alternative invalidating references and evidence for any and all references and/or evidence that CogniPower attempts to swear behind. Despite CogniPower's untimely priority contention, the asserted claims are nevertheless invalid as anticipated under 35 U.S.C. § 102 and/or obvious under 35 U.S.C. § 103 based on numerous references and combinations, and they are also invalid under 35 U.S.C § 112 as indefinite, lacking written description, and/or enablement.

## A.    Identification of Prior Art References

Fantasia lists in Tables 1 and 2 the prior art patents and publication now known to it and which it contends invalidates, alone or in combination, the asserted claims of the asserted patents. Fantasia reserves the right to rely on the earliest publication or priority dates to which each of the prior art references are entitled, including dates on which a claim of priority may be based for patent references that are any of a divisional, continuation, or continuation-in-part of an earlier filed patent application.

## Table 1 – U.S. Patent References

| Patent Number | Country of Origin | Date Filed | Date Issued/Published | BATES |
|---|---|---|---|---|
| Patent Application Publication No. 2011/0096573 A1 to Zhu ("Zhu") | U.S. | Oct. 23, 2009 | Apr. 28, 2011 | PIC00000093-PIC00000109 |
| Patent No. 7,773,392 to Matsumoto ("Matsumoto 392") | U.S. | Mar. 16, 2007 | Aug. 10, 2010 | PIC00000409-PIC00000436 |
| Patent No. 5,498,995 to Szepesi ("Szepesi") | U.S. | Dec. 13, 1994 | Mar. 12, 1996 | PIC00000308-PIC00000324 |
| Patent Application Publication No. 2011/0305043 A1 to Matsumoto ("Matsumoto 043") | U.S. | Jun. 10, 2011 | Dec. 15, 2011 | PIC00000253-PIC00000283 |
| Patent No. 5,973,945 to Balakrishnan ("Balakrishnan 945") | U.S. | Jul. 1, 1998 | Oct. 26, 1999 | PIC00000047-PIC00000068 |
| Patent No. 6,466,461 to Mao ("Mao") | U.S. | Feb. 7, 2002 | Oct. 15, 2002 | PIC00000036-PIC00000046 |
| Patent No. 5,418,410 to Tisinger ("Tisinger") | U.S. | May 25, 1993 | May 23, 1995 | PIC00000437-PIC00000442 |
| Patent No. 4,413,224 to Krupka ("Krupka") | U.S. | May 18, 1982 | Nov. 1, 1983 | PIC00000510-PIC00000518 |
| Patent No. 4,887,199 to Whittle ("Whittle") | U.S. | Sep. 22, 1987 | Dec. 12, 1989 | PIC00000493-PIC00000509 |
| Patent No. 6,301,135 to Mammano ("Mammano 135") | U.S. | Dec. 30, 1999 | Oct. 9, 2001 | PIC00000520-PIC00000527 |
| Patent No. 4,694,384 to Steigerwald ("Steigerwald") | U.S. | Dec. 4, 1986 | Sep. 15, 1987 | PIC00000471-PIC00000477 |
| Patent No. 5,841,641 To Faulk ("Faulk") | U.S. | Dec. 31, 1996 | Nov. 24, 1998 | PIC00000191-PIC00000222 |

**Table 2 – Publications**

| Title, Publication Information | Published | BATES |
|---|---|---|
| ST Microelectronics Application Note AN1283 – A Battery Charger Using TSM101 ("AN1283") | May 2001 | PIC00000486-PIC00000492 |
| Mammano, Bob, Isolated power conversion: making the case for secondary-side control, EDN, ("Mammano EDN") | June 2001 | PIC00000529-PIC00000535 |
| SG6840 Highly Integrated Green-Mode PWM Controller, Product Specification, System General ("SG6840") | May 2004 | PIC00000176-PIC00000190 |
| ML4863 Highly Efficient Flyback Controller, Fairchild Semiconductor ("ML4863") | July 2000 | PIC00000166-PIC00000175 |
| AN-918 Application Note, LM3001/LM3101 A 1 MHz Off-Line PWM Controller Chipset with Pulse Communication for Voltage-Current or Charge-Mode Control, National Semiconductor ("AN-918") | January 1994 | PIC00000478-PIC00000485 |
| Ching-Jan Chen, et. al.: A Novel Ripple-Based Constant On-Time Control with Virtual Inductor Current Ripple for Buck Converter with Ceramic Output Capacitors, APEC ("Chen") | 2011 | PIC00000030-PIC00000035 |
| UCC2961/UCC3961 Advanced Primary-Side Startup Controller datasheet, Texas Instruments ("UCC3961") | May 1999 | PIC00000138-PIC00000154 |
| Robert Erickson and Dragan Maksimovic, High Efficiency DC-DC Converters for Battery-Operated Systems with Energy Management, Worldwide Wireless Communications - Advances in the Information Industry Series - Barnes, Frank S., et al., eds. ("Erickson") | 1995 | PIC00000243-PIC00000252 |

The prior art references identified above and cited in the attached claim charts may disclose the limitations of claims either explicitly or inherently and may be relied upon to show the state of the art in the relevant timeframes. All of these references qualify as prior art to the asserted patents.

Zhu qualifies as prior art under 35 U.S.C. § 102(b). Specifically, Zhu is a published patent application, published April 28, 2011, more than one year before both asserted patents' earliest effective US filing date.

Matsumoto 392 qualifies as prior art under 35 U.S.C. § 102(b). Specifically, Matsumoto 392 is a patent that issued on August 10, 2010, more than one year before both asserted patents' earliest effective US filing date.

Szepesi qualifies as prior art under 35 U.S.C. § 102(b). Specifically, Szepesi is a patent that issued on March 12, 1996, more than one year before both asserted patents' earliest effective US filing date.

Matsumoto 043 qualifies as prior art under 35 U.S.C. § 102(a) and/or (e). Specifically, Matsumoto 043 is a published patent application that published on December 15, 2011, before both asserted patents' earliest effective US filing date.

Balakrishnan 945 qualifies as prior art under 35 U.S.C. § 102(b). Specifically, Matsumoto 392 is a patent that issued on October 26, 1999, more than one year before both asserted patents' earliest effective US filing date.

Mao qualifies as prior art under 35 U.S.C. § 102(b). Specifically, Mao is a patent that issued on October 15, 2002, more than one year before both asserted patents' earliest effective US filing date.

Tisinger qualifies as prior art under 35 U.S.C. § 102(b). Specifically, Tisinger is a patent that issued on May 23, 1995, more than one year before both asserted patents' earliest effective US filing date.

Krupka qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Krupka is a patent that issued on November 1, 1993, more than one year before both asserted patents' earliest effective US filing date.

Whittle qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Whittle is a patent that issued on December 12, 1989, more than one year before both asserted patents' earliest effective US filing date.

Mammano 135 qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Mammano 135 is a patent that issued on October 9, 2001, more than one year before both asserted patents' earliest effective US filing date.

Steigerwald qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Steigerwald is a patent that issued on September 15, 1987, more than one year before both asserted patents' earliest effective US filing date.

Faulk qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Faulk is a patent that issued on November 24, 1998, more than one year before both asserted patents' earliest effective US filing date.

AN1283 qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, AN1283 is a printed publication that was published in May 2001, more than one year before both asserted patents' earliest effective US filing date.

Mammano EDN qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Mammano EDN is a printed publication that was published in June 2001, more than one year before both asserted patents' earliest effective US filing date.

SG6840 qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, SG6840 is a printed publication that was published in May 2004, more than one year before both asserted patents' earliest effective US filing date.

ML4863 qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, ML4863 is a printed publication that was published in July 2000, more than one year before both asserted patents' earliest effective US filing date.

Chen qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Chen is a printed publication that was published in 2011, more than one year before both asserted patents' earliest effective US filing date.

AN-918 qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, AN-918 s a printed publication that was published in January 1994, more than one year before both asserted patents' earliest effective US filing date.

UCC3961 qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, UCC3961 is a printed publication that was published in May 1999, more than one year before both asserted patents' earliest effective US filing date.

Erickson qualifies as prior art under 35 U.S.C. § 102(b).  Specifically, Erickson is a printed publication that was published in 1995, more than one year before both asserted patents' earliest effective US filing date.

While the aforementioned patents and publication references are prior art in their own right, upon information and belief, they also describe products that were in public use and/or on sale in this country prior to the filing of the asserted patent.  The various datasheets and application notes describe actual products that were on sale and in public use well before the asserted patents' priority date.  For example, SG6840, ML4863, and UCC3961 are datasheets describing chips that

were likewise on sale and in public use.  In addition the application notes, such as AN1283 and AN-918 disclose the structure, function, and operation of the ST Micro TSM101 and National Semiconductor LM3001 Primary-Side PWM Driver integrated circuit device and LMM3101 Secondary-Side PWM Controller respectively, and which, upon information and belief, were on sale and in public use prior to the filing of the asserted patents; thus the sale and use of these chips are likewise invalidating prior art.

Power Integrations' prior invention of the "OmniSwitch" and "InnoSwitch" also qualifies as prior art under 35 U.S.C. §§ 102(a) and 102(g).  Specifically, PI inventors conceived of an invalidating integrated circuit product no later than June 10, 2011, more than one year before both asserted patents' earliest effective US filing date, and PI further made the alleged invention of the asserted claims and did not abandon, suppress or conceal it.  PI's inventors, Balu Balakrishnan, Mike Matthews, Alex Djenguerian, and Sheng Liu have personal knowledge about the conception and development of PI's invalidating invention.  Exemplary documents evidencing PI's prior invalidating invention have been produced with production numbers PIC00000069-PIC00000092, PIC00000110-PIC00000137, PIC00000284-PIC00000307, PIC00000366-PIC00000408, PIC00000452-PIC00000470, PIC00000536-PIC00000560, and PIC00000561-PIC00001738.

**B.     Grounds for Invalidity under 35 U.S.C. §§ 102, 103**

The asserted claims of the asserted patents are either invalid as anticipated pursuant to 35 U.S.C. § 102 or as obvious pursuant to 35 U.S.C. § 103 in view of the references cited above.

Fantasia attaches hereto, as Exhibits A.1-A.10, exemplary claim charts that identify how the prior art references anticipate and/or render obvious the asserted claims of the '031 patent.

By way of further disclosure, references and combinations that anticipate and/or render obvious claims 1, 2, 5, 6, 8, 10-12, and 18-64 of the '031 patent as follows.

As shown in the chart attached as Exhibit A.1, claims 1-2, 8, 10-12, 18, 25-27, 29-33, 38-40, 42-46, 49, 52-55, 57-61, and 64 are obvious over Zhu in view of Mao or AN1283; and claims 28, 34, 35, 41, 47, 48, 56, 62, and 63 are obvious over Zhu in view of Mao or AN1283 and further in view of Tisinger.

As shown in the chart attached as Exhibit A.2, claims 1-2, 6, 8, 10, 11-12, 18, 24-27, 29-30, 32-33, 36-40, 42-46, 49-55, 57-58, 60-61 are obvious over Matsumoto 392 in view of Mao or AN1283; claims 5, 19-23, are obvious over Matsumoto 392 in view of Mao or AN1283 and further in view of Krupka; claims 28, 31 , 34, 35, 41, 47, 48, 56, 59,62, and 63 are obvious over Matsumoto 392 in view of Mao or AN1283 and further in view of Tisinger; and claim 64 is anticipated by Matsumoto 392.

As shown in the chart attached as Exhibit A.3, claims 1-2, 5-6, 8, 10, 18-26, 28-33, 36-39, 41-46, 49-54, 56-61 are obvious over Szepesi in view of Mao or AN1283; and claims 11-12, and 64 are obvious over Szepesi in combination with Mao or AN1283 and also in combination with UCC3961.

As shown in the chart attached as Exhibit A.4, claims 1-2, 6, 8, 10-12, 18-21, 23-26, 30-33, 36-38, 43-46, 49, 51-54, 58-61 are anticipated by Matsumoto 043 and, alternatively, are obvious over Matsumoto 043 in view of Mao or AN1283; claims 5 and 50 are obvious over Matsumoto 043 in view of the knowledge of a POSITA, and alternatively, is obvious over Matsumoto 043 in view of Mao or AN1283; claims 28, 41, and 56 are obvious over Matsumoto 043 (or Matsumoto 043 in combination with Mao or AN1283) in view of Tisinger; and claim 64 is anticipated by Matsumoto 043.

As shown in the chart attached as Exhibit A.5, claims 1, 2, 8, 10-12, 18, 25, 27-31, 33, 37, 39-44, 46, 49, 52, 54-59, and 61 are obvious over Balakrishnan 945 in combination with Mao or AN1283; and claim 64 as anticipated by Balakrishnan 945.

As shown in the chart attached as Exhibit A.6, claims 1-2, 5-6, 8, 19-23, 25-26, 36-39, 41-46, 49-50, 54 are obvious over Mammano EDN/UCC3961 in combination with SG6840 or ML4863 or Krupka and also in combination with Mao or AN1283; claims 27, 34-35, 40, 47, 48, 55, and 62-63 are obvious over Mammano EDN/UCC3961 in combination with ML4863 or Krupka and also in combination with Mao or AN1283; claims 28 and 41 are obvious over Mammano EDN/UCC3961 in combination with SG6840 or ML4863 and also in combination with Mao or AN1283; claims 10-12, 18, 24, 29-33, 51-53, 56-61 are obvious over Mammano EDN/UCC3961 in combination with Mao or AN1283; and claim 64 is obvious over Mammano EDN/UCC3961.

As shown in the chart attached as Exhibit A.7, claims 1-2, 5-6, 8, 18, 23-47, 49-50, 54-55, and 62-63 are obvious over AN-918 or UCC3961 in combination with Chen, ML4863 or Krupka and also in combination with Mao or AN1283; claims 19-22 are obvious over AN-918 or UCC3961 in combination with Krupka and also in combination with Mao or AN1283; claims 10-12, 51-53, and 56-61 are obvious over AN-918 or UCC3961 in combination with Mao or AN1283; and claim 64 is anticipated by UCC3961.

As shown in the chart attached as Exhibit A.8, claims 1-2, 6, 8, 11-12, 25, 27, 36-40, 42-46, and 54-55, are obvious over Mammano 135 in combination with Whittle and Steigerwald; claims 10, 18, 24, 29-33, 49, 51-53, and 57-61 are obvious over Mammano 135 in combination with Whittle and claim 64 is obvious over Mammano 135 in combination with Steigerwald.

10

As shown in the chart attached as Exhibit A.9, claims 1, 6, 8, 10, 18, 24-25, 29-32, 36-39, 42-45, 51-54, and 57-60 are anticipated by Faulk and, alternatively, are obvious over Faulk in view of Mao or AN1283; and claims 28, 41, and 56 are obvious over Faulk (or Faulk in combination with Mao or AN1283) in combination with Tisinger

As shown in the HIGHLY CONFIDENTIAL chart attached as Exhibit A.10, claims 1-2, 5-6, 8, 10-12, 18-64 are anticipated by Power Integrations' prior invention of OmniSwitch, or in the alternative, by PI's invention of its original InnoSwitch product.

Fantasia attaches hereto, as Exhibits B.1-B.10, exemplary claim charts that identify how the prior art references anticipate and/or render obvious the asserted claims of the '713 patent.

As shown in the chart attached as Exhibit B.1, claims 18-23, 25, 29-31, 34-36, 41-43, 45-52 are obvious over Zhu in view of Mao or AN1283; and claim 44 is obvious over Zhu in view of Mao or AN1283 and further in view of Tisinger.

As shown in the chart attached as Exhibit B.2, claims 18-25, 26-30, 33-36, 38, 40-43, 45, 47-56, 58, and 60-61 are obvious over Matsumoto 392 in view of Mao or AN1283; claims 31-32 are obvious over Matsumoto 392 in view of Mao or AN1283 and further in view of Krupka; claims 44, 57 are obvious over Matsumoto 392 in view of Mao or AN1283 and further in view of Tisinger; and claims 46 and 59 are obvious over Matsumoto 392 in view of Mao or AN1283 and further in view of Krupka and further in view of Szepesi or Zhu.

As shown in the chart attached as Exhibit B.3, claims 18-28, 30-33, 35-36, 38, 40-42, and 44-51 are obvious over Szepesi in view of Mao or AN1283.

As shown in the chart attached as Exhibit B.4, claims 18-21, 24-29, 31, 35-36, 38, 41, 44, and 46-51 obvious over Matsumoto 043 in view of the knowledge of a POSITA and in combination with Mao or AN1283

As shown in the chart attached as Exhibit B.5, claims 18-24, 29-30, 33-36, 40, 42-45, and 47-51 are obvious over Balakrishnan 945 in combination with Mao or AN1283.

As shown in the chart attached as Exhibit B.6, claims 18-33, 35-36, 38, 40-42, and 44-52 are obvious over Mammano EDN/UCC3961 in combination with SG6840 or ML4863 or Krupka and also in combination with Mao or AN1283; and claims 34, 43, 53-61 are obvious over Mammano EDN/UCC3961 in combination with ML4863 or Krupka and also in combination with Mao or AN1283.

As shown in the chart attached as Exhibit B.7, claims 18-36, 38, 40-52 are obvious over AN-918 or UCC3961 in combination with Chen, ML4863 or Krupka and also in combination with Mao or AN1283; and claims 53-61 are obvious over AN-918 or UCC3961 in combination with ML4863 or Krupka and also in combination with Mao or AN1283.

As shown in the chart attached as Exhibit B.8, claims 18-19, 22-25, 29-31, 33-36, 38, 40-43, and 45-52, are obvious over Mammano 135 in combination with Whittle and Steigerwald.

As shown in the chart attached as Exhibit B.9, claims 18-19, 22-25, 30-31, 33, 35-36, 38, 40-42, and 45-50 are anticipated by Faulk and, alternatively, are obvious over Faulk in view of Mao or AN1283; claims 20-21 are obvious over Faulk in view of Mao or AN1283; and claims 44 is obvious over Faulk (or Faulk in combination with Mao or AN1283) with Tisinger.

As shown in the HIGHLY CONFIDENTIAL chart attached as Exhibit B.10, claims 18-36, 38, and 40-61 are anticipated by Power Integrations' prior invention of OmniSwitch, or in the alternative, by PI's invention of its original InnoSwitch product.

Dated:  October 15, 2020                FISH & RICHARDSON P.C.

By:   */s/ Warren K. Mabey, Jr.*
      Douglas E. McCann  (No. 3852)
      Warren K. Mabey, Jr. (No. 5775)
      222 Delaware Avenue, 17th Floor
      P.O. Box 1114
      Wilmington, DE  19801
      Telephone: (302) 652-5070
      Email:  dmccann@fr.com; mabey@fr.com

      Frank E. Scherkenbach
      One Marina Park Drive
      Boston, MA  02210-1878
      Telephone: (617) 542-5070
      Email: scherkenbach@fr.com

      Howard G. Pollack
      Michael R. Headley
      500 Arguello Street, Suite 500
      Redwood City, CA 94063
      Telephone: (650) 839-5070
      Email: pollack@fr.com; headley@fr.com

Attorneys for Defendant
Fantasia Trading, LLC, d/b/a AnkerDirect

**EXHIBIT B.10 – Highly Confidential – Attorneys' Eyes Only**

| Claim No. | Claim Element | Exemplary Disclosure in Prior Art |
|---|---|---|
| | Claim 18 | Claim 18 is anticipated by PI's prior invention of OmniSwitch, or in the alternative, by PI's invention of its original InnoSwitch product. |
| [18.0] | An article of manufacture comprising a flyback converter, the flyback converter comprising | As originally conceived, OmniSwitch was an integrated circuit apparatus designed and intended for use as a controller which would form the core of a flyback switched mode power supply. *See, e.g.*, the highlighted figures below showing OmniSwitch in a switched mode power converter application. |
| [18.1] | a primary side comprising an input port; | As conceived of by PI's inventors, an OmniSwitch-based power supply included a primary side comprising an input port.<br><br>Inventor, Mike Matthews, documented the original concept for OmniSwitch in his inventor notebook, with drawings dated June 10, 2011. These drawings illustrate that the original conception explicitly included almost all of the limitations recited in this claim. *See* annotated Matthews drawing below.<br><br> |

# EXHIBIT 10

# EXHIBIT 11

# EXHIBIT 12

EXHIBIT 13

# EXHIBIT 14

# EXHIBIT 15

# EXHIBIT 16

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:      William H. Morong, et al.
U.S. Patent No.:      RE47,031           Attorney Docket No.:  10256-0047IP1
Issue Date:           September 4, 2018
Appl. Serial No.:     15/090,929
Filing Date:          April 5, 2016
Title:                POWER CONVERTER WITH DEMAND PULSE ISOLATION

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. RE47,031 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

CP0088293

Attorney Docket No. 10256-0047IP1
IPR of U.S. Patent No. RE47,031

Fantasia Trading LLC D/B/A AnkerDirect ("Petitioner" or "Anker")

petitions for Inter Partes Review ("IPR") of claims 1, 2, 8, 10, 18, 25, 27, 30-33,

37-38, 40, 43-46, 49, 52-55, and 58-61 ("the Challenged Claims") of U.S. Patent

No. RE47,031 ("the '031 Patent") under 35 U.S.C. §§ 311–319 and 37 C.F.R. § 42.

As explained in this Petition, there exists a reasonable likelihood that Anker will

prevail with respect to at least one of the Challenged Claims.

## I.    REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104

### A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)

Anker certifies that the '031 Patent is available for IPR.  This Petition is

being filed within one year of service of a complaint against Anker in the District

of Delaware.  Anker is not barred or estopped from requesting this review

challenging the Challenged Claims on the below-identified grounds.

### B.    Challenge Under 37 C.F.R. § 42.104(b) and Relief
Requested

Anker requests IPR of the Challenged Claims on the grounds set forth in the

table below, and requests that each of the Challenged Claims be found

unpatentable.  An explanation of why these claims are unpatentable is provided in

the claim charts that follow, indicating where each element is found in the prior art.

Additional explanation and support for each ground is set forth in Exhibit PI-1003,

the Declaration of William Bohannon ("Expert Declaration"), referenced

throughout this Petition.

1

CP0088297

Attorney Docket No. 10256-0047IP1
IPR of U.S. Patent No. RE47,031

| Ground | '031 Patent Claims | Basis for Rejection |
|---|---|---|
| **Ground 1** | **1**, 2, 8, **10**, **18**, 25, 27, 30-33, 37, 38, 40, 43-46, 49, 52-55, 58-61 | Obvious in view of US2011/0096573 ("Zhu") and US6,466,461 ("Mao") |
| **Ground 2** | **1**, 2, 8, **10**, **18**, 25, 30-33, 37, 38, 43-46, 49, 52-54, 58-61 | Obvious in view of US5,498,995 ("Szepesi") and Mao |

Zhu, Mao, and Szepesi each qualifies as prior art under 35 U.S.C. §102(b).

Zhu [PI-1005] is a patent application that published April 28, 2011, more than one year before the '031 Patent's earliest effective US filing date.

Mao [PI-1006] is a patent that issued October 15, 2002, more than one year before the '031 Patent's earliest effective US filing date.

Szepesi [PI-1007] is a patent that issued March 12, 1996, more than one year before the '031 Patent's earliest effective US filing date.

## C.    Claim Construction under 37 C.F.R. §§ 42.104(b)(3)

A claim subject to IPR is interpreted under the claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny.  According to the *Phillips* standard, a claim term must be given an ordinary and customary meaning that a POSITA would apply to the term.  *Phillips*, 1312-13.  For purposes of this proceeding only, Anker submits that all terms should be given their plain meaning.

## II.    SUMMARY OF THE '031 PATENT

2

CP0088298

Attorney Docket No. 10256-0047IP1
IPR of U.S. Patent No. RE47,031

Accordingly, Petitioner requests institution for those claims of the '031 patent for each of the grounds presented herein.

## VI.    PAYMENT OF FEES – 37 C.F.R. § 42.103

Anker authorizes the Patent and Trademark Office to charge Deposit Account No. 06-1050 for the fee set in 37 C.F.R. § 42.15(a) for this Petition and further authorizes payment for any additional fees to be charged to this Deposit Account.

## VII.   MANDATORY NOTICES UNDER 37 C.F.R § 42.8(a)(1)

### A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

Anker and Power Integrations, Inc. are the real parties-in-interest.  Anker is a subsidiary of Anker Innovations Limited.

### B.    Related Matters Under 37 C.F.R. § 42.8(b)(2)

Petitioner is not aware of any disclaimers, reexamination certificates or petitions for inter partes review for the '031 Patent.  The '031 Patent is the subject of the civil action, *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect and Anker Innovations Limited*, C.A. No. 19-cv-02293-CFC (D. Del.).

### C.    Lead And Back-Up Counsel Under 37 C.F.R. § 42.8(b)(3)

Anker provides the following designation of counsel.

CP0088356

Attorney Docket No. 10256-0047IP1
IPR of U.S. Patent No. RE47,031

| Lead Counsel | Backup counsel |
|---|---|
| Jennifer J. Huang, Reg. No. 64,297<br>Fish & Richardson P.C.<br>3200 RBC Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Tel: 858-678-5070<br>Fax: 877-769-7945<br>Email: IPR10256-0047IP1@fr.com | Kim H. Leung, Reg. No. 64,399<br>Fish & Richardson P.C.<br>3200 RBC Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Tel: 858-678-5070<br>Fax: 877-769-7945<br>PTABInbound@fr.com |

### D.    Service Information

Please address all correspondence and service to the address listed above.

Petitioner consents to electronic service by email at IPR10256-0047IP1@fr.com

(referencing No. 10256-0047IP1 and cc'ing PTABInbound@fr.com,

huang@fr.com and leung@fr.com).

Respectfully submitted,

Dated October 16, 2020          /Jennifer J. Huang/
                               Jennifer J. Huang, Reg. No. 64,297
                               Kim H. Leung, Reg. No. 64,399
                               Fish & Richardson P.C.
                               3200 RBC Plaza, 60 South Sixth Street
                               Minneapolis, MN 55402
                               T: 858-678-5070
                               F: 877-769-7945

(Control No. IPR2021-00067)    Attorneys for Petitioner

61

CP0088357

# EXHIBIT 17

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of: William H. Morong, et al.
U.S. Patent No.: RE47,713   Attorney Docket No.: 10256-0047IP5
Issue Date: November 5, 2019
Appl. Serial No.: 15/168,998
Filing Date: May 31, 2016
Title: POWER CONVERTER WITH DEMAND PULSE ISOLATION

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. RE47,713 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

CP0018778

Attorney Docket No. 10256-0047IP5
IPR of U.S. Patent No. RE47,713

Fantasia Trading LLC D/B/A AnkerDirect ("Petitioner" or "Anker")

petitions for Inter Partes Review ("IPR") of claims 18, 19-23, 25, 30-31, 34-36, 41-

43, 45, 48 and 49-51 ("the Challenged Claims") of U.S. Patent No. RE47,713 ("the

'713 Patent") under 35 U.S.C. §§ 311–319 and 37 C.F.R. § 42. There exists a

reasonable likelihood that Anker will prevail with respect to at least one of the

Challenged Claims.

# I.    REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104

## A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)

Anker certifies that the '713 Patent is available for IPR. This petition is

being filed within one year of service of a complaint against Anker in the District

of Delaware. Anker is not barred or estopped from requesting this review

challenging the Challenged Claims on the below-identified grounds.

## B.    Challenge Under 37 C.F.R. § 42.104(b) and Relief Requested

Anker requests IPR of the Challenged Claims on the grounds set forth in the

table below, and requests each of the Challenged Claims be found unpatentable.

An explanation of why these claims are unpatentable is provided in claim charts

that follow. Additional explanation and support for each ground is set forth in

Exhibit PI-1003, the Declaration of William Bohannon ("Expert Declaration"),

referenced throughout this Petition.

1

Attorney Docket No. 10256-0047IP5
IPR of U.S. Patent No. RE47,713

| Ground | '713 Patent Claims | Basis for Rejection |
|--------|--------------------|---------------------|
| **Ground 1** | **18**, 19-23, 25, 30-31, 34-36, 41-43, 45, **48**-51 | Obvious under 35 U.S.C. §103 in view of US2011/0096573 ("Zhu") and US6,466,461 ("Mao") |
| **Ground 2** | **18**, 19-23, 25, 30-31, 35-36, 41-42, 45, **48**-51 | Obvious in view of US5,498,995 ("Szepesi") and Mao |
| **Ground 3** | **18**, 22-23, 25, 30, 34, 41-43, 45, **48**-49, 51 | Obvious in view of US7,773,392 ("Matsumoto") and Mao |

Zhu qualifies as prior art under 35 U.S.C. § 102(b). Zhu [PI-1005] is a published patent application, published April 28, 2011, more than one year before the '713 Patent's earliest effective US filing date.

Mao qualifies as prior art under 35 U.S.C. § 102(b). Mao [PI-1006] is a patent that issued on October 15, 2002, more than one year before the '713 Patent's earliest effective US filing date.

Szepesi qualifies as prior art under 35 U.S.C. § 102(b). Szepesi [PI-1007] is a patent that issued on March 12, 1996, more than one year before the '713 Patent's earliest effective US filing date.

Matsumoto qualifies as prior art under 35 U.S.C. § 102(b). Matsumoto [PI-1010] is a patent that issued on August 10, 2010, more than one year before the '713 Patent's earliest effective US filing date.

### C.    Claim Construction

A claim subject to IPR is interpreted under the claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and

2

CP0018784

Attorney Docket No. 10256-0047IP5
IPR of U.S. Patent No. RE47,713

Accordingly, Petitioner requests institution for those claims of the '713 Patent for each of the grounds presented herein.

## VI.    PAYMENT OF FEES – 37 C.F.R. § 42.103

Anker authorizes the Patent and Trademark Office to charge Deposit Account No. 06-1050 for the fee set in 37 C.F.R. § 42.15(a) for this Petition and further authorizes payment for any additional fees to be charged to this Deposit Account.

## VII.   MANDATORY NOTICES UNDER 37 C.F.R § 42.8(a)(1)

### A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

Anker and Power Integrations, Inc. are the real parties-in-interest. Anker is a subsidiary of Anker Innovations Limited.

### B.    Related Matters Under 37 C.F.R. § 42.8(b)(2)

Petitioner is not aware of any disclaimers, reexamination certificates or petitions for inter partes review for the '713 Patent.  The '713 Patent is the subject of the civil action, *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect and Anker Innovations Limited*, C.A. No. 19-cv-02293-CFC (D. Del.).

### C.    Lead And Back-Up Counsel Under 37 C.F.R. § 42.8(b)(3)

Anker provides the following designation of counsel.

58

CP0018840

Attorney Docket No. 10256-0047IP5
IPR of U.S. Patent No. RE47,713

| Lead Counsel | Backup counsel |
|---|---|
| Jennifer J. Huang, Reg. No. 64,297<br>Fish & Richardson P.C.<br>3200 RBC Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Tel: 858-678-5070<br>Fax: 877-769-7945<br>Email: IPR10256-0047IP5@fr.com | Kim H. Leung, Reg. No. 64,399<br>Fish & Richardson P.C.<br>3200 RBC Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Tel: 858-678-5070<br>Fax: 877-769-7945<br>PTABInbound@fr.com |

### D.    Service Information

Please address all correspondence and service to the address listed above.

Petitioner consents to electronic service by email at IPR10256-0047IP5@fr.com

(referencing No. 10256-0047IP5 and cc'ing PTABInbound@fr.com,

huang@fr.com and leung@fr.com).

Respectfully submitted,

Dated October 16, 2020           /Jennifer J. Huang/
                                 Jennifer J. Huang, Reg. No. 64,297
                                 Kim H. Leung, Reg. No. 64,399
                                 Fish & Richardson P.C.
                                 3200 RBC Plaza, 60 South Sixth Street
                                 Minneapolis, MN 55402
                                 T: 858-678-5070
                                 F: 877-769-7945

(Control No. IPR2021-00071)      Attorneys for Petitioner

59

CP0018841

# EXHIBIT 18

Trials@uspto.gov
571-272-7822

Paper 21
Entered: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

_____

IPR2021-00067
Patent RE47,031 E

_____

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

SMITH, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

CP0011691

IPR2021-00067
Patent RE47,031 E

## I.    INTRODUCTION

Fantasia Trading LLC D/B/A AnkerDirect  ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 (the "challenged claims") of U.S. Patent No. RE47,031 E (Ex. 1001, the "'031 patent," "challenged patent") pursuant to 35 U.S.C. § 311 *et seq*.  Paper 2 ("Pet.").  CogniPower LLC ("Patent Owner") filed a Preliminary Response.  Paper 11 ("Prelim. Resp."). With our authorization (Paper 14), Petitioner filed a Reply to the Preliminary Response (Paper 15, "Prelim. Reply"), and Patent Owner filed a Preliminary Sur-reply to Patent Owner's Preliminary Response (Paper 18, "Prelim. Sur-reply").

We have authority to institute an *inter partes* review under 35 U.S.C. § 314 if "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a) (2018).  After considering the briefing and the evidence of record, we institute an *inter partes* review in this proceeding.

### A. Related Matters

The parties identify the following related district court litigation: *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect*, C.A. No. 19-cv-02293 (D. Del.).  Pet. 60; Paper 5, 2.

Patent Owner identifies the following related IPRs: IPR2021-00068, -00069, and -00070, which challenge the '031 patent, and IPR2021-00071, -00072, and -00073, which challenge U.S. Patent No. RE47,713 E, which is a continuation of the '031 patent.  Paper 5, 1–4.

2

CP0011692

IPR2021-00067
Patent RE47,031 E

1. Apparatus configured to provide switched-mode power conversion, the apparatus comprising:

an input port configured to receive input power;

a switch configured to commutate the input power;

galvanic isolation circuitry configured to provide galvanic isolation between the input port and an output port, wherein the galvanic isolation circuitry comprises a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a first rectifier and the output port, wherein the transformer is configured to transfer power from the input port to supply voltage or current to a load connected to the output port;

a demand pulse generator galvanically connected to the secondary winding and configured to generate demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load; and

a capacitor and a second rectifier both galvanically connected to the second winding, wherein:

the second rectifier is different from the first rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the demand pulse generator is powered by energy stored in the capacitor to generate the demand pulses.

Ex. 1001, 12:7–34.

*D. Asserted Challenges to Patentability and Prior Art*

Petitioner challenges the following claims based on the grounds in the table below.

6

CP0011696

IPR2021-00067
Patent RE47,031 E

| Ground | Claims Challenged | 35 U.S.C. § | References/Basis |
|--------|-------------------|-------------|------------------|
| 1 | 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 | 103 | Zhu[1] and Mao[2] |
| 2 | 1, 2, 8, 10, 18, 25, 30–33, 37, 38, 43–46, 49, 52–54, 58–61 | 103 | Szepesi[3] and Mao |

Pet. 2.

Petitioner submits a declaration (Ex. 1003) from its proffered expert, Mr. Bohannon.  Patent Owner submits a declaration (Ex. 2001) from its proffered expert, Mr. Sandler.

## II.    LEVEL OF SKILL AND CLAIM CONSTRUCTION

### A. Level of Skill in the Art

To determine the level of an ordinarily skilled artisan, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field."  *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quotation omitted).

Mr. Bohannon testifies that an ordinarily skilled artisan would have "B.S. degree, or its equivalent, in electrical engineering or physics and approximately two years of practical experience working with switching regulators and analog/mixed signal circuit design, or an equivalent

---

[1] US 2011/0096573 A1, published Apr. 28, 2011 (Ex. 1005).
[2] US 6,466,461 B2, issued Oct. 15, 2002 (Ex. 1006).
[3] US 5,498,995, issued Mar. 12, 1996 (Ex. 1007).

7

CP0011697

IPR2021-00067
Patent RE47,031 E

## VI.    CONCLUSION

We are persuaded that Petitioner has demonstrated a reasonable likelihood of proving the unpatentability of at least one challenged claim of the '031 patent.  We clarify, however, that our analysis is based only on the record as it stands now and that we have not made a final determination with respect to the patentability of any challenged claim.[9]  At trial, the parties should support any arguments they wish to make and should not rely on any preliminary findings or analysis in this Decision.

## VII.    ORDER

It is:

ORDERED that, pursuant to 35 U.S.C. § 314(a) an *inter partes* review of the '031 patent is hereby instituted on the asserted grounds set forth in the Petition; and

FURTHER ORDERED, that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is given of the institution of a trial, which commences on the entry date of this Decision.

---

[9] The Preliminary Response, the Preliminary Reply, and the Preliminary Sur-reply are not part of the trial record.  If either party wishes to have an argument that it made in any of those papers considered for the Final Written Decision, that party must present that argument in the appropriate trial paper (e.g., Patent Owner Response, Petitioner's Reply).

42

CP0011732

IPR2021-00067
Patent RE47,031 E

FOR PETITIONER:

Jennifer Huang
Kim Leung
FISH & RICHARDSON, P.C.
jjh@fr.com
leung@fr.com


FOR PATENT OWNER:

Jonathan Lindsay
CROWELL & MORRELL LLP
jlindsay@crowell.com

Hong Zhong
IRELL AND MANELLA LLP
hzhong@irell.com

43

CP0011733

# EXHIBIT 19

Trials@uspto.gov

571-272-7822

Paper 22

Date: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

_____

IPR2021-00068
Patent RE47,031 E

_____

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

SMITH, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

ANK00003433

IPR2021-00068
Patent RE47,031 E

## I.   INTRODUCTION

Fantasia Trading LLC d/b/a Ankerdirect ("Petitioner") filed a Petition (Paper 3, "Pet.") requesting an *inter partes* review of claims 5, 6, 11, 12, 19–24, 26, 29, 39, 42, 50, 51 and 57 of U.S. Patent No. RE47,031 E (Ex. 1001, "the '031 patent"). *See* 35 U.S.C. § 311. Cognipower, LLC ("Patent Owner") filed a Preliminary Response. Paper 11 ("Prelim. Resp."). Petitioner then filed an authorized Reply to address arguments directed to 35 U.S.C. § 325(d) (Paper 15) and Patent Owner filed an authorized Sur-reply (Paper 18).

In addition, Petitioner filed a Notice Ranking Petitions to address its four concurrently filed petitions (IPR2021–00067 through IPR2021-00070) challenging claims of the '031 patent (Paper 1), to which Patent Owner filed a response (Paper 12).

We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2020). As part of this analysis, we may consider whether Petitioner has filed more than one petition directed to the challenged patent. For the reasons discussed below, we determine that Petitioner has not justified additional Petitions directed to the '031 patent. Accordingly, we do not institute an *inter partes* review.

### A.   *Real Parties in Interest*

Petitioner identifies Anker and Power Integrations, Inc. as the real parties-in-interest. Pet. 60. Petitioner also states that Anker is a subsidiary of Anker Innovations Limited. *Id.* Patent Owner identifies itself as the real party-in-interest. Paper 8 (Mandatory Notice), 2.

2

ANK00003434

IPR2021-00068
Patent RE47,031 E

### B.  Related Proceedings

Concurrent with the present Petition, Petitioner filed three additional petitions challenging claims of the '031 patent in the following proceedings: IPR2021-00067; IPR2021-00069; and IPR2021-00070.

Patent Owner identifies the following proceedings challenging RE47,713 E as related matters: *Fantasia Trading, LLC D/B/A AnkerDirect*, IPR2021-00071(PTAB); *Fantasia Trading, LLC D/B/A AnkerDirect*, IPR2021-00072 (PTAB); and *Fantasia Trading, LLC D/B/A AnkerDirect*, IPR2021-00073 (PTAB).  Paper 8, 3.  Patent Owner also identifies the following currently U.S. patent applications as related to the '031 patent: No. 16/547,850; No. 16/548,897; and No. 16/987,654.  *Id.*

The parties also identify the following judicial matter as related to the proceeding: *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect and Anker Innovations Limited*, Case No. 1:19-cv-02293 (D. Del) (the "Co-pending Litigation").  Pet. 60; Paper 8, 2.  Patent Owner further identifies the following judicial matter as related to the present proceeding: *Power Integrations, Inc. v. CogniPower LLC*, Case No. 1:20-cv-00015 (D. Del). Paper 8, 2.

### C.  The '031 Patent

The '031 patent, titled "Power Converter with Demand Pulse Isolation," relates to a switched-mode power converters with regulation demand pulses sent across a galvanic isolation barrier.  Ex. 1001, codes (54), (57).  The '031 patent describes embodiments of power converters using either a blocking oscillator (*see, e.g.*, *id.* at Figs. 1, 2)) a simple transformer (*id.* at Fig. 3), or a separate pulse transformer (*id.* at Fig. 4).

ANK00003435

IPR2021-00068
Patent RE47,031 E

Ex. 1001, 12:7–34.

> 5. The apparatus of claim 1, wherein the demand pulse generator comprises:
>
> an oscillator configured to generate oscillator pulses; and
>
> logic circuitry configured to selectively gate the oscillator pulses to generate the demand pulses applied to the galvanic isolation circuitry.

*Id.* at 12:48–54.

### E. Asserted Grounds of Unpatentability

Petitioner asserts that claims 5, 6, 11, 12, 19–24, 26, 29, 39, 42, 50, 51 and 57 would have been unpatentable on the following grounds:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 5, 6, 19–24, 26, 29, 36, 39, 42, 50, 51, 57 | 103 | Szepesi[1], Mao[2], Tisinger |
| 6, 11, 12, 24, 29, 36, 39, 42, 51, 57 | 103 | Matsumoto-392[3], Mao |
| 11, 12 | 103 | Matsumoto-043, Mao |

---

[1] U.S. Patent No. 5,498,995 A, issued March 12, 1996 (IPR2021-00067, Ex. 1007, "Szepesi").

[2] U.S. Patent No. 6,466,461 B2, issued October 15, 2002 (Ex. 1006, "Mao").

[3] U.S. Patent No. 7,773,392 B2, issued August 10, 2010 (Ex. 1010, "Matsumoto-392").

ANK00003437

IPR2021-00068
Patent RE47,031 E

## II.  DISCRETIONARY DENIAL UNDER 35 U.S.C. § 314(a)

### A.  The Parties Positions

Petitioner filed four petitions on the same day for *inter partes* review of the '031 patent.  *See* IPR2021-00067 through IPR2021-00070.  The challenged claims and asserted grounds for each petition are set forth below:

| Petition | IPR | Claims Challenged | Grounds |
|---|---|---|---|
| 1 | IPR2021-00067 | 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 | Zhu,[4] Mao |
| | | 1, 2 ,8, 10, 18, 25, 30–33, 37, 38, 43–46, 49, 52–54, 58–61 | Szepesi, Mao |
| 2 | IPR2021-00068 | 5, 6, 19–23, 26, 29, 36, 39, 42, 50, 51, 57 | Szepesi, Mao |
| | | 6, 11, 12, 24, 29, 36, 39, 42, 51, 57 | Matsumoto-392, Mao |
| | | 11, 12 | Matsumoto-043,[5] Mao |
| 3 | IPR2021-00069 | 64 | Matsumoto-392 |
| | | | Matsumoto-043 |
| | | | Mammano EDN,[6] UCC3961[7] |
| 4 | IPR2021-00070 | 28, 34, 35, 41, 47, 48, 56, 62, 63 | Zhu, Mao, Tsinger[8] |
| | | 28, 34, 35, 41, 47, 48, | Matsumoto-392, |

---

[4] U.S. Patent Application Publication No. 2011/0096573 A1, published April 28, 2011 (Ex. 1005, "Zhu").

[5]  U.S. Patent Application Publication No. 2011/0305043 A1, published December 15, 2001 (IPR2021-00068, Ex. 1011, "Matsumoto-043").

[6]  Bob Mammano, "Isolated power conversion: making the case for secondary-side control," EDN (June 7, 2001) (IPR2021-00069, Ex. 1012, "Mammano EDN").

[7]  Datasheet for UCC2961, UCC3961 Advanced Primary-Side Startup Controller (December 2000) (IPR2021-00069, Ex. 1013, "UCC3961").

[8] U.S. Patent No. 5,418,410 A, issued May 23, 1995 (Ex. 1016, "Tisinger").

ANK00003438

IPR2021-00068
Patent RE47,031 E

| Petition | IPR | Claims Challenged | Grounds |
|---|---|---|---|
| | | 56, 62, 63 | Mao, Tsinger |

Petitioner asserts that "[b]ecause each Petition challenges a distinct set of claims, the Board should institute all four Petitions." Paper 1, 1. Petitioner states that Patent Owner is currently asserting 53 of the 64 claims of the '031 patent in the Co-pending Litigation and, that due to the large number of claims being asserted, Petitioner "needs four petitions to challenge the asserted claims due to word count constraints." *Id.* at 2.[9]

Petitioner further asserts that the petitions are non-redundant because they each challenge distinct sets of claims and rely on different combinations of references that address the claim elements in material different ways. *Id.* at 3. In particular, Petitioner asserts that Petition 1 relies either on Zhu or on Szepisi as primary references, both of which were considered during reissue prosecution and found to disclose almost all the limitations of the claims, but combines them with a secondary reference (i.e., Mao) that expressly discloses the specific limitations that the PTO believed were not present in the prior art. *Id.* Petitioner asserts that Petition 3, which asserts claim 64 is unpatentable over 3 separate grounds—relying on either Matsumoto-392, Matsumoto-043, or Mammano-EDN as the primary reference, addresses the unique limitations of claim 63 that are not a part of the other independent claims. *Id.* Petitioner asserts that Petitions 2 and 4, which challenge dependent claims with unique limitations not addressed in the other Petitions, also relies on "primary references that were not before the PTO during the reissue." *Id.* Petition 2 relies on either Szepesi, Matsumoto-392,

---

[9] Petitioner does not cite to any evidence to support its assertion that Patent Owner is asserting 53 claims in the Co-pending Litigation.

ANK00003439

IPR2021-00068
Patent RE47,031 E

or Matusmoto-043 as the primary reference and Petition 4 relies on either
Zhu or Matsumoto-392 as the primary reference.

Petitioner further states that if the Board should exercise its discretion
to deny any petitions, then the Board should institute at least Petitions 1
and 3. Paper 1, 1.

Patent Owner responds that Petitioner has split up the claims across
multiple petitions to create the illusion that it did not have enough space to
address each set of challenged claims in a single petition. Paper 12, 4.
Patent Owner asserts that petitions 1, 2, and 4 present *four* different
challenges to each of independent claims 1, 10, and 18—i.e., relying on four
different primary references (1) Zhu, (2) Szepesi, (3) Matsumoto-392, or
(4) Matusumoto-043, each in combination with and Mao without explaining
why these redundant grounds are necessary or how they even materially
differ from each other. *Id.* at 3–4. Patent Owner also states that had
Petitioner divided the four primary references across the petitions, then there
would have been sufficient space to address each set of challenged claims
within each respective petition and then Petitioner would have had to justify
the filing of multiple petitions with different grounds.[10] *Id.*

Patent Owner further asserts, contrary to Petitioner's contentions, that
the claim elements are not challenged in materially different ways. *Id.* at 5.

---

[10] Although Patent Owner does not comment on Petition 3 (IPR2021-00069–
now terminated), we note that Petition 3 asserts independent claim 64 is
unpatentable over three separate grounds, two of which rely on the same
primary prior art reference asserted in other petitions, i.e., Matsumoto-392
and Matsumoto-043. *See, e.g.,* IPR2021-00069, Paper 2 (Petition), 9–13
(asserting claim 64 is anticipated by Matsumoto-392), 14–20 (asserting
claim 64 is anticipated by Matsumoto-043). Thus, Patent Owner's
arguments directed to Matsumoto-392 and Matumoto-043 also apply to
independent claim 64.

ANK00003440

IPR2021-00068
Patent RE47,031 E

Patent Owner contends that each of the primary references (i.e., Zhu,
Szepesi, Matsumoto-392, and Matsumoto-043) are relied on for disclosing
the same claim elements of the same independent claims and that each
reference is combined with Mao for the same reasons. *Id.* (citing Pet. 13, 33,
50). Patent Owner also asserts that, contrary to Petitioner's assertion,
only 42 claims were asserted in the Co-pending Litigation. *Id.* at 2.[11]

### B.    Analysis

Under § 314(a), we have discretion to deny institution of an *inter
partes* review. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140
(2016) ("[T]he agency's decision to deny a petition is a matter committed to
the Patent Office's discretion."); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348,
1356 (2018) ("[Section] 314(a) invests the Director with discretion on the
question whether to institute review . . . ." (emphasis omitted)); *Harmonic
Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is
permitted, but never compelled, to institute an IPR proceeding."); *see also*
37 C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the
Director."). The Patent Trial and Appeal Board Consolidated Trial Practice
Guide (Nov. 2019)[12] ("Trial Practice Guide") addresses the issue we face
here—whether to institute on more than one concurrently-filed petition
addressing the same patent—and states:

> Based on the Board's prior experience, one petition should be
> sufficient to challenge the claims of a patent in most situations.
> Two or more petitions filed against the same patent at or about
> the same time . . . may place a substantial and unnecessary burden

---

[11] Patent Owner does not cite to any evidence to support its assertion that it
is only asserting 42, not 53, claims in the Co-pending Litigation.
[12] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

9

ANK00003441

IPR2021-00068
Patent RE47,031 E

> on the Board and the patent owner and could raise fairness, timing, and efficiency concerns. *See* U.S.C. § 316(b). . . .

Trial Practice Guide, 59.

> The Trial Practice Guide recognizes that

> that there may be circumstances in which more than one petition may be necessary, including, for example, when the patent owner has asserted a large number of claims in litigation or when there is a dispute about priority date requiring arguments under multiple prior art references. In such cases two petitions by a petitioner may be needed, although this should be rare. Further, . . . the Board finds it unlikely that circumstances will arise where three or more petitions by a petitioner with respect to a particular patent will be appropriate.

*Id.*

> The Trial Practice Guide further instructs Petitioners that file more than one petition challenging the same patent to file (1) a ranking of the petitions in the order in which petitioner wishes the Board to consider the merits, and (2) a succinct explanation of the differences between the petitions, why the issues addressed by the differences are material, and why the Board should exercise its discretion to institute additional petitions if it identifies one petition that satisfies petitioner's burden under § 314(a). *Id.* at 59–60.

> Having considered the parties arguments, we are not persuaded that the present petition is necessary to challenge the claims of the '031 patent. Although Petitioner correctly argues that each of its four petitions challenge different claims, Petitioner has not shown that it was necessary to distribute its challenges across four petitions in order to present one ground of unpatentability for each challenged claim.

ANK00003442

IPR2021-00068
Patent RE47,031 E

Notably, Petitioner does not assert that it could not have asserted at least one ground against challenged claim in a single petition. Rather, Petitioner asserts that it could not fit "*all of its grounds* against the asserted claims into a single petition." Paper 1, 2. Each Petition, however, asserts multiple grounds for nearly every challenged claim with significant repetition of argument among the various petitions. For example, with respect to challenging claims on multiple grounds, the present Petition asserts that independent claims 1, 10, and 18 are unpatentable over both Zhu and Mao as well as over Matsumoto-392 and Mao, and that the challenged claims are unpatentable either over Zhu, Mao, and Tisinger or over Matsumoto-392, Mao, and Tisinger. Pet. 2, 15–56. Similarly, in Petition 1 (IPR2021-00067), Petitioner asserts independent claims 1, 10, and 18, as well as the dependent claims 2, 8, 25, 30–33, 37, 38, 43–46, 49, 52–54, and 58–61, are unpatentable over two grounds, namely either over Zhu and Mao or over Szepesi and Mao. IPR2021-00067, Paper 2 (Petition), 2. In Petition 2 (IPR2021-00068), Petitioner challenges claims 6, 24, 36, 39, 42, 51, and 57, which depend directly or indirectly on claims 1, 10, or 18 over both Szepesi and Mao as well as over Matsumoto-392 and Mao and challenges claims 11 and 12, which depend directly or indirectly on claim 10, over both Matsumoto-392 and Mao as well as over Matsumoto-043 and Mao. IPR2021-00068, Paper 3 (Petition), 2. In Petition 3 (IPR2021-00069), Petitioner challenges independent claim 64 on three grounds, namely (1) Matsumoto-392, (2) Matsumoto-043, as well as (3) Mammano EDN and UCC3961.[13] Thus, in addition to challenging nearly every dependent claim

---

[13] As noted above in footnote 10, Patent Owner's arguments do not address would be a fifth set of primary references (i.e., Mammano EDN), which is asserted as a third ground challenging claim 64 in Petition 3.

ANK00003443

IPR2021-00068
Patent RE47,031 E

on at least two different grounds, Petitioner challenges independent claims 1,
10, and 18 on four different grounds (relying on either Zhu, Szepesi,
Matsumoto-392, or Matsumoto-043 in combination with Mao) and
independent claim 64 on three different grounds (relying on either
Matsumoto-392, Matsumoto-043, an Mammano EDN and  UCC3961).

Additionally, there is a great deal of repetition or overlap among the
different petitions that could have been avoided had each petition been
directed to grounds that rely on one primary prior art reference (i.e., Zhu,
Szepesi, Matsumoto-392, or Matsumoto-042).  For example, the arguments
in the present petition as to the unpatentability of independent claims 1, 10,
and 18 over Zhu and Mao appear to be the same arguments set forth in
Petition 1 (IPR2021-00067).  *Compare* Pet. 15–20, 24–29, 31–34 (asserting
claims 1, 10, and 18 are unpatentable over Zhu and Mao) *with* IPR2021-
00067, Paper 2, 13–20, 23–29, 31–34 (asserting same).  The arguments in
the present petition as to the unpatentability of independent claims 1, 10, and
18 over Matsumoto-392 and Mao appear to be the same arguments set forth
in Petition 2 (IPR2021-00068).  *Compare* Pet. 39–44, 47–52, 54–56
(asserting claims 1, 10, and 18 are unpatentable over Matsumoto-392 and
Mao) *with* IPR2021-00068, Paper 3, 34–38, 40–44, 46–48 (asserting same).

Given Petitioner's failure to assert that it could not fit a single ground
against the asserted claims into a single petition, and given that the four
petitions (1) present four alternative grounds to challenge independent
claims 1, 10, and 18; (2) present three alternative grounds to challenge
independent claim 64; (3) present multiple grounds against most of the
dependent claims; and (4) contain significant overlap due to the repetition of
arguments in multiple petitions, we determine Petitioner has not shown that

12

ANK00003444

IPR2021-00068
Patent RE47,031 E

it was necessary to distribute its challenges across four petitions in order to present one ground of unpatentability for each challenged claim.

We also determine that Petitioner has not shown material differences among the asserted grounds. Petitioner does assert that Petition 1 relies on primary references that were considered during reissue (i.e., Zhu and Szepesi), Petition 3 relies on primary references that were not before the PTO during the reissue proceeding (i.e., Matsumoto-392, Matsumoto-042, and Matsumoto-EDN) to challenge independent claim 64 which has limitations not part of any other independent claim. Paper 1, 3. Petitioner further asserts that Petition 2 and Petition 4 (the present Petition) addresses dependent claims that include "unique limitations not addressed in the other petitions and also rely on primary references that were not before the PTO during reissue." *Id.*

These assertions, however, are not an explanation as to why it is necessary to assert multiple petitions that rely on multiple grounds when a single petition could have been presented to challenge the claims. For example, Petitioner provides no argument that different dependent claims require assertion of different primary references. Nor does Petitioner argue that the Director's discretion under 35 U.S.C. § 325(d)—to deny a petition because the same or substantially the same art was previously presented to the Office—would require arguments under multiple prior art references.

On this record, Petitioner has not demonstrated a need for multiple petitions to challenge the patentability of claims of the '031 patent. Accordingly, we exercise our discretion under 35 U.S.C. § 314 and *deny* the current Petition.

13

IPR2021-00068
Patent RE47,031 E

## III. CONCLUSION

For the reasons discussed above, we deny institution of *inter partes*

review.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that no *inter partes* review is instituted.

14

ANK00003446

# EXHIBIT 20

Trials@uspto.gov                                                 Paper 12
571-272-7822                                          Date: May 20, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

_____

IPR2021-00069
Patent RE47,031 E

_____

Before KEVIN F. TURNER, KIMBERLY McGRAW, and
JOHN R. KENNY, *Administrative Patent Judges*.

McGRAW, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
Due to Disclaimer of All Challenged Claims
*35 U.S.C. § 314; 37 C.F.R. § 42.107(e)*

CP0016813

IPR2021-00069
Patent RE47,031 E

## I.  INTRODUCTION

Fantasia Trading LLC d/b/a Ankerdirect ("Petitioner") filed a Petition
(Paper 2, "Pet.") requesting institution of an *inter partes* review of claim 64
of U.S. Patent No. RE47,031 E (Ex. 1001, "the '031 patent").  Cognipower,
LLC ("Patent Owner") filed a Preliminary Response, which includes a
notice of patent disclaimer directed to the sole challenged claim.  Paper 11
("Prelim. Resp."); Ex. 2001 (statutory disclaimer).

For reasons that follow, based on the information presented, we deny
the Petition based on the disclaimer and, accordingly, do not institute an
*inter partes* review.

## II.  DISCUSSION

### A.  *Background*

The '031 patent relates to switched-mode power converters.
Ex. 1001, code (57), 1:28–29.  Claim 64 is directed to an apparatus
configured to provide galvanically isolated switched-mode power
conversion.  *Id.* at 19:8–30.

Petitioner identifies itself as the real party-in-interest.  Pet. 2. Patent
Owner identifies itself as the real party-in-interest.  Paper 8, 2.

The parties identified the following judicial matter related to the
proceeding: *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect
and Anker Innovations Limited*, No. 1:19-cv-02293 (D. Del).  Pet. 30; Paper
8, 2.  Patent Owner also identified the following judicial matter also related
to the proceeding: *Power Integrations, Inc. v. CogniPower LLC*, No. 1:20-
cv-00015 (D. Del).  Paper 8, 2.

Concurrent with the present Petition, Petitioner filed three additional
petitions challenging claims of the '031 patent in IPR2021-00067, IPR2021-

CP0016814

IPR2021-00069
Patent RE47,031 E

00068, and IPR2021-00070 (PTAB). Each of these petitions is currently pending.

Patent Owner identifies IPR2021-00071, IPR2021-00072, and IPR2021-00073 as three additional related IPR proceedings that challenge claims of RE47,713 E, a continuation of the '031 patent. Prelim. Resp. 13; Paper 8, 2–3. In addition, Patent Owner identifies the following currently pending U.S. patent applications as related to the '031 patent: App. No. 16/547,850; App. No. 16/548/897; and App. No. 16/987,654. Paper 8, 3.

### B. Analysis

A "patent owner may file a statutory disclaimer under 35 U.S.C. [§] 253(a) in compliance with § 1.321(a) of this chapter, disclaiming one or more claims in the patent. No *inter partes* review will be instituted based on disclaimed claims." 37 C.F.R. § 42.107(e) (2020).

A disclaimer under 35 U.S.C. § 253(a) is "considered as part of the original patent" as of the date on which it is "recorded" in the Office. 35 U.S.C. § 253(a). For a disclaimer to be "recorded" in the Office, the document filed by the patent owner must:

> 1. Be signed by the patentee, or an attorney or agent of record;
>
> 2. Identify the patent and complete claim or claims, or term being disclaimed. A disclaimer which is not a disclaimer of a complete claim or claims, or term will be refused recordation;
>
> 3. State the present extent of patentee's ownership interest in the patent; and
>
> 4. Be accompanied by the fee set forth in 37 C.F.R. § 1.20(d).

37 C.F.R. § 1.321(a).

3

CP0016815

IPR2021-00069
Patent RE47,031 E

A disclaimer is "recorded" pursuant to 35 U.S.C. § 253(a) on the date that the Office receives a disclaimer meeting the above-listed requirements of 37 C.F.R. § 1.321(a) – no further action is required in the Office for a disclaimer to be "recorded." *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1382 (Fed. Cir. 1998).

Here, Patent Owner directs us to a statutory disclaimer of claim 64 of the '031 patent and, further, avers that the disclaimer was "recorded with the Office as of February 25, 2021." Prelim. Resp. 2 (citing Ex. 2001). Based on our review of Exhibit 2001 and Office public records (that is, the USPTO Patent Application Information Retrieval (PAIR) database, containing the image file wrapper and other information for the '031 patent), we conclude that a disclaimer of claim 64 of the '031 patent under 35 U.S.C. § 253(a) was recorded in the office on February 25, 2021. Based on the information presented, we find that the disclaimer complies with the above-listed requirements of 37 C.F.R. § 1.321(a).

Because the sole claim challenged in the present petition, i.e., claim 64, is disclaimed under 35 U.S.C. § 253(a) in compliance with 37 C.F.R. § 1.321(a), we decline to institute an *inter partes* review. 37 C.F.R. § 42.107(e); *see General Electric Co. v. United Techs. Corp.*, IPR2017-00491, Paper 9 (PTAB July 6, 2017) (precedential) (declining to institute review where all challenged claims are disclaimed under 35 U.S.C. § 253(a)).

## III. CONCLUSION

For the above reasons, we *deny* the Petition and do not institute an *inter partes* review.

4

CP0016816

IPR2021-00069
Patent RE47,031 E

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petition is *denied* and no *inter partes* review is instituted.

5

CP0016817

# EXHIBIT 21

Trials@uspto.gov
571-272-7822

Paper 21
Date: May 20, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

———————————————

IPR2021-00070
Patent RE47,031 E

———————————————

Before KEVIN F. TURNER, KIMBERLY McGRAW, and
JOHN R. KENNY, *Administrative Patent Judges*.

McGRAW, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

ANK00003519

IPR2021-00070
Patent RE47,031 E

## I. INTRODUCTION

Fantasia Trading LLC d/b/a Ankerdirect ("Petitioner") filed a Petition (Paper 3, "Pet.") requesting an *inter partes* review of claims 28, 34–35, 41, 47–48, 56, and 62–63 of U.S. Patent No. RE47,031 E (Ex. 1001, "the '031 patent"). *See* 35 U.S.C. § 311. Cognipower, LLC ("Patent Owner") filed a Preliminary Response. Paper 11 ("Prelim. Resp."). Petitioner then filed an authorized Reply to address arguments directed to 35 U.S.C. § 325(d) (Paper 15) and Patent Owner filed an authorized Sur-reply (Paper 18).

In addition, Petitioner filed a Notice Ranking Petitions to address its four concurrently filed petitions (IPR2021–00067 through IPR2021-00070) challenging claims of the '031 patent (Paper 1), to which Patent Owner filed a response (Paper 12).

We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2020). As part of this analysis, we may consider whether Petitioner has filed more than one petition directed to the challenged patent. For the reasons discussed below, we determine that Petitioner has not justified additional Petitions directed to the '031 patent. Accordingly, we do not institute an *inter partes* review.

### A. Real Parties in Interest

Petitioner identifies Anker and Power Integrations, Inc. as the real parties-in-interest. Pet. 62. Petitioner also states that Anker is a subsidiary of Anker Innovations Limited. *Id.* Patent Owner identifies itself as the real party-in-interest. Paper 8 (Mandatory Notice), 2.

### B. Related Proceedings

Concurrent with the present Petition, Petitioner filed three additional petitions challenging claims of the '031 patent in the following proceedings: IPR2021-00067 (instituted (IPR2021-00067, Paper 21)); IPR2021-00068

ANK00003520

IPR2021-00070
Patent RE47,031 E

(denied (IPR2021-00068, Paper 22)); and IPR2021-00069 (terminated prior
to institution (IPR2021-00069, Paper 12)).

Patent Owner identifies the following proceedings challenging
RE47,713 E as related matters: *Fantasia Trading, LLC D/B/A AnkerDirect*,
IPR2021-00071(PTAB); *Fantasia Trading, LLC D/B/A AnkerDirect*,
IPR2021-00072 (PTAB); and *Fantasia Trading, LLC D/B/A AnkerDirect*,
IPR2021-00073 (PTAB). Paper 8, 3. Patent Owner also identifies the
following currently U.S. patent applications as related to the '031 patent:
No. 16/547,850; No. 16/548,897; and No. 16/987,654. *Id.*

The parties also identify the following judicial matter as related to the
proceeding: *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect
and Anker Innovations Limited*, Case No. 1:19-cv-02293 (D. Del) (the "Co-
pendeing Litigation"). Pet. 63; Paper 8, 2. Patent Owner further identifies
the following judicial matter as related to the present proceeding: *Power
Integrations, Inc. v. CogniPower LLC*, Case No. 1:20-cv-00015 (D. Del).
Paper 8, 2.

### C. The '031 Patent

The '031 patent, titled "Power Converter with Demand Pulse
Isolation," relates to a switched-mode power converters with regulation
demand pulses sent across a galvanic isolation barrier. Ex. 1001, codes (54),
(57). The '031 patent describes embodiments of power converters using
either a blocking oscillator (*see, e.g.*, *id.* at Figs. 1, 2)) a simple transformer
(*id.* at Fig. 3), or a separate pulse transformer (*id.* at Fig. 4).

### D. Claims

Petitioner challenges claims 28, 34, and 35 (which depend from
independent claim 18), claims 41, 47, and 48 (which depend from

ANK00003521

IPR2021-00070
Patent RE47,031 E

noted above, depend from different base claims. *Id.* at 15:43–16:26, 16:64–17:43, 18:28–19:8.

### E. *Asserted Grounds of Unpatentability*

Petitioner asserts that claims 28, 34–35, 41, 47–48, 56, and 62–63 would have been unpatentable on the following grounds:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 28, 34–35, 41, 47–48, 56, 62–63 | 103 | Zhu[1], Mao[2], Tisinger[3] |
| 28, 34–35, 41, 47–48, 56, 62–63 | 103 | Matsumoto-392[4], Mao, Tisinger |

## II. DISCRETIONARY DENIAL UNDER 35 U.S.C. § 314(a)

### A. *The Parties Positions*

Petitioner filed four petitions on the same day for *inter partes* review of the '031 patent. *See* IPR2021-00067 through IPR2021-00070. The challenged claims and asserted grounds for each petition are set forth below:

| Petition | IPR | Claims Challenged | Grounds |
|---|---|---|---|
| 1 | IPR2021-00067 | 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 | Zhu, Mao |
| | | 1, 2 ,8, 10, 18, 25, 30–33, 37, 38, 43–46, 49, 52–54, 58–61 | Szepesi[5], Mao |

---

[1] U.S. Patent Application Publication No. 2011/0096573 A1, published April 28, 2011 (Ex. 1005, "Zhu").

[2] U.S. Patent No. 6,466,461 B2, issued October 15, 2002 (Ex. 1006, "Mao").

[3] U.S. Patent No. 5,418,410 A, issued May 23, 1995 (Ex. 1016, "Tisinger").

[4] U.S. Patent No. 7,773,392 B2, issued August 10, 2010 (Ex. 1010, "Matsumoto-392").

[5] U.S. Patent No. 5,498,995 A, issued March 12, 1996 (IPR2021-00067, Ex. 1007, "Szepesi").

5

ANK00003523

IPR2021-00070
Patent RE47,031 E

| Petition | IPR | Claims Challenged | Grounds |
|---|---|---|---|
| 2 | IPR2021-00068 | 5, 6, 19–23, 26, 29, 36, 39, 42, 50, 51, 57 | Szepesi, Mao |
| | | 6, 11, 12, 24, 29, 36, 39, 42, 51, 57 | Matsumoto-392, Mao |
| | | 11, 12 | Matsumoto-043,[6] Mao |
| 3 | IPR2021-00069 | 64 | Matsumoto-392 |
| | | | Matsumoto-043 |
| | | | Mammano EDN,[7] UCC3961[8] |
| 4 | IPR2021-00070 | 28, 34, 35, 41, 47, 48, 56, 62, 63 | Zhu, Mao, Tisinger |
| | | 28, 34, 35, 41, 47, 48, 56, 62, 63 | Matsumoto-392, Mao, Tisinger |

Petitioner asserts that "[b]ecause each Petition challenges a distinct set
of claims, the Board should institute all four Petitions." Paper 1, 1.
Petitioner states that Patent Owner is currently asserting 53 of the 64 claims
of the '031 patent in the Co-pending Litigation and, that due to the large
number of claims being asserted, Petitioner "needs four petitions to
challenge the asserted claims due to word count constraints." *Id.* at 2.[9]

Petitioner further asserts that the petitions are non-redundant because
they each challenge distinct sets of claims and rely on different combinations
of references that address the claim elements in material different ways. *Id.*

---

[6] U.S. Patent Application Publication No. 2011/0305043 A1, published
December 15, 2001 (IPR2021-00068, Ex. 1011, "Matsumoto-043").
[7] Bob Mammano, "Isolated power conversion: making the case for
secondary-side control," EDN (June 7, 2001) (IPR2021-00069, Ex. 1012,
"Mammano EDN").
[8] Datasheet for UCC2961, UCC3961 Advanced Primary-Side Startup
Controller (December 2000) (IPR2021-00069, Ex. 1013, "UCC3961").
[9] Petitioner does not cite to any evidence to support its assertion that Patent
Owner is asserting 53 claims in the Co-pending Litigation.

ANK00003524

IPR2021-00070
Patent RE47,031 E

at 3.  In particular, Petitioner asserts that Petition 1 relies either on Zhu or on
Szepesi as primary references, both of which were considered during reissue
prosecution and found to disclose almost all the limitations of the claims, but
combines them with a secondary reference (i.e., Mao) that expressly
discloses the specific limitations that the PTO believed were not present in
the prior art.  *Id.*  Petitioner asserts that Petition 3, which asserts claim 64 is
unpatentable over 3 separate grounds—relying on either Matsumoto-392,
Matsumoto-043, or Mammano-EDN as the primary reference, addresses the
unique limitations of claim 63 that are not a part of the other independent
claims.  *Id.*  Petitioner asserts that Petitions 2 and 4, which challenge
dependent claims with unique limitations not addressed in the other
Petitions, also relies on "primary references that were not before the PTO
during the reissue."  *Id.*  Petition 2 relies on either Szepesi, Matsumoto-392,
or Matsumoto-043 as the primary reference and Petition 4 relies on either
Zhu or Matsumoto-392 as the primary reference.

Petitioner further states that if the Board should exercise its discretion
to deny any petitions, then the Board should institute at least Petitions 1
and 3.  Paper 1, 1.

Patent Owner responds that Petitioner has split up the claims across
multiple petitions to create the illusion that it did not have enough space to
address each set of challenged claims in a single petition.  Paper 12, 4.
Patent Owner asserts that petitions 1, 2, and 4 present *four* different
challenges to each of independent claims 1, 10, and 18—i.e., relying on four
different primary references (1) Zhu, (2) Szepesi, (3) Matsumoto-392, or
(4) Matusumoto-043, each in combination with and Mao without explaining
why these redundant grounds are necessary or how they even materially
differ from each other.  *Id.* at 3–4.  Patent Owner also states that had

7

IPR2021-00070
Patent RE47,031 E

Petitioner divided the four primary references across the petitions, then there would have been sufficient space to address each set of challenged claims within each respective petition and then Petitioner would have had to justify the filing of multiple petitions with different grounds.[10] *Id.*

Patent Owner further asserts, contrary to Petitioner's contentions, that the claim elements are not challenged in materially different ways. *Id.* at 5. Patent Owner contends that each of the primary references (i.e., Zhu, Szepesi, Matsumoto-392, and Matsumoto-043) are relied on for disclosing the same claim elements of the same independent claims and that each reference is combined with Mao for the same reasons. *Id.* (citing Pet. 13, 33, 50). Patent Owner also asserts that, contrary to Petitioner's assertion, only 42 claims were asserted in the Co-pending Litigation. *Id.* at 2.[11]

### B.    Analysis

Under § 314(a), we have discretion to deny institution of an *inter partes* review. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) ("[Section] 314(a) invests the Director with discretion on the

---

[10] Although Patent Owner does not comment on Petition 3 (IPR2021-00069– now terminated), we note that Petition 3 asserts independent claim 64 is unpatentable over three separate grounds, two of which rely on the same primary prior art reference asserted in other petitions, i.e., Matsumoto-392 and Matsumoto-043. *See, e.g.,* IPR2021-00069, Paper 2 (Petition), 9–13 (asserting claim 64 is anticipated by Matsumoto-392), 14–20 (asserting claim 64 is anticipated by Matsumoto-043). Thus, Patent Owner's arguments directed to Matsumoto-392 and Matumoto-043 also apply to independent claim 64.

[11] Patent Owner does not cite to any evidence to support its assertion that it is only asserting 42, not 53, claims in the Co-pending Litigation.

ANK00003526

IPR2021-00070
Patent RE47,031 E

question whether to institute review . . . .” (emphasis omitted)); *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (“[T]he PTO is permitted, but never compelled, to institute an IPR proceeding.”); *see also* 37 C.F.R. § 42.4(a) (“The Board institutes the trial on behalf of the Director.”).  The Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019)[12] (“Trial Practice Guide”) addresses the issue we face here—whether to institute on more than one concurrently-filed petition addressing the same patent—and states:

> Based on the Board’s prior experience, one petition should be sufficient to challenge the claims of a patent in most situations. Two or more petitions filed against the same patent at or about the same time . . . may place a substantial and unnecessary burden on the Board and the patent owner and could raise fairness, timing, and efficiency concerns.  *See* U.S.C. § 316(b).  . . .

Trial Practice Guide, 59.

> The Trial Practice Guide recognizes that

> that there may be circumstances in which more than one petition may be necessary, including, for example, when the patent owner has asserted a large number of claims in litigation or when there is a dispute about priority date requiring arguments under multiple prior art references.  In such cases two petitions by a petitioner may be needed, although this should be rare. Further, . . . the Board finds it unlikely that circumstances will arise where three or more petitions by a petitioner with respect to a particular patent will be appropriate.

*Id.*

The Trial Practice Guide further instructs Petitioners that file more than one petition challenging the same patent to file (1) a ranking of the petitions in the order in which petitioner wishes the Board to consider the

---

[12] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

9

ANK00003527

IPR2021-00070
Patent RE47,031 E

merits, and (2) a succinct explanation of the differences between the
petitions, why the issues addressed by the differences are material, and why
the Board should exercise its discretion to institute additional petitions if it
identifies one petition that satisfies petitioner's burden under § 314(a). *Id.*
at 59–60.

Having considered the parties arguments, we are not persuaded that
the present petition is necessary to challenge the claims of the '031 patent.
Although Petitioner correctly argues that each of its four petitions challenge
different claims, Petitioner has not shown that it was necessary to distribute
its challenges across four petitions in order to present one ground of
unpatentability for each challenged claim.

Notably, Petitioner does not assert that it could not have asserted at
least one ground against challenged claim in a single petition. Rather,
Petitioner asserts that it could not fit "*all of its grounds* against the asserted
claims into a single petition." Paper 1, 2 (emphasis added). Each Petition,
however, asserts multiple grounds for nearly every challenged claim with
significant repetition of argument among the various petitions. For
example, with respect to challenging claims on multiple grounds, the present
Petition asserts that independent claims 1, 10, and 18 are unpatentable over
both Zhu and Mao as well as over Matsumoto-392 and Mao, and that the
challenged claims are unpatentable either over Zhu, Mao, and Tisinger or
over Matsumoto-392, Mao, and Tisinger. Pet. 2, 15–56. Similarly, in
Petition 1 (IPR2021-00067), Petitioner asserts independent claims 1, 10,
and 18, as well as the dependent claims 2, 8, 25, 30–33, 37, 38, 43–46, 49,
52–54, and 58–61, are unpatentable over two grounds, namely either over
Zhu and Mao or over Szepesi and Mao. IPR2021-00067, Paper 2
(Petition), 2. In Petition 2 (IPR2021-00068), Petitioner challenges claims 6,

ANK00003528

IPR2021-00070
Patent RE47,031 E

24, 36, 39, 42, 51, and 57, which depend directly or indirectly on claims 1, 10, or 18 over both Szepesi and Mao as well as over Matsumoto-392 and Mao and challenges claims 11 and 12, which depend directly or indirectly on claim 10, over both Matsumoto-392 and Mao as well as over Matsumoto-043 and Mao. IPR2021-00068, Paper 3 (Petition), 2. In Petition 3 (IPR2021-00069), Petitioner challenges independent claim 64 on three grounds, namely (1) Matsumoto-392, (2) Matsumoto-043, as well as (3) Mammano EDN and UCC3961.[13] Thus, in addition to challenging nearly every dependent claim on at least two different grounds, Petitioner challenges independent claims 1, 10, and 18 on four different grounds (relying on either Zhu, Szepesi, Matsumoto-392, or Matsumoto-043 in combination with Mao) and independent claim 64 on three different grounds (relying on either Matsumoto-392, Matsumoto-043, an Mammano EDN and UCC3961).

Additionally, there is a great deal of repetition or overlap among the different petitions that could have been avoided had each petition been directed to grounds that rely on one primary prior art reference (i.e., Zhu, Szepesi, Matsumoto-392, or Matsumoto-042). For example, the arguments in the present petition as to the unpatentability of independent claims 1, 10, and 18 over Zhu and Mao appear to be the same arguments set forth in Petition 1 (IPR2021-00067). *Compare* Pet. 15–20, 24–29, 31–34 (asserting claims 1, 10, and 18 are unpatentable over Zhu and Mao) *with* IPR2021-00067, Paper 2, 13–20, 23–29, 31–34 (asserting same). The arguments in the present petition as to the unpatentability of independent claims 1, 18, and

---

[13] As noted above in footnote 10, Patent Owner's arguments do not address would be a fifth set of primary references (i.e., Mammano EDN), which is asserted as a third ground challenging claim 64 in Petition 3.

11

ANK00003529

IPR2021-00070
Patent RE47,031 E

18 over Matsumoto-392 and Mao appear to be the same arguments set forth in Petition 2 (IPR2021-00068). *Compare* Pet. 39–44, 47–52, 54–56 (asserting claims 1, 10, and 18 are unpatentable over Matsumoto-392 and Mao) *with* IPR2021-00068, Paper 3, 34–38, 40–44, 46–48 (asserting same).

Given Petitioner's failure to assert that it could not fit a single ground against the asserted claims into a single petition, and given that the four petitions (1) present four alternative grounds to challenge independent claims 1, 10, and 18; (2) present three alternative grounds to challenge independent claim 64; (3) present multiple grounds against most of the dependent claims; and (4) contain significant overlap due to the repetition of arguments in multiple petitions, we determine Petitioner has not shown that it was necessary to distribute its challenges across four petitions in order to present one ground of unpatentability for each challenged claim.

We also determine that Petitioner has not shown material differences among the asserted grounds. Petitioner does assert that Petition 1 relies on primary references that were considered during reissue (i.e., Zhu and Szepesi), Petition 3 relies on primary references that were not before the PTO during the reissue proceeding (i.e., Matsumoto-392, Matsumoto-042, and Matsumoto-EDN) to challenge independent claim 64 which has limitations not part of any other independent claim. Paper 1, 3. Petitioner further asserts that Petition 2 and Petition 4 (the present Petition) addresses dependent claims that include "unique limitations not addressed in the other petitions and also rely on primary references that were not before the PTO during the reissue." *Id.*

These assertions, however, are not an explanation as to why it is necessary to assert multiple petitions that rely on multiple grounds when a single petition could have been presented to challenge the claims. For

12

ANK00003530

IPR2021-00070
Patent RE47,031 E

example, Petitioner provides no argument that different dependent claims require assertion of different primary references. Nor does Petitioner argue that the Director's discretion under 35 U.S.C. § 325(d)—to deny a petition because the same or substantially the same art was previously presented to the Office—would require arguments under multiple prior art references.

On this record, Petitioner has not demonstrated a need for multiple petitions to challenge the patentability of claims of the '031 patent. Accordingly, we exercise our discretion under 35 U.S.C. § 314 and *deny* the current Petition.

## III. CONCLUSION

For the reasons discussed above, we deny institution of *inter partes* review.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that no *inter partes* review is instituted.

13

# EXHIBIT 22

Trials@uspto.gov
571-272-7822

Paper 21
Date: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

————————

IPR2021-00071
Patent RE47,713 E

————————

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

KENNY, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

CP0018998

IPR2021-00071
Patent RE47,713 E

## I.    INTRODUCTION

Fantasia Trading LLC D/B/A AnkerDirect ("Petitioner") filed a
Petition to institute an *inter partes* review of claims 18, 19–23, 25, 30, 31,
34–36, 41–43, 45, and 48–51 (the "challenged claims") of U.S. Patent
No. RE47,713 E (Ex. 1001, the "'713 patent," "challenged patent") pursuant
to 35 U.S.C. § 311 *et seq.*  Paper 3 ("Pet.").  CogniPower LLC ("Patent
Owner") filed a Preliminary Response.  Paper 13 ("Prelim. Resp.").  With our
authorization (Paper 15), Petitioner filed a Reply to the Preliminary Response
(Paper 16, "Prelim. Reply"), and Patent Owner filed a Preliminary Sur-reply
to Patent Owner's Preliminary Response (Paper 18, "Prelim. Sur-reply").

We have authority to institute an *inter partes* review under 35 U.S.C.
§ 314 if "there is a reasonable likelihood that the petitioner would prevail
with respect to at least 1 of the claims challenged in the petition."  35 U.S.C.
§ 314(a) (2018).  After considering the briefing and the evidence of record,
we institute an *inter partes* review in this proceeding.

*A. Related Matters*

The parties identify the following related district court litigation:
*CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect*, C.A. No.
19-cv-02293 (D. Del.).  Pet. 13; Paper 5, 2.

Patent Owner identifies the following related IPRs: IPR2021-00072
and -00073, which both challenge the '713 patent, and IPR2021-00067, -
00068, -00069, and -00070, which all challenge U.S. Patent No. RE47,031 E,
of which the '713 patent is a continuation.  Paper 5, 2–4; Ex. 1001, code (63).

CP0018999

IPR2021-00071
Patent RE47,713 E

> a first rectifier poled to charge the first capacitor during
> forward power converter pulses of the flyback
> converter, wherein the demand pulses are generated
> using energy stored in the first capacitor.

Ex. 1001, 14:1–43.

### D. Asserted Challenges to Patentability and Prior Art

Petitioner challenges the following claims based on the grounds in the table below.

| Ground | Claims Challenged | 35 U.S.C. § | References |
|---|---|---|---|
| 1 | 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, 48–51 | 103 | Zhu[1] and Mao[2] |
| 2 | 18, 19-23, 25, 30, 31, 35–36, 41, 42, 45, 48–51 | 103 | Szepesi[3] and Mao |
| 3 | 18, 22–23, 25, 30, 34, 41–43, 45, 48, 49, 51 | 103 | Matsumoto[4] and Mao |

Pet. 2.

Petitioner submits a declaration (Ex. 1003) from its proffered expert, Mr. Bohannon. Patent Owner submits a declaration (Ex. 2001) from its proffered expert, Mr. Sandler.

---

[1] US 2011/0096573 A1, published Apr. 28, 2011 (Ex. 1005).
[2] US 6,466,461 B2, issued Oct. 15, 2002 (Ex. 1006).
[3] US 5,498,995, issued Mar. 12, 1996 (Ex. 1007).
[4] US 7,773,392 B2, issued Aug. 10, 2010 (Ex. 1010).

7

CP0019004

IPR2021-00071
Patent RE47,713 E

according to Patent Owner, are directed to entirely different types of converters.  Prelim. Resp. 65–69.

In its Annotated Combined Figure, Petitioner combined portions of the circuits of Matsumoto Figures 4 and 8 with the bias circuit of Mao Figure 9. Pet. 46–47.  Petitioner, however, provided no explanation for its combination of Figures 4 and 8 of Matsumoto.  *Id.*  Thus, on this record, it appears that Petitioner has not demonstrated a reasonable likelihood of proving that an ordinarily skilled artisan would have made the combination proposed by Petitioner and thus has not established a reasonable likelihood of prevailing on Ground 3.[12]

## IV.    DISCRETION UNDER 35 U.S.C. § 314 REGARDING THE FILING OF THREE PETITIONS CHALLENGING THE SAME PATENT

Petitioner filed three petitions challenging the patentability of the claims of the '713 patent.  The first petition challenges claims 18–23, 25, 30, 31, 34–36, 41–43, 45, and 48–51 in this proceeding.  The second petition challenges claims 24, 26–29, 32, 33, 38, 40, 44, 46, and 47 in IPR2021-00072 ("'072 IPR").  The third petition challenges claims 52–61 in IPR2021-00073 (""'073 IPR").  Pursuant to the Board's Consolidated Trial Practice Guide, Petitioner filed a Notice Ranking and Explaining Material Differences Between Petitions for *Inter Partes* Review of U.S. Patent No. RE47,713. Paper 1 ("Notice"); PTAB Consolidated Trial Practice Guide, 59–60 (Nov. 2019) (available at https://www.uspto.gov/TrialPracticeGuideConsolidated). In its Notice, Petitioner requests that we institute in all three IPRs, but

---

[12] During trial, the parties may also want to address how, in Petitioner's combination of Matsumoto and Mao, the Vbias powers the control circuitry of Matsumoto.  *See* Pet. 47.

CP0019034

IPR2021-00071
Patent RE47,713 E

consider the Petition in this proceeding first. Paper 1, 1. Patent Owner

responded, requesting that we deny the petitions filed in the '072 and '073

IPRs. Paper 12, 1–5.

Because Petitioner ranked this Petition first and Patent Owner does not

object, we decline to exercise our discretion to deny institution under

35 U.S.C. § 314(a) in this proceeding based on the filing of two additional

petitions challenging the same patent. In separate decisions, we deny

institution of the petitions in the '072 and '073 IPRs.

## V.    DISCRETION UNDER 35 U.S.C. § 325(D)

### A. Advanced Bionics

Patent Owner asserts that we should exercise our discretion to deny

institution of the *inter partes* review under 35 U.S.C. § 325(d). Prelim.

Resp. 13–24; Prelim. Sur-reply 1–5. For the reasons that follow, we decline

to deny institution on that basis.

In evaluating arguments under § 325(d), we use:

> [a] two-part framework: (1) whether the same or substantially the
> same art previously was presented to the Office or whether the
> same or substantially the same arguments previously were
> presented to the Office; and (2) if either condition of [the] first
> part of the framework is satisfied, whether the petitioner has
> demonstrated that the Office erred in a manner material to the
> patentability of challenged claims.

*Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*,

IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential); *see also*

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586,

Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential as to Section III.C.5,

first paragraph) (listing factors to consider in evaluating the applicability of

§ 325(d)) ("*Becton, Dickinson*").

38

CP0019035

IPR2021-00071
Patent RE47,713 E

respect to the patentability of any challenged claim.[14] At trial, the parties should support any arguments they wish to make and should not rely on any preliminary findings or analysis in this Decision.

## VII. ORDER

It is:

ORDERED that, pursuant to 35 U.S.C. § 314(a) an *inter partes* review of the '713 patent is hereby instituted on the asserted grounds set forth in the Petition; and

FURTHER ORDERED, that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is given of the institution of a trial, which commences on the entry date of this Decision.

---

[14] The Preliminary Response, the Preliminary Reply, and the Preliminary Sur-reply are not part of the trial record. If either party wishes to have an argument that it made in any of those papers considered for the Final Written Decision, that party must present that argument in the appropriate trial paper (e.g., Patent Owner Response, Petitioner's Reply).

CP0019041

# EXHIBIT 23

Trials@uspto.gov
571-272-7822
Paper 20
Date: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

————————

IPR2021-00072
Patent RE47,713 E

————————

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

KENNY, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

ANK00003588

IPR2021-00072
Patent RE47,713 E

## I.    INTRODUCTION

Fantasia Trading LLC D/B/A AnkerDirect ("Petitioner") filed a
Petition to institute an *inter partes* review of claims 24, 26–29, 32, 33, 38, 40,
44, 46, and 47 (the "challenged claims") of U.S. Patent No. RE47,713 E
(Ex. 1001, the "'713 patent," "challenged patent") pursuant to 35 U.S.C.
§ 311 *et seq.*  Paper 3 ("Pet.").  CogniPower LLC ("Patent Owner") filed a
Preliminary Response.  Paper 12 ("Prelim. Resp.").  With our authorization
(Paper 14), Petitioner filed a Reply to the Preliminary Response (Paper 15),
and Patent Owner filed a Preliminary Sur-reply to Patent Owner's
Preliminary Response (Paper 17).

In addition, Petitioner filed a Notice Ranking and Explaining
Differences Between Petitions for *Inter Partes* Review of U.S. Patent No.
RE47,713.  Paper 1 ("Ranking Notice").  This Notice addressed three
concurrently filed petitions (IPR2021-00071 through IPR2021-00073).
Patent Owner filed a response to this Notice.  Paper 11.

We have authority to determine whether to institute an *inter partes*
review.  35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2020).  As part of our
analysis, we may consider whether Petitioner has filed more than one petition
directed to the challenged patent.  For the reasons discussed below, we
determine that Petitioner has not justified more than one petition directed to
the '713 patent.  Accordingly, we do not institute an *inter partes* review in
this proceeding.

### A. Related Matters

The parties identify the following related district court litigation:
*CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect*, C.A. No.
1:19-cv-02293 (D. Del.) ("Co-pending Litigation").  Pet. 47; Paper 5, 2.

ANK00003589

IPR2021-00072
Patent RE47,713 E

Patent Owner identifies the following related IPRs: IPR2021-00071 and IPR2021-00073, which both challenge the '713 patent, and IPR2021-00067, IPR2021-00068, IPR2021-00069, and IPR2021-00070, which all challenge U.S. Patent No. RE47,031 E, of which the '713 patent is a continuation.  Paper 5, 2–4; Ex. 1001, code (63).

*B. Challenged Patent*

The '713 patent relates to "switched-mode power converters" and discloses "a switched-mode power converter with regulation demand pulses sent across a galvanic isolation barrier."  Ex. 1001, code (57), 1:33–35.

Figure 1 of the '713 patent is shown below:



# Fig. 1

Figure 1 is a schematic diagram of a power converter (10a).  Ex. 1001, 2:34–35.  "Terminals 11a and 12a constitute a power input port that places source 5a in circuit with primary winding 101a of transformer 100a and with

3

ANK00003590

IPR2021-00072
Patent RE47,713 E

off the primary-side switch is originated on the primary
side and not on the secondary side;

frequency with which the primary-side switch is turned on is
adjusted by the demand pulses conveyed from the
secondary side to the primary side to regulate the output
voltage or the output current at the output port; and

the secondary side further comprises:

a first capacitor; and

a first rectifier poled to charge the first capacitor during
forward power converter pulses of the flyback
converter, wherein the demand pulses are generated
using energy stored in the first capacitor.

Ex. 1001, 14:1–43.

### D. Asserted Challenges to Patentability and Prior Art

Petitioner challenges the following claims based on the grounds in the
table below.

| Ground | Claims Challenged | 35 U.S.C. § | References |
|--------|-------------------|-------------|------------|
| 1 | 24, 26–28, 32, 33, 38, 40, 44, 46, 47 | 103 | Szepesi[1] and Mao[2] |
| 2 | 24, 29, 33, 38, 40, 47 | 103 | Matsumoto[3] and Mao |
| 3 | 44 | 103 | Matsumoto, Mao, Tisinger[4] |

Pet. 2.

_____

[1] US 5,498,995, issued Mar. 12, 1996 (Ex. 1007).
[2] US 6,466,461 B2, issued Oct. 15, 2002 (Ex. 1006).
[3] US 7,773,392 B2, issued Aug. 10, 2010 (Ex. 1010).
[4] US 5,418,410, issued May 23, 1995 (Ex. 1016).

7

ANK00003594

IPR2021-00072
Patent RE47,713 E

Petitioner submits a declaration (Ex. 1003) from its proffered expert, Mr. Bohannon.  Patent Owner submits a declaration (Ex. 2001) from its proffered expert, Mr. Sandler.

## II.  DISCRETION UNDER 35 U.S.C. § 314(a)

### A. The Parties' Positions

Petitioner filed three petitions on the same day for *inter partes* review of the '713 patent.  *See* IPR2021-00071 through -00073.  The challenged claims and asserted grounds for each petition are set forth below:

| Petition | IPR | Claims Challenged | Grounds |
|---|---|---|---|
| 1 | IPR2021-00071 | 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, 48–51 | Zhu[5] and Mao |
| | | 18, 19–23, 25, 30, 31, 35, 36, 41, 42, 45, 48–51 | Szepesi and Mao |
| | | 18, 22, 23, 25, 30, 34, 41–43, 45, 48, 49, 51 | Matsumoto and Mao |
| 2 | IPR2021-00072 | 24, 26–28, 32, 33, 38, 40, 44, 46, 47 | Szepesi and Mao |
| | | 24, 29, 33, 38, 40, 47 | Matsumoto and Mao |
| | | 44 | Matsumoto, Mao, and Tisinger |
| 3 | IPR2021-00073 | 52 | Matsumoto and Mao |
| | | 53–56, 58, 60, 61 | Matsumoto, Mao, and Krupka[6] |
| | | 57 | Matsumoto, Mao, Krupka, and Tisinger |
| | | 59 | Matsumoto, Mao, Krupka, and Szepesi |

---

[5] US 2011/0096573 A1, published Apr. 28, 2011 (IPR2021-00071, Ex. 1005).
[6] US 4,413,224, issued Nov. 1, 1983 (IPR2021-00073, Ex. 1019).

ANK00003595

IPR2021-00072
Patent RE47,713 E

Petitioner asserts that "[b]ecause each Petition challenges a distinct set of claims, the Board should institute all three Petitions."  Ranking Notice 1. Petitioner states that Patent Owner is currently asserting 59 of the 61 claims of the '713 patent in the Co-pending Litigation and that, due to the large number of claims being asserted, Petitioner "needs four petitions[7] to challenge the asserted claims due to word count constraints."  *Id.* at 2.

Petitioner argues that Petition 1 challenges independent claims 1 and 48, and as many of the dependent claims as was practical to address in view of word limits.  Ranking Notice 3.  Petitioner further argues that Petitions 2 and 3 address dependent claims that include unique limitations and unique combination of limitations.  *Id.*

Petitioner further asserts that the petitions are non-redundant because they each challenge distinct sets of claims and rely on different combinations of references that address the claim elements in materially different ways. Ranking Notice 2.  In particular, Petitioner asserts that Petition 1 relies on primary references that were considered during reissue prosecution and found to disclose almost all the limitations of the claims (i.e., Zhu and Szepesi), but combines them with a secondary reference (i.e., Mao) that expressly discloses the specific limitations that the PTO believed were not present in the prior art.  *Id.* at 3.  Petitioner also asserts that Petition 1 relies on a new primary reference that was not considered during prosecution.  *Id.*  Petitioner identifies Matsumoto as not being before the PTO during reissue.  Pet. 28. Petitioner further asserts that Petitions 2 and 3 also rely on primary references that were not before the PTO during reissue.  Ranking Notice 3.

_____

[7] Presumably, Petitioner meant to argue that three petitions are needed.

9

ANK00003596

IPR2021-00072
Patent RE47,713 E

Petitioner further states that if the Board should exercise its discretion to deny any petitions, then the Board should institute at least Petition 1. Ranking Notice 1.

Patent Owner responds that Petitioner has split up the claims across multiple petitions to create the illusion that it did not have enough space to address each set of challenged claims in a single petition. Ranking Resp. 4. Patent Owner argues that Petition 1 challenges the independent claims with three different grounds with a dozen or so dependent claims. *Id.* Patent Owner further asserts that had Petitioner divided the three grounds from Petition 1 across its three petitions it would have had sufficient space to address all dependent claims with each petition. *Id.*

Patent Owner further asserts, contrary to Petitioner's contentions, that the claim elements are not challenged in materially different ways. Ranking Resp. 5. Patent Owner contends that each of the primary references (i.e., Zhu, Szepesi, Matsumoto) are relied on for disclosing the same claim elements of the same independent claims and that each reference is combined with Mao for the same reasons. *Id.* (citing Pet. 13, 29, 43).

*B. Analysis*

Under section 314(a), we have discretion to deny institution of an *inter partes* review. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) ("[Section] 314(a) invests the Director with discretion on the question whether to institute review . . . ." (emphasis omitted)); *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding."); *see also*

10

ANK00003597

IPR2021-00072
Patent RE47,713 E

37 C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the
Director."). The Patent Trial and Appeal Board Consolidated Trial Practice
Guide (Nov. 2019)[8] ("Trial Practice Guide") addresses the issue we face
here—whether to institute on more than one concurrently-filed petition
addressing the same patent—and states:

> Based on the Board's experience, one petition should be sufficient
> to challenge the claims of a patent in most situations. Two or
> more petitions filed against the same patent at or about the same
> time . . . may place a substantial and unnecessary burden on the
> Board and the patent owner and could raise fairness, timing, and
> efficiency concerns. *See* U.S.C. § 316(b). . . .

Trial Practice Guide, 59.

> The Trial Practice Guide recognizes that

> that there may be circumstances in which more than one petition
> may be necessary, including, for example, when the patent owner
> has asserted a large number of claims in litigation or when there
> is a dispute about priority date requiring arguments under multiple
> prior art references. In such cases two petitions by a petitioner
> may be needed, although this should be rare. Further, . . . the
> Board finds it unlikely that circumstances will arise where three
> or more petitions by a petitioner with respect to a particular patent
> will be appropriate.

*Id.*

The Trial Practice Guide further instructs Petitioners that file more
than one petition challenging the same patent to file (1) a ranking of the
petitions in the order in which petitioner wishes the Board to consider the
merits, and (2) a succinct explanation of the differences between the
petitions, why the issues addressed by the differences are material, and why
the Board should exercise its discretion to institute additional petitions if it

---

[8] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

11

ANK00003598

IPR2021-00072
Patent RE47,713 E

identifies one petition that satisfies petitioner's burden under § 314(a).  *Id*. at 59–60.

Having considered the parties' arguments, we are not persuaded that the present petition is necessary to challenge the claims of the '713 patent.  In a decision that is being issued contemporaneously with this Decision, we are instituting trial based on the petition in IPR2021-00071, Petitioner's top-ranked petition.  Ranking Notice 1.  Although Petitioner correctly argues that each of its three petitions challenge different claims, Petitioner has not shown that it was necessary to distribute its challenges across three petitions in order to present one ground of unpatentability for each challenged claim.

Notably, Petitioner does not argue that it could not have asserted at least one ground against each claim being challenged in a single petition.  Rather, Petitioner asserts that it could not fit "*all of its grounds* against the asserted claims into a single petition."  Ranking Notice 2 (emphasis added).  Two of the Petitions, however, assert more than one ground for nearly every challenged claim with significant repetition of argument among the various petitions.  For example, Petition 1 asserts that independent claims 18 and 48 are unpatentable over three grounds, namely Zhu and Mao, Szepesi and Mao, and Matsumoto and Mao.  IPR2021-00071, Paper 3, 2.  Petition 1 further asserts that dependent claims 22, 23, 25, 30, 41, 42, 48, 49 and 51 are unpatentable over three grounds, namely Zhu and Mao, Szepesi and Mao, and Matsumoto and Mao.  *Id.*  Petition 1 further asserts that dependent claims 19–21, 31, 35, 36, and 50 are unpatentable over two grounds, namely Zhu and Mao and Szepesi and Mao.  *Id.*  The Petition in this proceeding asserts that dependent claims 24, 33, 38, 40, and 47 are unpatentable over Szepesi and Mao and over Matsumoto and Mao.  Pet. 2.  This Petition further asserts

12

ANK00003599

IPR2021-00072
Patent RE47,713 E

that dependent claim 44 is unpatentable over Szepesi and Mao and over

Matsumoto, Mao, and Tisinger.  *Id.*

Additionally, there is a great deal of repetition or overlap among the

different petitions that could have been avoided had each petition been

directed to grounds that rely on one primary prior art reference (i.e., Zhu,

Szepesi, Matsumoto).  For example, the claim-by-claim analysis in this

Petition had to repeat the analysis from Petition 1 of how (i) Szepesi and Mao

and (ii) Matsumoto and Mao disclose the elements of claim 18.  Pet. 15–21,

30–39.  This Petition also had to repeat the motivation-to-combine analysis

and the description of references for Szepesi and Mao and for Matsumoto and

Mao from Petition 1.  Pet. 10–15, 27–29, 39–41.  Similarly, in Petition 3,

Petitioner had to repeat the analysis from Petition 1 of how Matsumoto and

Mao disclose the elements of claim 18 as well its analysis of the motivation

to combine those references and its descriptions of those references.

IPR2021-00073, Paper 3, 10–21.

Given Petitioner's lack of assertion that it could not fit a single ground

against the challenged claims into a single petition, and given that the three

petitions (1) present three alternative grounds to challenge independent

claims 18 and 48; (2) present three alternative grounds to challenge

dependent claims 22, 23, 25, 30, 41, 42, 45, 48, 49, and 51; (3) present two

alternative grounds to challenge dependent claims 19–21, 24, 31, 33, 35, 36,

38, 40, 44, 47, and 50; and (4) contain significant overlap due to the

repetition of arguments in multiple petitions, we determine Petitioner has not

shown that it was necessary to distribute its challenges across three petitions

in order to present one ground of unpatentability for each challenged claim.

13

IPR2021-00072
Patent RE47,713 E

We also determine that Petitioner has not shown material differences among the asserted grounds. Petitioner does assert that Petition 1 relies on primary references that were considered during reissue (i.e., Zhu and Szepesi) and a primary reference that was not (i.e., Matsumoto). Ranking Notice 3. Petitioner further argues that this Petition and Petition 3 each rely on a primary reference that was not considered during reissue. *Id.* Petitioner further asserts that this Petition and Petition 3 address dependent claims that include "unique limitations, and unique combinations of limitations, not addressed in Petition 1." *Id.*

These assertions, however, do not explain why it is necessary to assert multiple petitions that rely on multiple grounds when a single petition could have been presented to challenge the claims. For example, Petitioner provides no argument that different dependent claims require assertion of different primary references. Nor does Petitioner argue that the Director's discretion under 35 U.S.C. § 325(d)—to deny a petition because the same or substantially the same art was previously presented to the Office—would require that arguments under multiple prior art references be grouped in the same petition.

On this record, Petitioner has not demonstrated a need for multiple petitions to challenge the patentability of claims of the '713 patent. Thus, we exercise our discretion under 35 U.S.C. § 314 and *deny* the current Petition.

## III.    CONCLUSION

For the reasons discussed above, we deny institution of *inter partes* review.

ANK00003601

IPR2021-00072
Patent RE47,713 E

IV.    ORDER

It is:

ORDERED that no *inter partes* review is instituted.


FOR PETITIONER:

Jennifer J. Huang
Kim H. Leung
FISH & RICHARDSON P.C.
jjh@fr.com
leung@fr.com


FOR PATENT OWNER:

Jonathan M. Lindsay
Hong Annita Zhong

IRELL & MANELLA LLP
jlindsay@irell.com
hzhong@irell.com

15

# EXHIBIT 24

Trials@uspto.gov                                               Paper 21
571-272-7822                                           Date: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

———————

IPR2021-00073
Patent RE47,713 E

———————

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

KENNY, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

ANK00003655

IPR2021-00073
Patent RE47,713 E

## I.    INTRODUCTION

Fantasia Trading LLC D/B/A AnkerDirect ("Petitioner") filed a
Petition to institute an *inter partes* review of claims 52–61 (the "challenged
claims") of U.S. Patent No. RE47,713 E (Ex. 1001, the "'713 patent,"
"challenged patent") pursuant to 35 U.S.C. § 311 *et seq*.  Paper 3 ("Pet.").
CogniPower LLC ("Patent Owner") filed a Preliminary Response.  Paper 12
("Prelim. Resp.").  With our authorization (Paper 14), Petitioner filed a Reply
to the Preliminary Response (Paper 15), and Patent Owner filed a Preliminary
Sur-reply to Patent Owner's Preliminary Response (Paper 18).

In addition, Petitioner filed a Notice Ranking and Explaining
Differences Between Petitions for *Inter Partes* Review of U.S. Patent No.
RE47,713.  Paper 1 ("Ranking Notice").  This Notice addressed three
concurrently filed petitions (IPR2021-00071 through IPR2021-00073).
Patent Owner filed a response to this Notice.  Paper 11.

We have authority to determine whether to institute an *inter partes*
review.  35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2020).  As part of our
analysis, we may consider whether Petitioner has filed more than one petition
directed to the challenged patent.  For the reasons discussed below, we
determine that Petitioner has not justified more than one petition directed to
the '713 patent.  Accordingly, we do not institute an *inter partes* review in
this proceeding.

### A. Related Matters

The parties identify the following related district court litigation:
*CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect*, C.A. No.
1:19-cv-02293 (D. Del.) ("Co-pending Litigation").  Pet. 44; Paper 5, 2.

2

ANK00003656

IPR2021-00073
Patent RE47,713 E

Patent Owner identifies the following related IPRs: IPR2021-00071 and IPR2021-00072, which both challenge the '713 patent, and IPR2021-00067, IPR2021-00068, IPR2021-00069, and IPR2021-00070, which all challenge U.S. Patent No. RE47,031 E, of which the '713 patent is a continuation.  Paper 5, 2–4; Ex. 1001, code (63).

### B. Challenged Patent

The '713 patent relates to "switched-mode power converters" and discloses "a switched-mode power converter with regulation demand pulses sent across a galvanic isolation barrier."  Ex. 1001, code (57), 1:33–35.

Figure 1 of the '713 patent is shown below:



# Fig. 1

Figure 1 is a schematic diagram of a power converter (10a).  Ex. 1001, 2:34–35.  "Terminals 11a and 12a constitute a power input port that places source 5a in circuit with primary winding 101a of transformer 100a and with

3

ANK00003657

IPR2021-00073
Patent RE47,713 E

> off the primary-side switch is originated on the primary
> side and not on the secondary side;

> frequency with which the primary-side switch is turned on is
> adjusted by the demand pulses conveyed from the
> secondary side to the primary side to regulate the output
> voltage or the output current at the output port; and

> the secondary side further comprises:

> > a first capacitor; and

> > a first rectifier poled to charge the first capacitor during
> > forward power converter pulses of the flyback
> > converter, wherein the demand pulses are generated
> > using energy stored in the first capacitor.

Ex. 1001, 14:1–43.

### D. Asserted Challenges to Patentability and Prior Art

Petitioner challenges the following claims based on the grounds in the
table below.

| Ground | Claims Challenged | 35 U.S.C. § | References |
|--------|-------------------|-------------|------------|
| 1 | 52 | 103 | Matsumoto[1] and Mao[2] |
| 2 | 53–56, 58, 60, 61 | 103 | Matsumoto, Mao, and Krupka[3] |
| 3 | 57 | 103 | Matsumoto, Mao, Krupka, and Tisinger[4] |
| 4 | 59 | 103 | Matsumoto, Mao, Krupka, and Szepesi[5] |

Pet. 1–2.

---

[1] US 7,773,392 B2, issued Aug. 10, 2010 (Ex. 1010).
[2] US 6,466,461 B2, issued Oct. 15, 2002 (Ex. 1006)
[3] US 4,413,224, issued Nov. 1, 1983 (IPR2021-00073, Ex. 1019).
[4] US 5,418,410, issued May 23, 1995 (Ex. 1016).
[5] US 5,498,995, issued Mar. 12, 1996 (Ex. 1007).

7

IPR2021-00073
Patent RE47,713 E

Petitioner submits a declaration (Ex. 1003) from its proffered expert, Mr. Bohannon. Patent Owner submits a declaration (Ex. 2001) from its proffered expert, Mr. Sandler.

## II.   DISCRETION UNDER 35 U.S.C. § 314(a)

### A. The Parties' Positions

Petitioner filed three petitions on the same day for *inter partes* review of the '713 patent. *See* IPR2021-00071 through -00073. The challenged claims and asserted grounds for each petition are set forth below:

| Petition | IPR | Claims Challenged | Grounds |
|---|---|---|---|
| 1 | IPR2021-00071 | 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, 48–51 | Zhu[6] and Mao |
| | | 18, 19–23, 25, 30, 31, 35, 36, 41, 42, 45, 48–51 | Szepesi and Mao |
| | | 18, 22, 23, 25, 30, 34, 41–43, 45, 48, 49, 51 | Matsumoto and Mao |
| 2 | IPR2021-00072 | 24, 26–28, 32, 33, 38, 40, 44, 46, 47 | Szepesi and Mao |
| | | 24, 29, 33, 38, 40, 47 | Matsumoto and Mao |
| | | 44 | Matsumoto, Mao, and Tisinger |
| 3 | IPR2021-00073 | 52 | Matsumoto and Mao |
| | | 53–56, 58, 60, 61 | Matsumoto, Mao, and Krupka |
| | | 57 | Matsumoto, Mao, Krupka, and Tisinger |
| | | 59 | Matsumoto, Mao, Krupka, and Szepesi |

---

[6] US 2011/0096573 A1, published Apr. 28, 2011 (IPR2021-00071, Ex. 1005).

ANK00003662

IPR2021-00073
Patent RE47,713 E

Petitioner asserts that "[b]ecause each Petition challenges a distinct set of claims, the Board should institute all three Petitions."  Ranking Notice 1. Petitioner states that Patent Owner is currently asserting 59 of the 61 claims of the '713 patent in the Co-pending Litigation and that, due to the large number of claims being asserted, Petitioner "needs four petitions[7] to challenge the asserted claims due to word count constraints."  Id. at 2.

Petitioner argues that Petition 1 challenges independent claims 1 and 48, and as many of the dependent claims as was practical to address in view of word limits.  Ranking Notice 3.  Petitioner further argues that Petitions 2 and 3 address dependent claims that include unique limitations and unique combination of limitations.  Id.

Petitioner further asserts that the petitions are non-redundant because they each challenge distinct sets of claims and rely on different combinations of references that address the claim elements in materially different ways. Ranking Notice 2.  In particular, Petitioner asserts that Petition 1 relies on primary references that were considered during reissue prosecution and found to disclose almost all the limitations of the claims (i.e., Zhu and Szepesi), but combines them with a secondary reference (i.e., Mao) that expressly discloses the specific limitations that the PTO believed were not present in the prior art.  Id. at 3.  Petitioner also asserts that Petition 1 relies on a new primary reference that was not considered during prosecution.  Id.  Petitioner identifies Matsumoto as not being before the PTO during reissue.  Pet. 10. Petitioner further asserts that Petitions 2 and 3 also rely on primary references that were not before the PTO during reissue.  Ranking Notice 3.

---

[7] Presumably, Petitioner meant to argue that three petitions are needed.

ANK00003663

IPR2021-00073
Patent RE47,713 E

Petitioner further states that if the Board should exercise its discretion to deny any petitions, then the Board should institute at least Petition 1. Ranking Notice 1.

Patent Owner responds that Petitioner has split up the claims across multiple petitions to create the illusion that it did not have enough space to address each set of challenged claims in a single petition. Ranking Resp. 4. Patent Owner argues that Petition 1 challenges the independent claims with three different grounds with a dozen or so dependent claims. *Id.* Patent Owner further asserts that had Petitioner divided the three grounds from Petition 1 across its three petitions it would have had sufficient space to address all dependent claims with each petition. *Id.*

Patent Owner further asserts, contrary to Petitioner's contentions, that the claim elements are not challenged in materially different ways. Ranking Resp. 5. Patent Owner contends that each of the primary references (i.e., Zhu, Szepesi, Matsumoto) are relied on for disclosing the same claim elements of the same independent claims and that each reference is combined with Mao for the same reasons. *Id.* (citing Pet. 13, 29, 43).

*B. Analysis*

Under section 314(a), we have discretion to deny institution of an *inter partes* review. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) ("[Section] 314(a) invests the Director with discretion on the question whether to institute review . . . ." (emphasis omitted)); *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding."); *see also*

ANK00003664

IPR2021-00073
Patent RE47,713 E

37 C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the
Director."). The Patent Trial and Appeal Board Consolidated Trial Practice
Guide (Nov. 2019)[8] ("Trial Practice Guide") addresses the issue we face
here—whether to institute on more than one concurrently-filed petition
addressing the same patent—and states:

> Based on the Board's experience, one petition should be sufficient
> to challenge the claims of a patent in most situations. Two or
> more petitions filed against the same patent at or about the same
> time . . . may place a substantial and unnecessary burden on the
> Board and the patent owner and could raise fairness, timing, and
> efficiency concerns. *See* U.S.C. § 316(b). . . .

Trial Practice Guide, 59.

> The Trial Practice Guide recognizes that

> that there may be circumstances in which more than one petition
> may be necessary, including, for example, when the patent owner
> has asserted a large number of claims in litigation or when there
> is a dispute about priority date requiring arguments under multiple
> prior art references. In such cases two petitions by a petitioner
> may be needed, although this should be rare. Further, . . . the
> Board finds it unlikely that circumstances will arise where three
> or more petitions by a petitioner with respect to a particular patent
> will be appropriate.

*Id.*

The Trial Practice Guide further instructs Petitioners that file more
than one petition challenging the same patent to file (1) a ranking of the
petitions in the order in which petitioner wishes the Board to consider the
merits, and (2) a succinct explanation of the differences between the
petitions, why the issues addressed by the differences are material, and why
the Board should exercise its discretion to institute additional petitions if it

---

[8] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

11

ANK00003665

IPR2021-00073
Patent RE47,713 E

identifies one petition that satisfies petitioner's burden under § 314(a). *Id.* at
59–60.

Having considered the parties' arguments, we are not persuaded that
the present petition is necessary to challenge the claims of the '713 patent. In
a decision that is being issued contemporaneously with this Decision, we are
instituting trial based on the petition in IPR2021-00071, Petitioner's top-
ranked petition. Ranking Notice 1. Although Petitioner correctly argues that
each of its three petitions challenge different claims, Petitioner has not shown
that it was necessary to distribute its challenges across three petitions in order
to present one ground of unpatentability for each challenged claim.

Notably, Petitioner does not argue that it could not have asserted at
least one ground against each claim being challenged in a single petition.
Rather, Petitioner asserts that it could not fit "*all of its grounds* against the
asserted claims into a single petition." Ranking Notice 2 (emphasis added).
Two of the Petitions, however, assert more than one ground for nearly every
challenged claim with significant repetition of argument among the various
petitions. For example, Petition 1 asserts that independent claims 18 and 48
are unpatentable over three grounds, namely Zhu and Mao, Szepesi and Mao,
and Matsumoto and Mao. IPR2021-00071, Paper 3, 2. Petition 1 further
asserts that dependent claims 22, 23, 25, 30, 41, 42, 48, 49, and 51 are
unpatentable over three grounds, namely Zhu and Mao, Szepesi and Mao,
and Matsumoto and Mao. *Id.* Petition 1 further asserts that dependent claims
19–21, 31, 35, 36, and 50 are unpatentable over two grounds, namely Zhu
and Mao and Szepesi and Mao. *Id.* Petition 2 asserts that dependent claims
24, 33, 38, 40, and 47 are unpatentable over Szepesi and Mao and over
Matsumoto and Mao. Pet. 2. Petition 2 further asserts that dependent claim

12

ANK00003666

IPR2021-00073
Patent RE47,713 E

44 is unpatentable over Szepesi and Mao and over Matsumoto, Mao, and Tisinger. *Id.*

Additionally, there is a great deal of repetition or overlap among the different petitions that could have been avoided had each petition been directed to grounds that rely on one primary prior art reference (i.e., Zhu, Szepesi, Matsumoto). For example, the claim-by-claim analysis in Petition 2 had to repeat the analysis from Petition 1 of how (i) Szepesi and Mao and (ii) Matsumoto and Mao disclose the elements of claim 18. IPR2021-00072, Paper 3, 15–21, 30–39. Petition 2 also had to repeat the motivation-to-combine analysis and the description of references for Szepesi and Mao and for Matsumoto and Mao from Petition 1. *Id.* at 10–15, 27–29, 39–41. Similarly, in the Petition in this proceeding, Petitioner had to repeat the analysis from Petition 1 of how Matsumoto and Mao disclose the elements of claim 18 as well its analysis of the motivation to combine those references and its descriptions of those references. Pet. 10–21.

Given Petitioner's lack of assertion that it could not fit a single ground against the  claims being challenged into a single petition, and given that the three petitions (1) present three alternative grounds to challenge independent claims 18 and 48; (2) present three alternative grounds to challenge dependent claims 22, 23, 25, 30, 41, 42, 45, 48, 49, and 51; (3) present two alternative grounds to challenge dependent claims 19–21, 24, 31, 33, 35, 36, 38, 40, 44, 47, and 50; and (4) contain significant overlap due to the repetition of arguments in multiple petitions, we determine Petitioner has not shown that it was necessary to distribute its challenges across three petitions in order to present one ground of unpatentability for each challenged claim.

ANK00003667

IPR2021-00073
Patent RE47,713 E

We also determine that Petitioner has not shown material differences among the asserted grounds. Petitioner does assert that Petition 1 relies on primary references that were considered during reissue (i.e., Zhu and Szepesi) and a primary reference that was not (i.e., Matsumoto). Ranking Notice 3. Petitioner further argues that this Petition and Petition 2 each rely on a primary reference that was not considered during reissue. *Id.* Petitioner further asserts that this Petition and Petition 2 address dependent claims that include "unique limitations, and unique combinations of limitations, not addressed in Petition 1." *Id.*

These assertions, however, do not explain why it is necessary to assert multiple petitions that rely on multiple grounds when a single petition could have been presented to challenge the claims. For example, Petitioner provides no argument that different dependent claims require assertion of different primary references. Nor does Petitioner argue that the Director's discretion under 35 U.S.C. § 325(d)—to deny a petition because the same or substantially the same art was previously presented to the Office—would require that arguments under multiple prior art references be grouped in the same petition.

On this record, Petitioner has not demonstrated a need for multiple petitions to challenge the patentability of claims of the '713 patent. Thus, we exercise our discretion under 35 U.S.C. § 314 and *deny* the current Petition.

## III. CONCLUSION

For the reasons discussed above, we deny institution of *inter partes* review.

ANK00003668

IPR2021-00073
Patent RE47,713 E

## IV.   ORDER

It is:

ORDERED that no *inter partes* review is instituted.


FOR PETITIONER:

Jennifer J. Huang
Kim H. Leung
FISH & RICHARDSON P.C.
jjh@fr.com
leung@fr.com


FOR PATENT OWNER:

Jonathan M. Lindsay
Hong Annita Zhong
IRELL & MANELLA LLP
jlindsay@irell.com
hzhong@irell.com


15

ANK00003669

# EXHIBIT 25

Trials@uspto.gov
571-272-7822

Paper 55
Entered: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

———————

IPR2021-00067
Patent RE47,031 E

———————

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

SMITH, *Administrative Patent Judge*.

DECISION
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

CP0114789

IPR2021-00067
Patent RE47,031 E

# I.   INTRODUCTION

Fantasia Trading LLC D/B/A AnkerDirect  ("Petitioner") filed a
Petition to institute an *inter partes* review of claims 1, 2, 8, 10, 18, 25, 27,
30–33, 37, 38, 40, 43–46, 49, 52–55, and 58–61 (the "challenged claims") of
U.S. Patent No. RE47,031 E (Ex. 1001, the "'031 patent," "challenged
patent") pursuant to 35 U.S.C. § 311 *et seq*.  Paper 2 ("Pet.").  CogniPower
LLC ("Patent Owner") filed a Preliminary Response.  Paper 11 ("Prelim.
Resp.").

On May 12, 2021, we instituted an *inter partes* review of all
challenged claims.  Paper 21 ("Institution Decision" or "Inst. Dec.").  Patent
Owner filed a Patent Owner Response (Paper 32, "PO Resp.").  Petitioner
filed a Reply (Paper 37, "Pet. Reply"), and Patent Owner filed a Sur-reply
(Paper 38, "PO Sur-reply").  A transcript of an oral hearing held on February
11, 2022 (Paper 49, "Tr.") has been entered into the record.

We have jurisdiction under 35 U.S.C. § 6.  For the reasons discussed
below, we determine that Petitioner has not shown, by a preponderance of the
evidence, that claims 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–
55, and 58–61 are unpatentable.

## A. Related Matters

The parties identify the following related district court litigation:
*CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect*, C.A. No.
19-cv-02293 (D. Del.).  Pet. 60; Paper 5, 2.

Patent Owner identifies the following related IPRs: IPR2021-00068, -
00069, and -00070, which challenge the '031 patent, and IPR2021-00071, -
00072, and -00073, which challenge U.S. Patent No. RE47,713 E, which is a
continuation of the '031 patent.  Paper 5, 1–4.

CP0114790

IPR2021-00067
Patent RE47,031 E

1.  Apparatus configured to provide switched-mode power conversion, the apparatus comprising:

an input port configured to receive input power;

a switch configured to commutate the input power;

galvanic isolation circuitry configured to provide galvanic isolation between the input port and an output port, wherein the galvanic isolation circuitry comprises a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a first rectifier and the output port, wherein the transformer is configured to transfer power from the input port to supply voltage or current to a load connected to the output port;

a demand pulse generator galvanically connected to the secondary winding and configured to generate demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load; and

a capacitor and a second rectifier both galvanically connected to the second winding, wherein:

the second rectifier is different from the first rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the demand pulse generator is powered by energy stored in the capacitor to generate the demand pulses.

Ex. 1001, 12:7–34.

*D. Asserted Challenges to Patentability and Prior Art*

Petitioner challenges the following claims based on the grounds in the table below.

6

CP0114794

IPR2021-00067
Patent RE47,031 E

| Ground | Claims Challenged | 35 U.S.C. § | References/Basis |
|--------|-------------------|-------------|------------------|
| 1 | 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 | 103 | Zhu[1] and Mao[2] |
| 2 | 1, 2, 8, 10, 18, 25, 30–33, 37, 38, 43–46, 49, 52–54, 58–61 | 103 | Szepesi[3] and Mao |

Pet. 2.

Petitioner submits a declaration (Ex. 1003) from its proffered expert, Mr. Bohannon.  Patent Owner submits a declaration (Ex. 2001) from its proffered expert, Mr. Sandler.

## II.   LEVEL OF SKILL AND CLAIM CONSTRUCTION

### A. Level of Skill in the Art

To determine the level of an ordinarily skilled artisan, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field."  *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quotation omitted).

Mr. Bohannon testifies that an ordinarily skilled artisan would have "B.S. degree, or its equivalent, in electrical engineering or physics and approximately two years of practical experience working with switching regulators and analog/mixed signal circuit design, or an equivalent

---

[1] US 2011/0096573 A1, published Apr. 28, 2011 (Ex. 1005).
[2] US 6,466,461 B2, issued Oct. 15, 2002 (Ex. 1006).
[3] US 5,498,995, issued Mar. 12, 1996 (Ex. 1007).

CP0114795

IPR2021-00067
Patent RE47,031 E

combination of academic study and work experience." Ex. 1003 ¶ 41.

Mr. Sandler uses the same definition for his analysis. Ex. 2001 ¶ 19.

We are persuaded that Messrs. Bohannon's and Sandler's description of the level of ordinary skill in the art is appropriate for the subject matter of the '031 patent, and, for this Decision, we adopt that description.

*B. Claim Construction*

We determine that we do not need to construe any claim term expressly for this Decision.[4] *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### III.    ANALYSIS OF ASSERTED GROUNDS

"In an *inter partes* review . . ., the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). "[T]he burden of proof is on the petitioner to prove unpatentable those issued claims that were actually challenged in the petition for review and for which the Board instituted review." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1334 (Fed. Cir. 2016). To satisfy its burden of proving obviousness, a petitioner must articulate a reason why a person of ordinary skill in the art would have combined or modified prior art references. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016); *see also Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017) ("In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any

---

[4] We authorized the parties to file additional briefs regarding the meaning of the term "frequency" and appreciate the parties' briefing of that issue. Papers 50–54. We have nevertheless determined that we do no need to construe that term for this Decision.

8

CP0114796

IPR2021-00067
Patent RE47,031 E

reason why a person of skill in the art would have made the combination.");

*Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015)

("[O]bviousness concerns whether a skilled artisan not only could have made

but would have been motivated to make the combinations or modifications of

prior art to arrive at the claimed invention.") (citing *InTouch Techs., Inc. v.

VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)).  Further, it is

Petitioner's "burden to demonstrate both 'that a skilled artisan would have

been motivated to combine the teachings of the prior art references to achieve

the claimed invention, and that the skilled artisan would have had a

reasonable expectation of success in doing so.'" *In re Magnum Oil Tools

Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (quoting *Intelligent Bio–

Sys., Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir.

2016)).

As set forth below, we determine that Petitioner has not proven that an

ordinarily skilled artisan would have been motivated to make any of the

combinations set forth in its asserted grounds.  Thus, Petitioner has not

proven that any challenged claim would be unpatentable.  *Magnum Oil*, 829

F.3d at 1381.

*A. Ground 1: Asserted Obviousness over Zhu and Mao*

Petitioner asserts that claims 1, 2, 8, 10, 25, 27, 30–33, 37, 38, 40, 43–

46, 49, 52–55, and 58–61 would have been obvious over Zhu and Mao.

Pet. 2.

9

IPR2021-00067
Patent RE47,031 E

topologies is also conclusory. Mr. Bohannon merely declares that it would be beneficial to remove what he terms the dependent bias circuit of Szepesi and replace it with Mao's circuit without explaining why that modification would purportedly be perceived as advantageous by an ordinarily skilled artisan for using with flyback, forward, and Cuk converters. Ex. 1025 ¶ 35; *see TQ Delta*, 942 F.3d at 1359.

We determine that Petitioner has not proven that an ordinarily skilled artisan would be motivated to combine Szepesi's and Mao's teachings to allow Szepesi to be applied to additional topologies.

### g. Summary

In sum, we determine that Petitioner has not proven by a preponderance of the evidence that an ordinarily skilled artisan would be motivated to combine Szepesi's and Mao's teachings.

### IV. CONCLUSION

As set forth in the following table, Petitioner has not proven that any of the challenged claims are unpatentable:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 | 103 | Zhu, Mao | | 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 |
| 1, 2, 8, 10, 18, 25, 30–33, 37, 38, 43–46, | 103 | Szepesi, Mao | | 1, 2, 8, 10, 18, 25, 30–33, 37, 38, 43–46, 49, 52–54, 58–61 |

CP0114842

IPR2021-00067
Patent RE47,031 E

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 49, 52–54, 58–61 | | | | |
| **Overall Outcome** | | | | 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, 58–61 |

## V.    ORDER

It is:

ORDERED that claims 1, 2, 8, 10, 18, 25, 27, 30–33, 37, 38, 40, 43–46, 49, 52–55, and 58–61 of the '031 patent have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

CP0114843

IPR2021-00067
Patent RE47,031 E

FOR PETITIONER:

Jennifer Huang
Kim Leung
Howard Pollock
FISH & RICHARDSON, P.C.
jjh@fr.com
leung@fr.com
pollack@fr.com


FOR PATENT OWNER:

Jonathan Lindsay
Hong Zhong
Jason Sheasby
IRELL AND MANELLA LLP
jlindsay@irell.com
hzhong@irell.com
jsheasby@irell.com

CP0114844

# EXHIBIT 26

Trials@uspto.gov                                          Paper 55
571-272-7822                                        Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

FANTASIA TRADING LLC D/B/A ANKERDIRECT,
Petitioner,

v.

COGNIPOWER, LLC,
Patent Owner.

———————

IPR2021-00071
Patent RE47,713 E

———————

Before KEVIN F. TURNER, JEFFREY S. SMITH, and JOHN R. KENNY,
*Administrative Patent Judges*.

KENNY, *Administrative Patent Judge*.

DECISION
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

CP0114845

IPR2021-00071
Patent RE47,713 E

## I.     INTRODUCTION

Fantasia Trading LLC D/B/A AnkerDirect ("Petitioner") filed a Petition to institute an *inter partes* review of claims 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, and 48–51 (the "challenged claims") of U.S. Patent No. RE47,713 E (Ex. 1001, the "'713 patent," "challenged patent") pursuant to 35 U.S.C. § 311 *et seq.*  Paper 3 ("Pet."), 1.  CogniPower LLC ("Patent Owner") filed a Preliminary Response.  Paper 13 ("Prelim. Resp.").

On May 12, 2021, we instituted an *inter partes* review of all challenged claims.  Paper 21 ("Institution Decision" or "Inst. Dec.").  Patent Owner filed a Patent Owner Response (Paper 31, "PO Resp.").  Petitioner filed a Reply (Paper 37, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 39, "PO Sur-reply").  A transcript of an oral hearing held on February 11, 2022 (Paper 49, "Tr.") has been entered into the record.

We have jurisdiction under 35 U.S.C. § 6.  For the reasons discussed below, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, and 48–51 are unpatentable.

*A. Related Matters*

The parties identify the following related district court litigation: *CogniPower LLC v. Fantasia Trading, LLC D/B/A AnkerDirect*, C.A. No. 19-cv-02293 (D. Del.).  Pet. 13; Paper 5, 2.

Patent Owner identifies the following related IPRs: IPR2021-00072 and -00073, which both challenge the '713 patent, and IPR2021-00067, -00068, -00069, and -00070, which all challenge U.S. Patent No. RE47,031 E, of which the '713 patent is a continuation.  Paper 5, 2–4; Ex. 1001, code (63).

CP0114846

IPR2021-00071
Patent RE47,713 E

perceived as advantageous by an ordinarily skilled artisan for use with flyback, forward, and Cuk converters.  Ex. 1025 ¶ 45; *see TQ Delta*, 942 F.3d at 1359.

We determine that Petitioner has not proven that an ordinarily skilled artisan would have been motivated to combine Matsumoto's and Mao's teachings to allow Matsumoto to be applied to additional topologies.

### f. Summary

In sum, we determine that Petitioner has not proven by a preponderance of the evidence that an ordinarily skilled artisan would have been motivated to combine Matsumoto's and Mao's teachings.  Thus, Petitioner has not proven that any challenged claim would have been obvious over the combination of Matsumoto and Mao.

## IV.    CONCLUSION

As set forth in the following table, Petitioner has not proven that any of the challenged claims are unpatentable:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, 48–51 | 103 | Zhu, Mao | | 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, 48–51 |
| 18, 19–23, 25, 30, 31, 35, 36, 41, 42, 45, 48–51 | 103 | Szepesi, Mao | | 18, 19-23, 25, 30, 31, 35–36, 41, 42, 45, 48–51 |
| 18, 22, 23, 25, 30, 34, 41–43, 45, 48, 49, 51 | 103 | Matsumoto, Mao | | 18, 22–23, 25, 30, 34, 41–43, 45, 48, 49, 51 |

66

CP0114910

IPR2021-00071
Patent RE47,713 E

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| **Overall Outcome** | | | | 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, 48–51 |

## V.    ORDER

It is:

ORDERED that claims 18, 19–23, 25, 30, 31, 34–36, 41–43, 45, and 48–51 of the '713 patent have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

67

CP0114911

# EXHIBIT 27

# New IsolationTechnology Improves Reliability and Safety

To ensure safe and reliable operation for industrial and automotive electrical systems, isolation is required between the high voltage, high power elements in a circuit and the low voltage sensing, processing and control elements. Power Integrations' FluxLink™ magneto-inductive coupling technology uses a coreless transformer built-into the lead frame of the device. This unique technology not only affords complete galvanic isolation between the low voltage and high voltage sides of the device but also provides a high speed isolated two-way communications link. **Michael Hornkamp, Senior Director Marketing, Gate Drivers, Power Integrations GmbH, Ense, Germany**

**Incorporating FluxLink into the lead** frame ensures the mechanical tolerances can be maintained to a high level, providing a stable, low coupling capacitance, high speed, bi-directional link which can maintain its isolation integrity even after IC destruction. The low capacitive coupling between the primary side and secondary of the transformer and its reduced loop area improve primary side immunity to magnetic field interference and current and voltage transients developed on the secondary side to achieve reliable robust operation.

**High isolation capability**
FluxLink provides reinforced Isolation up to 1200 V, basic isolation to 1700 V, transient isolation voltage of 8 kV maximum for 1 minute and is certified to VDE0884-10. This internal reinforced isolation is supported by the external creepage and clearance distances of 9.5 mm provided by Power Integrations' eSOP™ package

(Figure 1) which meets or exceeds TUV/IEC60950 requirements.

FluxLink provides the galvanic and reinforced isolation required to meet VDE0884-11 and IEC60747-17 requirements along with very high electromagnetic interference (EMI) and magnetic field immunity, allowing manufacturers to easily comply with IEC61000-4-8 and IEC61000-4-9 standards. All parts in the family operate up to 125°C and are 100 % tested during production using both hi-pot and partial discharge techniques along with functionality testing designed to ensure safe reliable operation throughout the device lifetime.

Additionally, FluxLink technology delivers full safety isolation in the event of a system failure on the high voltage side, caused for example, by an IGBT Collector Gate short. Alternative isolation technologies such as optocouplers offer similar voltage isolation but suffer from temperature stability and

long-term reliability issues, thereby reducing system reliability and increasing maintenance costs. Other isolation techniques may not offer the safety isolation provided by FluxLink in the event of a failure on the high voltage secondary side, compromising protection and safety on the primary side.

**Simplified power semiconductor drivers**
FluxLink technology has been integrated into many products including AC/DC convertors and SCALE-iDriver IGBT / Power MOSFET drivers. The high speed, low latency, low jitter, of the FluxLink enables precise control and timing signals to be transferred from the low voltage primary interface and controller side to the high voltage secondary power switching side. The high voltage secondary side is also able to return feedback and fault information back to the primary interface and control side to ensure correct and safe



**Figure 1: FluxLink™ magneto-inductive coupling technology uses a coreless transformer built-into the lead frame of the device**

CP0059971



**Figure 2: Typical single channel IGBT with SCALE-iDriver**

operation of the power stage. Enhanced safety features, previously performed by additional external components, can now be integrated into the SCALE-iDriver IC, simplifying board design, reducing the bill of materials cost and improving reliability.

The SCALE-iDriver family has a working voltage of up to 900 V. Devices are available with four peak output-current ratings - 1 A (SID1112K) 2.5 A (SID1132K), 5.0 A (SID1152K) and 8.0 A (SID1182K), and three voltage ratings - 650 V, 1200 V and 1700 V. This high peak drive current allows the SCALE-iDriver to directly drive IGBTs with collector currents up to 800 A.

For gate drive requirements in excess of sink/source peak current of ±8.0 A, the SID1182K gate driver IC may be used with an external amplifier (current booster) to achieve 15 A or more with full safety functionality. Safety features include short-circuit detection (DESAT), Advanced Soft Shut Down (ASSD) to reduce turn off di/dt and limit turn-off overvoltage, primary side and secondary side Under Voltage Lockout (UVLO) and temperature compensated output impedance.

**IGBT driver example**

If we examine a typical SCALE-iDriver design, we can see how FluxLink is able to improve safety and reliability whilst reducing overall build cost. Figure 2 illustrates the number of external component required for a typical single channel IGBT SCALE-iDriver circuit.

The SCALE-iDriver power supply requirements have been simplified. Only two power rails are required, +5 V (VCC Pin) Vin to power the primary side, and a single unregulated +25 V (VISO Pin) to power the secondary side. The secondary side power supply should provide the

same level of isolation that the SCALE-iDriver provides with minimal capacitive coupling between primary and secondary or to any other secondary channel; typically this could be provided by a flyback converter with primary side regulation. Internal power supply monitoring and auxiliary power supply generation blocks on both the primary and secondary sides are integrated within the SCALE-iDriver. The secondary side +25 V supply is internally regulated to +15 V to generate the positive gate emitter voltage and then a negative -10 V rail is generated to provide the negative gate emitter voltage.

On the primary side the interface is designed to work with microcontrollers using 5 V I/O logic. Only two pins are required, the Input (IN Pin) and an open drain Fault Output (SO Pin). The input gate driver commands are transferred from the input across the FluxLink isolation barrier to the secondary side logic driving the Gate High (GHO turn-on Pin and Gate Low (GL) turn-off pins.

During normal operation the SO signal stays in the high impedance state, pulled high by an external pull up resistor. In the event of a fault condition, either on the primary side or secondary side, the SO output will be connected to ground and the input switching commands will be ignored. Primary and secondary fault detection and reporting enhances system reliability and safety. The primary side will indicate a fault when the Vcc supply drops below the primary side under voltage limit, UVLO Vcc and the SO output will remain grounded as long as Vcc stays below the threshold.

The secondary side features under voltage detection and output short circuit detection with advanced soft shut down.

When a fault is detected the information is transferred back across the isolation barrier to drive the fault output low. During either of these conditions the fault output is driven low after a delay of typically 190 ns. To manage IGBT and SiC-MOSFET behavior, the ASSD can turn off the IGBT or SiC-MOSFET typically in 1.8 μs with a programmable delay time, the SO output SO fault signal has a period of 10 μs. Once the fault has been removed, the SCALE-iDriver IC will need a new 'turn-on' command transition on the input before the driver will enter the on-state again.

A short-circuit of the connected power device is detected using the semiconductor desaturation effect which then triggers the ASSD routine protecting the power switch by controlling the collector current slope, limiting the Vce over voltage excursions which could damage the IGBT or MOSFET. The primary and secondary side under voltage detection also enables safe power on and power off even in the event of slow supply voltage ramp rate. The driver will also correct any short drive pulses, caused by input noise, by internally extending the duration of the output drive signals GH and GL.

To receive your

own copy of

Power Electronics Europe

subscribe today at:

**www.power-mag.com**

CP0059972

# EXHIBIT 28

**GATE DRIVERS**

**power** integrations™

WHITE PAPER

# Communication & Isolation Technology for Integrated Gate Driver ICs

Andrew Smith | Director of Technical Outreach



© 2022 Power Integrations | **POWER.com**

CP0059885

## A New Isolation Technology

Magneto-inductive coupling (FluxLink) is a new approach employed to create a bidirectional data transfer mechanism using the IC lead-frame structure to form the send and receive windings. Isolation is provided by a thick (>0.4 mm, a distance which is comparable to opto IC devices), homogenous layer of mold compound. The concept is shown in Figure 3.



**Figure 3: Isolated data transmission technology in new 9.5 mm housing.**

Using the performance of established isolation technologies such as optocouplers as a guide, we can measure the relative performance of this new isolation technology to determine its suitability as a gate driver technology. The SCALE-iDriver family of gate drivers from Power Integrations is the vehicle we will use for the examination. A stylized representation of the device cross section is shown in Figure 4.



**Figure 4: Cross-sectional representation of the SCALE-iDriver device structure showing relative positions of primary and secondary lead frames and bond wires.**

CP0059888

# EXHIBIT 29

# EXHIBIT 32

# EXHIBIT 33

# EXHIBIT 34

# EXHIBIT 35

# EXHIBIT 36

# EXHIBIT 37

EXHIBIT 38

# EXHIBIT 39

EXHIBIT 40

# EXHIBIT 41

# EXHIBIT 42

# EXHIBIT 43

EXHIBIT 44

EXHIBIT 45

EXHIBIT 46

# EXHIBIT 47

EXHIBIT 48

# EXHIBIT 49

EXHIBIT 50

# EXHIBIT 51

# EXHIBIT 53

# EXHIBIT 54

# EXHIBIT 55

**power integrations**

NEWS RELEASE

# Power Integrations Revolutionizes Switch-Mode Power-Supply Design by Launching the InnoSwitch Family of Switcher ICs

11/11/2014

*Using new FluxLinkTM safety-isolated communication technology, InnoSwitch™ combines primary- and secondary-switcher circuitry to reduce component count, eliminate slow and unreliable optocouplers, outperform primary-side controllers and slash manufacturing costs*

SAN JOSE, Calif.--(BUSINESS WIRE)-- Power Integrations (Nasdaq:**POWI**), the leader in high-voltage integrated circuits for energy-efficient power conversion, today announced a new class of power-supply ICs. The **InnoSwitch™** family of highly integrated switcher ICs combines primary, secondary and feedback circuits into a single, worldwide safety-rated, surface-mount package. With **InnoSwitch** ICs, designers can easily exceed all global regulatory standards for efficiency and no-load consumption, while minimizing component count and providing highly accurate constant voltage and constant current up to 25 W. The **InnoSwitch** family is ideal for smart mobile device chargers and adapters for a wide range of applications such as set-top boxes, networking equipment and computer peripherals.

Inside the new device, highly accurate secondary-side direct voltage and current measurements are communicated across the safety isolation barrier using high-speed digital **FluxLinkTM** technology. This proprietary new feedback technique permits precise control without the need for a bulky optocoupler, while avoiding the performance compromises inherent in primary-side regulation (PSR), such as limited accuracy and efficiency and poor transient response versus no-load consumption. Furthermore, unlike primary-side regulated switchers, **InnoSwitch**-based secondary-side regulated (SSR) designs are inherently less sensitive to the tolerance of external components such as transformers, diodes, resistors and capacitors. This dramatically increases manufacturing yield and reduces total power supply cost. Now, mobile device chargers up to 5 A can have a total component count as low as PSR designs, with accurate CV and CC control (+/- 3% and +/- 5% respectively) and low voltage ripple. With high operating

1

PIC00013292

# EXHIBIT 56



# INN20x3-20x5
# InnoSwitch-CH Family

Off-Line CV/CC Flyback Switcher IC with Integrated 650 V MOSFET,
Synchronous Rectification and Feedback

## Product Highlights

### Highly Integrated, Compact Footprint
- Incorporates flyback controller, 650 V MOSFET, secondary-side sensing and synchronous rectification driver
- Integrated FluxLink™, HIPOT-isolated, feedback link
- Exceptional CV/CC accuracy, independent of transformer design or external components
- Instantaneous transient response ±5% CV with 0%-100%-0% load step

### EcoSmart™— Energy Efficient
- <10 mW no-load at 230 VAC when supplied by transformer bias winding
- Easily meets all global energy efficiency regulations
- Low heat dissipation

### Advanced Protection / Safety Features
- Primary sensed output OVP
- Secondary sensed output overshoot clamp
- Secondary sensed output OCP to zero output voltage
- Hysteretic thermal shutdown

### Full Safety and Regulatory Compliance
- 100% production HIPOT compliance testing equivalent to 6 kV DC/1 sec
- Reinforced insulation
- Isolation voltage >3,500 VAC
- UL1577 and TUV (EN60950) safety approved
- EN61000-4-8 (100 A/m) and EN61000-4-9 (1000 A/m) compliant

### Green Package
- Halogen free and RoHS compliant

### Applications
- Chargers and adapters for smart mobile devices
- High efficiency, low voltage, high current power supplies

## Description

The InnoSwitch™-CH family of ICs dramatically simplifies the development and manufacturing of low-voltage, high current power supplies, particularly those in compact enclosures or with high efficiency requirements.  The InnoSwitch-CH architecture is revolutionary in that the devices incorporate both primary and secondary controllers, with sense elements and a safety-rated feedback mechanism into a single IC.

Close component proximity and innovative use of the integrated communication link permit accurate control of a secondary-side synchronous rectification MOSFET and optimization of primary-side switching to maintain high efficiency across the entire load range. Additionally, the minimal DC bias requirements of the link enables the system to achieve less than 10 mW no-load in challenging applications such as smart-mobile device chargers.



*Figure 1.   Typical Application/Performance.*



*Figure 2.   High Creepage, Safety-Compliant eSOP Package.*

## Output Power Table

| Product[3,4] | 85-265 VAC | |
|---|---|---|
| | Adapter[1] | Peak or Open Frame[2] |
| INN20x3K | 12 W | 15 W |
| INN20x4K | 15 W | 20 W |
| INN20x5K | 20 W | 25 W |

*Table 1.   Output Power Table.*
Notes:
1.  Minimum continuous power in a typical non-ventilated enclosed typical size adapter measured at 40 °C ambient. Max output power is dependent on the design. With condition that package temperature must be < = 125 °C.
2.  Minimum peak power capability.
3.  Package: eSOP-R16B.
4.  x = 0 (No cable compensation), x = 2 (6% cable compensation).

*This Product is Covered by Patents and/or Pending Patent Applications.*

CP0047816

**INN20x3-20x5**



Figure 3.    Primary-Side Controller Block Diagram.

Figure 4.    Secondary-Side Controller Block Diagram.




www.power.com

CP0047817

INN20x3-20x5

## Pin Functional Description

**DRAIN (D) Pin (Pin 1)**
This pin is the power MOSFET drain connection.

**SOURCE (S) Pin (Pin 3-6)**
This pin is the power MOSFET source connection. It is also the ground reference for the PRIMARY BYPASS pin.

**PRIMARY BYPASS (BPP) Pin (Pin 7)**
It is the connection point for an external bypass capacitor for the primary IC supply.

**FORWARD (FWD) Pin (Pin 10)**
The connection point to the switching node of the transformer output winding for sensing and other functions.

**OUTPUT VOLTAGE (VOUT) Pin (Pin 11)**
This pin is connected directly to the output voltage of the power supply to provide bias to the secondary IC.

**SYNCHRONOUS RECTIFIER DRIVE (SR) Pin (Pin 12)**
Connection to external SR FET gate terminal.

**SECONDARY BYPASS (BPS) Pin (Pin 13)**
It is the connection point for an external bypass capacitor for the secondary IC supply.

**FEEDBACK (FB) Pin (Pin 14)**
This pin connects to an external resistor divider to set the power supply CV voltage regulation threshold.

**SECONDARY GROUND (GND) (Pin 15)**
Ground connection for the secondary IC.

**ISENSE (IS) Pin (Pin 16)**
Connection to the power supply output terminals. Internal current sense is connected between this pin and the SECONDARY GROUND pin.



*Figure 5.    Pin Configuration.*

## InnoSwitch-CH Functional Description

The InnoSwitch-CH combines a high-voltage power MOSFET switch and both primary-side and secondary-side controllers in one device. The feedback scheme using a proprietary FluxLink coupling scheme using the package lead frame and bond wires to provide a reliable and low-cost means to provide accurate direct sensing of the output voltage and output current on the secondary to communicate

information to the primary IC. Unlike conventional PWM (pulse width modulated) controllers, it uses a simple ON/OFF control to regulate the output voltage and current. The primary controller consists of an oscillator, a receiver circuit magnetically coupled to the secondary controller, current limit state machine, 5.95 V regulator on the PRIMARY BYPASS pin, overvoltage circuit, current limit selection circuitry, over temperature protection, leading edge blanking and a 650 V power MOSFET. The InnoSwitch-CH secondary controller consists of a transmitter circuit that is magnetically coupled to the primary receiver, constant voltage (CV) and constant current (CC) control circuitry, a 4.45 V regulator on the SECONDARY BYPASS pin, synchronous rectifier MOSFET driver, frequency jitter oscillator and a host of integrated protection features. Figures 3 and 4 show the functional block diagrams of the primary and secondary controllers with the most important features.

### PRIMARY BYPASS Pin Regulator

The PRIMARY BYPASS pin has an internal regulator that charges the PRIMARY BYPASS pin capacitor to $V_{BPP}$ by drawing current from the voltage on the DRAIN pin whenever the power MOSFET is off. The PRIMARY BYPASS pin is the internal supply voltage node. When the power MOSFET is on, the device operates from the energy stored in the PRIMARY BYPASS pin capacitor. Extremely low power consumption of the internal circuitry allows the InnoSwitch-CH to operate continuously from current it takes from the DRAIN pin.

In addition, there is a shunt regulator clamping the PRIMARY BYPASS pin voltage to $V_{SHUNT}$ when current is provided to the PRIMARY BYPASS pin through an external resistor. This facilitates powering the InnoSwitch-CH externally through a bias winding to decrease the no-load consumption to less than 10 mW (5 V output design).

### PRIMARY BYPASS Pin Capacitor Selection

The PRIMARY BYPASS pin can use a ceramic capacitor as small as 0.1 $\mu$F for decoupling the internal power supply of the device. A larger capacitor size can be used to adjust the current limit. A 1 $\mu$F capacitor on the PRIMARY BYPASS pin will select a higher current limit equal to the standard current of the next larger device. A 10 $\mu$F capacitor on the PRIMARY BYPASS pin selects a lower current limit equal to the standard current limit of the next smaller device

### PRIMARY BYPASS Pin Undervoltage

The PRIMARY BYPASS pin undervoltage circuitry disables the power MOSFET when the PRIMARY BYPASS pin voltage drops below $V_{BPP}$-$V_{BPP(H)}$ in steady-state operation. Once the PRIMARY BYPASS pin voltage falls below this threshold, it must rise back above $V_{BPP}$ to enable switching the power MOSFET.

### PRIMARY BYPASS Pin Output Overvoltage Latching Function

The PRIMARY BYPASS pin has an OV protection latching feature. A Zener diode in parallel in series with the PRIMARY BYPASS pin capacitor is typically used to detect an overvoltage on the primary bias winding to activate this protection mechanism. In the event the current into the PRIMARY BYPASS pin exceeds the ($I_{SD}$) the device will disable the power MOSFET switching. The latching condition is reset by bringing the primary bypass below the reset threshold voltage ($V_{BPP(RESET)}$).

### Over-Temperature Protection

The thermal shutdown circuitry senses the primary die temperature. This threshold is set to 142 °C with 75 °C hysteresis. When the die temperature rises above this threshold the power MOSFET is disabled and remains disabled until the die temperature falls by 75 °C, at which point it is re-enabled. A large hysteresis of 75 °C is provided to prevent over-heating of the PC board due to continuous fault condition.

### Current Limit Operation

The current limit circuit senses the current in the power MOSFET. When this current exceeds the internal threshold ($I_{LIMIT}$), the power


www.power.com

CP0047818

**INN20x3-20x5**

## Applications Example



*Figure 14.  5 V, 2 A Universal Input Charger.*

The circuit shown in Figure 14 is a low cost, very high efficiency charger designed to provide 5 V, 2 A CV/CC charging, using an INN2023K integrated power supply controller.

This single 5 V output charger design features DoE Level 6 and EC CoC 5 compliance at 85 VAC, the converter being able to operate at the minimum DC voltage, just before the next AC cycle refreshes the input. The DC voltage is applied to the primary winding of T1. The other end of the primary winding is driven by the MOSFET inside the InnoSwitch-CH IC.

A low-cost RCD clamp formed by diode D1, resistors R1 and R14, and capacitor C1 limits the peak drain voltage of the InnoSwitch-CH IC at the instant of turn-off of the MOSFET. The clamp helps dissipate the energy stored in the leakage reactance of transformer T1 and

effectively limits the turn-off voltage spike at the DRAIN pin of U1 to a safe value.

The InnoSwitch-CH IC is self-starting, using an internal high-voltage current source to charge the PRIMARY BYPASS pin capacitor (C6) when AC is first applied. During normal operation the primary-side controller is powered from an auxiliary winding on the transformer T1. Output of the auxiliary (or bias) winding is rectified using diode D2 and filtered using capacitor C5. Resistor R4 limits the current being supplied to the PRIMARY BYPASS pin of the InnoSwitch-CH IC (U1) to be close to the IC supply current so as to minimize no-load input power.

Output regulation is achieved using ON/OFF control, the number of enabled switching cycles are adjusted based on the output load. At high-load, most switching cycles are enabled, and at light-load or no-load, most cycled are disabled or skipped. Once a cycle is enabled, the MOSFET will remain on until the primary current ramps to the device current limit for the specific operating state. There are four operating states (current limits) arranged such that the frequency content of the primary current switching pattern remains out of the audible range until at light-load where the transformer flux density and therefore audible noise generation is at a very low level.

The secondary-side of the InnoSwitch-CH IC provides output voltage, output current sensing and drive to a MOSFET providing synchronous rectification.

The secondary of the transformer is rectified by MOSFET Q1 and filtered by capacitor C10. Resistor R7 and C9 limit high-frequency

power integrations
www.powerint.com

CP0047823

**INN20x3-20x5**

BYPASS pin and associated circuit and trace lengths in this circuit should be minimized.

The loop area of the loop comprising of the input rectifier filter capacitor, the primary winding and the InnoSwitch-CH IC primary-side MOSFET should be kept as small as possible.

Figure 15 shows a design example for an InnoSwitch-CH IC based charger design. Considerations provided in this design are marked in the figure and are listed below:

## Recommendations for EMI Reduction

1. Appropriate component placement and small loop areas of the primary and secondary power circuits help minimize radiated and conducted EMI. Care should be taken to achieve a compact loop area for these loops.
2. A small capacitor in parallel to the clamp diode on the primary side can help reduced radiated EMI.
3. A resistor in series with the bias winding helps reduce radiated EMI.
4. Common mode chokes are typically required at the input of the charger to sufficiently attenuate common mode noise. The same can be achieved by using shield windings on the transformer. Shield windings can also be used in conjunction with common mode filter inductors at input to achieve improved conducted and radiated EMI margins.
5. Values of components of the RC snubber connected across the output SR MOSFET can help reduce high frequency radiated and conducted EMI.
6. A π filter comprising of differential inductors and capacitors can be used in the input rectifier circuit to reduce low frequency differential EMI.
7. A 1 µF ceramic capacitor when connected at the output of the power supply helps to reduce radiated EMI.

## Recommendations for Audible Noise Suppression

The state machine used in the InnoSwitch-CH IC automatically adjusts the current limit so as to adjust the operating frequency at light load. This helps to eliminate audible noise that typically results from intermittent switching of the power supply at very light loads.

In case of audible noise from a power supply, following should be considered as guidelines for audible noise reduction:

1. Ensure that the flyback transformers are dip varnished.
2. Often the source of audible noise are ceramic capacitors. Check both the bias winding and primary-side clamp capacitors. To find the source substitute the clamp capacitor with a metalized film type and the bias with an electrolytic type. By far the most common source is the bias capacitor.
3. If the noise is generated by the bias winding filter capacitor, generally, use of a capacitor of higher voltage rating will typically resolve the issue. If the circuit board layout and any physical enclosure size constraints, allow, an electrolytic capacitor should be used instead.
4. Reducing the AC flux density (ΔB) of the transformer will also lead to reduction in audible noise from the core.
5. If the secondary-winding is terminated with flying leads verify if the wires are vibrating against the bobbin or each other.
6. If the circuit board shows any signs of pulse bunching (multiple switching cycles followed by no switching activity), this could be a cause of audible noise. Pulse bunching can be caused by incorrect circuit board layout in which the feedback node is being affected by switching noise. Guidelines provided for FEEDBACK pin decoupling and the phase lead RC network described in this note can be evaluated. Verify the board layout recommendations associated with feedback divider network have been followed.



*Figure 15. PCB Layout Guidelines. Bottom (Left Side), Top (Right Side).*

**power** integrations
www.power.com

CP0047827



eSOP-R16B

Notes:
1. Dimensioning and tolerancing per ASME Y14.5M-1994.
2. Dimensions noted are determined at the outermost extremes of the plastic body exclusive of mold flash, tie bar burrs, gate burrs, and inter-lead flash, but including any mismatch between the top and bottom of the plastic body. Maximum mold protrusion is 0.007 [0.18] per side.
3. Dimensions noted are inclusive of plating thickness.
4. Does not include inter-lead flash or protrusions.
5. Controlling dimensions in inches [mm].
6. Datums A and B to be determined in Datum H.
7. Exposed metal at the plastic package body outline/surface between leads 6 and 7, connected internally to wide lead 3/4/5/6.

mm [INCH]

Reference Solder Pad Dimensions

PI 6995-010645
POD-eSOP-R16B Rev B

**INN20x3-20x5**

## PACKAGE MARKING

### eSOP-R16B



A.  Power Integrations Registered Trademark
B.  Assembly Date Code (last two digits of year followed by 2-digit work week)
C.  Product Identification (Part #/Package Type)
D.  Lot Identification Code

PI-7765-102715

**power** integrations

www.power.com

CP0047837

EXHIBIT 57

# EXHIBIT 60

# EXHIBIT 61

# EXHIBIT 62

# EXHIBIT 63

# EXHIBIT 64

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

PUMA BIOTECHNOLOGY, INC.    )
and WYETH, LLC,    )
    )
     Plaintiffs,    )
    )
   vs.    )    **Case No. 21-cv-1338-MFK**
    )
ASTRAZENECA PHARMACEUTICALS )
LP and ASTRAZENECA AB,    )
    )
    Defendants.    )

## RULINGS ON REMAINING MOTIONS IN LIMINE

MATTHEW F. KENNELLY, District Judge:

In this order, the Court rules on the parties' remaining motions *in limine* that were not addressed in the Court's order dated August 29, 2024 or during the final pretrial conference on May 3, 2024.

During May 3 conference, the Court orally ruled on defendants' remaining motions and briefly memorializes those rulings here. Specifically, the Court denied defendants' motions 4 (seeking to exclude "purported objective indicia of obviousness based on Tagrisso"), 6 (asking to bar "assertions that Tagrisso is a copy of the patents-in-suit"), and 10 (asking to exclude "undisclosed expert opinions related to alleged willfulness"). On defendants' motion 7 (seeking to bar "AstraZeneca's sales or revenue other than sales alleged to infringe"), the Court: (a) barred testimony on direct examination from plaintiff's damages expert Dr. Rao regarding defendants' sales of Tagrisso predating issuance of plaintiff's patent, and (b) barred testimony from Dr. Rao regarding the overall amount of defendants' post-issuance sales revenue, as

distinguished from the revenues from the smaller proportion of sales alleged to be infringing.  *See* May 3, 2024 Tr. at 20-21.

On defendants' motion 2 (asking to bar evidence of "pre-suit communications between AstraZeneca and Puma") one aspect of the motion was left open in the Court's prior rulings:  the admissibility of discussions between those entities in 2020-21, which plaintiff appeared to contend was relevant and admissible to show "commercial acquiescence," a consideration regarding obviousness.  But plaintiff represented during the May 3 pretrial conference that it would not use those communications at trial.  *See id.* at 6.  This aspect of defendants' motion 2 is moot based on this representation.

The remainder of this order will concern plaintiff's motions *in limine*.

**1.     Evidence and argument regarding FDA
         non-approval and clinical trial results**

In its first motion *in limine*, plaintiff seeks to exclude evidence, cited by defendants' experts, that several irreversible EGFR inhibitors that fall within the specifications of the patents-in-suit failed clinically and/or were not approved by the Food and Drug Administration for treatment of gefitinib and/or erlotinib resistant non-small cell lung cancer (NSCLC).  Defendants' experts cite this on the issues of enablement and written description.[1]  Plaintiff contends this evidence is irrelevant and that its admission would lead to undue jury confusion or unfair prejudice.

First, the Court agrees with plaintiff that evidence regarding FDA non-approval of

---

[1] In a footnote in their response, defendants say that evidence of failure to obtain FDA approval and of other clinical trials "is also probative of other issues expected to be presented to the jury, including non-obviousness and damages."  Defs.' Resp. to Pl.'s Mots. In Limine at 2 n.1.  But defendants make no effort to explain this.  The Court concludes they have forfeited these particular points.

other products should be excluded.  Safety and efficacy are required for FDA approval, but they are not required for patentability.  *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023) (citing *In re Brana*, 51 F.3d 1560, 1567 (Fed. Cir. 1995), for the proposition that "'the requirements under the law for obtaining a patent' are different from 'the requirements for obtaining government approval to market a particular drug for human consumption.'").  Given the difference in requirements, admission of evidence of FDA non-approval of products that are purportedly within the specifications of the patents-in-suit is highly likely to lead to jury confusion, and it would require an unwarranted detour into the requirements for FDA approval and the specifics of non-approval in these particular instances.  These factors significantly outweigh the limited probative value of FDA non-approval.

Plaintiff also contends the evidence regarding alleged clinical failures of other products within the specification is irrelevant because it postdates the patents' priority date of February 3, 2005 as well as what plaintiff contends is defendants' asserted priority date of February 2, 2006.  Plaintiff argues that the evidence is irrelevant for that reason alone:  post-priority date evidence, it contends, would not assist a jury in deciding whether a person of ordinary skill in the art *at the time of filing* would have found the claims adequately described or enabled with respect to unit dose and g/e resistance.  *See generally Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010) (en banc).  The correct priority date involves questions of fact to be decided by the jury, but in their response, defendants do not appear to dispute that the evidence at issue on the motion *in limine* post-dates the patents' priority date even if the correct date is what defendants contend it should be.

3

That said, there does not appear to be a rule categorically precluding post-priority-date evidence on the questions of enablement or written description. For example, when the patent makes a claim to a genus, post-priority date evidence may be admissible on the question of written description, "to show that the patent purportedly did not disclose a representative number of species." *Amgen, Inc. v. Sanofi*, 872 F.3d 1367, 1373 (Fed. Cir. 2017). That, however, is not defendants' contention here—at least they don't say in their response that it is their contention.

In addition, however, "[i]f an inventor attempts but fails to enable his invention in a commercial product that purports to be an embodiment of the patented invention, that is strong evidence that the patent specification lacks enablement." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007). This would seem to support defendants' position that post-priority date evidence is not categorically inadmissible, at least on the question of enablement. The problem here, however, is that defendants have made no effort to connect up the evidence they want to introduce to this (or any other) applicable defense. To be more specific, defendants have offered no explanation, nor have they pointed to explanations offered by their experts, for how *this particular* post-priority date evidence tends to show lack of enablement *with respect to the patents-in-suit*. Plaintiff, in its motion *in limine*, cites a number of paragraphs in defendants' expert reports referencing the post-priority date evidence at issue. *See* Pl.'s Mots. In Limine at 1-2 (citing Janne Report ¶¶ 343, 116, 294, 315-16, 320, 324-25; Taft Tr. 75:14-21). The Court has carefully reviewed these excerpts, which plaintiff provided as exhibits to its motion. The excerpts cite various claimed clinical failures and FDA non-approvals (the Court again notes that the latter evidence is independently

inadmissible under Rule 403 for the reasons discussed above), but they contain no explanation for how these failures or non-approvals bear on the questions of lack of enablement or written description. Defendants, who are the proponents of the challenged evidence, make no effort in their response to connect the evidence up: they do not explain, nor do they cite to or provide excerpts from their experts' reports or testimony that explain, the connection between the clinical failure/FDA non-approval evidence and the enablement/written description defenses *as they are claimed to apply in this case*. Rather, defendants simply cite general legal principles without explaining how exactly they apply to this evidence. *See* Defs.' Resp. to Pl.'s Mots. In Limine at 1-2. Defendants have painted with far too broad a brush; their response amounts to a forfeiture of the point. In sum, defendants' total failure to *explain* how the challenged FDA non-approval and clinical failure evidence is relevant and probative leads to the conclusion that the evidence should be excluded as irrelevant and under Rule 403.

The Court also notes that there is, at a minimum, a good deal of tension between defendants' apparent position on this evidence and a claim construction ruling made by the Court. Evidence regarding the clinical efficacy of other compounds disclosed in the specification or otherwise within the scope of the claims might have some probative value if the patent itself required clinical efficacy, but the Court ruled during claim construction that it doesn't. *See* Claim Construction Decision at 19-20; *see generally CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003) ("Title 35 does not require that a patent disclosure enable one of ordinary skill in the art to make and use a perfected, commercially viable embodiment absent a claim limitation to that effect. Title 35 requires only that the inventor enable one of skill in the art to make and use the

full scope of the claimed invention."). If clinical efficacy isn't required by the claims, then it doesn't bear on the enablement or written description defenses. *See McRO, Inc. v. Bandai Namco Games Am., Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020) (35 U.S.C. § 112 requires enablement of only the claimed invention, not matter outside the claims). Admission of the evidence cited by defendants' experts would present a significant risk of confusing the jury regarding the proper construction of the patent claims, and this would far outweigh the evidence's limited probative value.

For these reasons, the Court grants plaintiff's first motion *in limine.*[2]

## 2. Evidence and argument suggesting that direct infringers must have knowledge of the patents-in-suit, must know a particular patient is g/e resistant, or must specifically intend to treat diagnosed T790M resistance

The Court turns next to plaintiff's second motion *in limine*. The primary focus of this motion is plaintiff's request to exclude evidence that, to infringe, a direct infringer must know a particular patient is g/e resistant or must specifically intend to treat diagnosed T790M resistance, a particular form of g/e resistance.

Defendants' response to this motion elides the distinction between intending to treat g/e resistant NSCLC and knowing that the patient being treated has g/e resistant NSCLC. The former is required by the patent; the latter isn't. The Court expressly overruled defendants' proposed claim construction on this exact point:

> AstraZeneca is correct that "the preambles should be construed consistent with the plain meaning," Joint Claim Constr. Br. at 22, but its proposed construction would require (1) the method to involve administering an "effective amount" of the drug "for the purpose of providing a

---

[2] This includes the "Carmi 2010" reference cited by defendants' expert Dr. Reider, *see* Pl.'s Mots. In Limine, Ex. 4 (Reider rebuttal report) ¶¶ 107-08, but the ruling does not require the wholesale exclusion of Dr. Reider's opinion referenced in those paragraphs, as it relies in significant part on other evidence besides the post-priority date Carmi 2010 reference.

therapeutically beneficial effect," and (2) the patient to be diagnosed with g/e-resistant NSCLC.  Federal Circuit precedent . . . precludes the Court from adopting either of these limitations.

Claim Construction Decision at 7.  *See also id.* at 9 ("The Court . . . declines to read the claims as only encompassing treatment of patients already diagnosed with g/e-resistant NSCLC.").

The Court agrees with plaintiff that "whether a patient has been diagnosed with T790M—and thus whether or not doctors have knowledge of a specific pre-treatment diagnosis—is not a required element to practice the asserted claims."  Pl.'s Mots. In Limine at 6.  No prior knowledge of whether a patient is g/e resistant is required to practice the asserted claims.  One administering the treatment can intend to target g/e resistant NSCLC without knowing that's the patient's condition.  Thus there doesn't have to be a pre-existing diagnosis, test, or other indication of g/e resistance for infringement to take place.

On one other point asserted in plaintiff's motion, defendants agree that "a doctor's knowledge of the patents is not relevant to infringement."  Defs.' Resp. to Pl.'s Mots. In Limine at 7.

The Court thus excludes, as requested in plaintiff's second motion *in* limine, evidence and argument "that direct infringers must have knowledge of the patents-in-suit, must know a particular patient is g/e resistant, or must specifically intend to treat diagnosed T790M resistance."  Pl.'s Mots. In Limine at 1 (title of section 1); *see also id.* at 9 (penultimate sentence of concluding paragraph of section 1).

**3.      Evidence and argument regarding
        defendant's patents and patent applications**

In its third motion *in limine*, plaintiff seeks to exclude evidence and argument

7

regarding defendant's patents and patent applications. Defendants say they are relevant regarding the issues of willful infringement, damages, and invalidity. The Court addresses each point in turn.

On the question of willfulness, defendants rely primarily on *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853 (Fed. Cir. 1985), in which the court stated:

> Even though its activities later constituted infringement, by relying on the issuance of its patent, which even cited the '153 patent as prior art, Otari's management might reasonably have believed that its actions were protected as within its own patentably distinct claims, while falling outside the '153 patent claims. For the district court to make such an inference does not constitute clear error.

*Id.* at 867. Plaintiff, by contrast, relies on a later Federal Circuit decision, *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294 (Fed. Cir. 2001), in which the court seemingly came out the opposite way on the same or a very similar point:

> Medtronic's first assertion is that the district court abused its discretion by refusing to allow Medtronic to show that certain features of the Falcon catheter are covered by Medtronic's '556 patent. This assertion is wholly without merit. The fact that Medtronic's '556 patent might read on the Falcon catheter is totally irrelevant to the question of whether Medtronic willfully infringed another patent.

*Id.* at 1309.

The difference between these two cases (aside from the slight difference in standards of review) is that in *King Instrument*, the relevance of the defendant's patent on the question of willful infringement seems to have turned on the fact that the patent was issued over the plaintiff's patent, which had been cited as prior art, whereas in *Advanced Cardiovascular*, this was not the case. Nothing in defendants' response to plaintiff's motions *in limine* suggests that their patent(s) were issued over a citation of plaintiff's patent as prior art. Nor is this a situation in which defendants contend they

"designed around" plaintiff's patent, which if so might make their own patent(s) relevant on willfulness. *See, e.g., Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, No. 16 C 2212, 2022 WL 17082541, at *3 (N.D. Ill. Nov. 18, 2022). During discovery, defendants disavowed any contention of a design-around.

The Court concludes that the existence of defendants' patents and patent applications is not relevant on the issue of willful infringement and that if relevant, the probative value of this evidence on willfulness would be significantly outweighed by the risk of the jury being confused into believing that the defendants' patent(s) gave them the right to practice the technology the patents covered. *See, e.g., Sonos, Inc. v. D&M Holdings, Inc.*, No. 14-1330, 2018 WL 5633204, at *1 (D. Del. Nov. 21, 2017) (Bryson, J., sitting by designation). (That said, if plaintiff intends—as its response to a defense motion *in limine* suggests—to offer argument or evidence that defendants "copied" plaintiff's patents, then the existence of defendants' patents will be admissible to rebut this.)

Defendants also contend their patents are admissible on damages, to show the portion of their profits attributable to the plaintiff's patented invention, as opposed to non-patented elements or improvements added by defendants. But the pertinent opinion of defendants' expert(s) turns on their view that the patents-in-suit do not cover defendants' Tagrisso product—including that Tagrisso has features not covered by plaintiff's patents—and thus does not depend on whether defendants have their own patent covering the compound. The probative value of defendants' patent(s) on this point is minimal at best, and it is significantly outweighed by the risk that jurors would inappropriately believe that no damages are owed because defendants have their own

patents.

Finally, defendants contend that their patents are admissible to "refute [plaintiff's] attempts to rely on Tagrisso's success as objective indicia of non-obviousness."  Defs.' Resp. to Pl.'s Mots. In Limine at 10.  The Court reaches the same conclusion here as on the damages point.  As defendants primarily describe the contention—"Dr. Reider relies on the AZ Patents to highlight unclaimed features of Tagrisso that rebut [plaintiff's] assertion of a nexus between the patents-in-suit and Tagrisso," Defs.' Resp. to Pl.'s Mots. In Limine at 11—the testimony is not dependent on defendants having their own patents; rather, it turns on differences between Tagrisso and the patents.  Again, the probative value of the defendants' patents here is minimal and far outweighed by the potential for jury confusion and unfair prejudice to plaintiff.

The Court grants plaintiff's third motion *in limine*.

**4.    Evidence and argument that defendant's decisionmakers
relied on advice of counsel (regarding invalidity) in
<u>choosing not to license the patents-in-suit</u>**

Plaintiff's fourth motion, despite its somewhat more expansive title, targets whether defendants may elicit testimony from Dr. Scott Alban regarding reliance on an opinion from an attorney named Armitage that the patents-in-suit were invalid in deciding not to obtain a license from Wyeth/Puma and proceeding ahead with making and selling defendants' product Tagrisso.  Plaintiff's contention, simplified somewhat, is that Dr. Alban was not a decisionmaker but rather only communicated his views to the actual decisionmaker(s) and that defendants convinced the Court to preclude them from taking the latter person(s)' depositions.

The Court orally denied plaintiff's motion after conducting an evidentiary hearing

on May 3, 2024. The Court emphasized, however, that Dr. Alban may not communicate during his testimony (and defendants may not otherwise introduce into evidence) the views of others at AstraZeneca (including, for example, the general counsel and the deputy general counsel for oncology) or their response to his determination to rely on the Armitage opinion.

5. **Evidence and argument regarding defendant's in-house counsel communications concerning infringement**

This motion addresses a different topic from the previous motion. Specifically, it concerns communications among in-house counsel regarding their views on whether Tagrisso infringes the patents-in-suit. The Court orally granted the motion during the final pretrial conference. *See* May 3, 2024 Tr. at 88.

6. **Evidence relating exclusively to indefiniteness or inequitable conduct**

This motion, which seeks to exclude from the jury trial testimony relating to certain defenses that will be tried to the Court rather than the jury, is moot. Defendants have represented that they do not intend to call during the jury trial the witnesses in question. *See* May 3, 2024 Tr. at 90.

7. **Duplicative expert testimony**

Defendants intend to call two expert witnesses, Dr. Janne and Dr. Reider, to testify regarding their anticipation and obviousness defenses. Both will rely on the same prior art. In addition, those same two expert witnesses and a third, Dr. Taft, will testify regarding the defenses of inadequate written description and lack of enablement. Plaintiff argues that this is unreasonably and unfairly duplicative. During the final pretrial conference, the Court denied the motion without prejudice to a Rule 403 objection at trial. The Court also made clear the parameters of what it likely would and

likely would not permit.  *See* May 3, 2024 Tr. at 95-96.

## Conclusion

The Court has now ruled on all of both sides' motions *in limine* (dkt. nos. 388, 389).  The parties are expected and directed to instruct their witnesses regarding the Court's *in limine* rulings impacting their testimony to avoid running afoul of the rulings during the upcoming trial.

Date:  May 6, 2024

_____
MATTHEW F. KENNELLY
United States District Judge

# EXHIBIT 66

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COGNIPOWER LLC,

        Plaintiff-Counterclaim Defendant,

v.

FANTASIA TRADING, LLC D/B/A
ANKERDIRECT and ANKER
INNOVATIONS LIMITED;

        Defendants,

POWER INTEGRATIONS, INC.

        Intervenor-Counterclaim Plaintiff.

C.A. No. 19-cv-2293-JLH-SRF

**FANTASIA TRADING, LLC D/B/A ANKERDIRECT, ANKER INNOVATIONS
LIMITED, AND POWER INTEGRATIONS' RESPONSES AND OBJECTIONS TO
COGNIPOWER'S THIRD SET OF INTERROGATORIES (NOS. 21-25)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Fantasia

Trading, LLC D/B/A AnkerDirect and Anker Innovations Limited (collectively "Anker") and

Intervenor-Counterclaim Plaintiff Power Integrations, Inc. ("PI") respond and provide objections

to Plaintiff-Counterclaim Defendant CogniPower LLC's ("Cogni") Third Set of Interrogatories

(Nos. 21-25). The responses and objections are made according to the Federal Rules of Civil

Procedure and the Local Rules of the United States District Court for the District of Delaware

and are based upon information presently available to Anker and PI. These responses and

objections are without prejudice to Anker and PI's right to use or rely on subsequently

discovered information.

K.      Anker and PI object to the definitions of "Anker" and "Power Integrations" to the extent they are overbroad, unduly burdensome, to the extent that they purport to require information or documents not in Fantasia, Anker, or PI's possession, custody, or control.

L.      Anker and PI may repeat a General Objection for emphasis or some other reason. The failure to repeat any General Objection does not waive any General Objection to the interrogatory. Moreover, Anker and PI do not waive their right to amend their objections.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 21:

Describe fully and in complete detail all customers and products implementing a Power Integrations InnoSwitch chip that you contend are subject to the counterclaims this action, including but not limited to a listing of each product by customer, name, model, and configurations, and all financial data related to the sales or supply to these customers.

### RESPONSE TO INTERROGATORY NO. 21:

Anker and PI object to this interrogatory because it is overly broad and unduly burdensome, in particular to the extent it seeks information without any restriction as to date. Anker and PI further object because this interrogatory seeks information that is not relevant to any claim or defense in this action, and because CogniPower's request to "describe fully and in complete detail" all of the requested information is not proportional to the needs of the case, particularly given CogniPower's lack of any counterclaim for infringement against PI. Anker and PI further object to this interrogatory as vague, ambiguous, overly broad, and unduly burdensome in its use of the phrase "subject to the counterclaims in this action." Anker and PI object to this interrogatory to the extent it calls for a legal conclusion. Anker and PI also object to this interrogatory because it contains multiple subparts that should be separately set forth and

4

numbered. Anker and PI further object to this interrogatory because it is directed to what Anker

and PI "contend."

Nevertheless, subject to and without waiving the foregoing General and Specific

Objections, which are incorporated by reference as if fully set forth herein, PI responds as

follows:

Understanding this interrogatory to refer to PI's counterclaim for declaratory judgment of

noninfringement, PI responds that any product that incorporates an InnoSwitch chip falls within

the scope of PI's counterclaim, and further does not infringe the Asserted Patents. CogniPower

has not responded to PI's suit for declaratory judgment contending otherwise.

To the extent this interrogatory refers to PI's counterclaim for declaratory judgment of

invalidity, PI responds that PI's OmniSwitch project conceived of no later than June 10, 2011

falls within the scope of PI's counterclaim for declaratory judgment of invalidity.

Subject to and without waiving any of its Specific or General Objections, Anker responds

as follows: Anker did not design and does not sell any InnoSwitch chips and understands this

interrogatory to be directed to PI.

**INTERROGATORY NO. 22:**

Describe fully and in complete detail the signals fed into and/or out from the feedback

driver, including the waveforms of these signals and identify and describe in detail any testing,

simulations, evaluations, and measurements that show these signals, for the InnoSwitch Families,

and separately for each InnoSwitch Family to the extent that you contend those signals are

different by InnoSwitch Family.

**RESPONSE TO INTERROGATORY NO. 22:**

Anker and PI object to this interrogatory as overbroad to the extent it seeks irrelevant

subject matter and is not reasonably calculated to lead to the discovery of admissible evidence